# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN HARRIS          :
        Plaintiff     :     CIVIL ACTION
                   :     No. 2:13-cv-03937-LFR
        v.         :
                   :
SAINT JOSEPH'S UNIVERSITY, et. al.  :
        Defendants    :

# O R D E R

AND NOW, this       day of      , 2013, upon consideration of Defendant

Jane Doe's Motion to Dismiss Plaintiff's Complaint Under Fed.R.Civ.P. 12(b)(6), and any

response thereto, it is hereby **ORDERED** and **DECREED** that said Motion is **GRANTED**.

Plaintiff's Complaint and all claims against Jane Doe hereby are dismissed, with prejudice, for

failure to state a claim upon which relief can be granted against Jane Doe.


                                  BY THE COURT:


                                  _____
                                                , J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN HARRIS               :

          Plaintiff       :      CIVIL ACTION

                          :      No. 2:13-cv-03937-LFR

       v.                :

                          :

SAINT JOSEPH'S UNIVERSITY, et. al.  :

          Defendants    :

## MOTION OF DEFENDANT JANE DOE TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED.R.CIV.P. 12(B)(6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Pursuant to Federal Rule of Civil Procedure 12(B)(6), defendant Jane Doe, by and through her counsel, Rawle & Henderson LLP, respectfully moves this Honorable Court to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted.

The arguments and authorities advanced in support of the motion are set forth in the accompanying memorandum of law.

Respectfully submitted,

RAWLE & HENDERSON LLP

Dated: <u>August 15, 2013</u>      By: _____

                               Daniel J. Rucket, Esquire
                               I.D. No. 70009
                               The Widener Building
                               One South Penn Square
                               Philadelphia, PA 19107
                               (215) 575-4200
                               *Attorneys for Defendant Jane Doe*

6668058-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRIAN HARRIS | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | No. 2:13-cv-03937-LFR |
| v. | : | |
| | : | |
| SAINT JOSEPH'S UNIVERSITY, et. al. | : | |
| Defendants | : | |

## DEFENDANT JANE DOE'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED.R.CIV.P. 12(B)(6)

### Statement of the Facts

Plaintiff Brian Harris ("Harris") has filed this lawsuit after Saint Joseph's University ("SJU") suspended him for one year after **twice** being found by SJU to have **sexually assaulted defendant Jane Doe** on November 17, 2012. Despite **twice** being found to have committed this heinous act, Harris now attempts to further traumatize and further victimize Jane Doe by filing a lawsuit attempting to improperly relitigate SJU's findings.

### A.     The sexual assault by Harris on Jane Doe

In the fall of 2012, Harris and Jane Doe were both freshmen at SJU. Harris and Jane Doe had become friends, but did not have any type of sexual relationship. On the evening of Friday, November 16, 2012, Harris began an exchange of text messages with Jane Doe. Harris was in his dorm room. Jane Doe was out with her friends at various spots on and off campus, during which she drank alcoholic beverages. Throughout the course of the text messages, Harris and Jane Doe began planning to try to see each other later in the evening. At one point in the text message exchange, Jane Doe and Harris discuss "cuddling". *A copy of the Complaint is*

*appended hereto as Exhibit "A", ¶ 20.*[1]  Harris claims that "cuddling" is synonymous with "sex" or "having sex", **a claim that Jane Doe denies**.  *See Exhibit "A", ¶ 21-23.*  Harris then informed Jane Doe that he was asked to leave his dormitory room by his roommate, stating that he had been "sexiled".  *See Exhibit "A", ¶ 25 and Exhibit A to the Complaint.*  Early in the morning of November 17, 2012, Jane Doe asked Harris come to her dormitory room.  She later offered him the opportunity to sleep over, as he was not permitted back into his own dormitory room that night.  *See Exhibit "A", ¶ 26-27 and Exhibit A to the Complaint.*  At no time did Jane Doe invite Harris over to have sexual intercourse, ask him to have sexual intercourse, or agree to have sexual intercourse with him.  The term "sex" is not found anywhere in the text messages.

When Harris arrived at Jane Doe's dorm room, it was or should have been obvious to him that Jane Doe was intoxicated.  While in Jane Doe's dorm room, Harris claims that they voluntarily began engaging in foreplay and then sexual intercourse.  *See Exhibit "A", ¶ 30-32.*  On the contrary, Harris took advantage of Jane Doe's condition and began trying to engage in sexual activity, at which point Jane Doe tried to stop his advances.  Harris became more aggressive and Jane Doe continued to try to stop his advances.  Harris then proceeded to engage in sexual intercourse without Jane Doe's consent.

At her earliest opportunity, Jane Doe left the room and went to the hall bathroom, crying because of the traumatic sexual assault she just experienced.  *See Exhibit "A", ¶ 34.*  O.T. [2], another student who lived on the dormitory floor with Jane Doe, was also in the bathroom.  While in the bathroom immediately following the sexual assault by Harris, Jane Doe told O.T. that Harris had forcibly engaged in sexual intercourse with her without her consent.  *See Exhibit "A", ¶ 41.*  Jane Doe identified Harris by his nickname.  O.T. suggested that Jane Doe report the

---

[1] The Complaint and text message attachment to the Complaint as Exhibit "A" have been redacted to remove Jane Doe's actual name and identifying witnesses by their initials, as the parties have stipulated to identifying her only as Jane Doe and to confidentiality of the names of other SJU students and witnesses.

[2] The parties have stipulated to identifying other students at SJU by their initials.

sexual assault. Afraid of what Harris would do at that time of the morning, Jane Doe decided not to report the incident at that time. Instead, she returned to her dorm room.[3]

The next morning, Jane Doe's roommate returned to their dorm room and Jane Doe told her about the sexual assault. Jane Doe decided to report the sexual assault to her dormitory Resident Assistant after she returned from breakfast. At breakfast, Harris was sitting at a table with his friends, who looked and laughed at Jane Doe when they saw her. Jane Doe returned to her dormitory and reported the sexual assault to her Resident Assistant, A.I. Later the same day, A.I. informed Harris that he was being investigated for non-consensual sexual relations with Jane Doe. *Exhibit "A", ¶ 37.*

### B.    SJU's policies and regulations

SJU's Student Handbook sets out the University's policies and regulations. *A true and correct copy of pertinent portions of the SJU Handbook is appended hereto as Exhibit "B".* According to the SJU Handbook, any student alleged to have committed or alleged to have attempted to commit a sexual offense, as set forth in the SJU Sexual Violence Policy, is subject to the Community Standards process outlined in the Handbook. *See Exhibit "B", p.27-28.* The Sexual Violence Policy in the SJU Handbook provides that a forcible sexual offense is "any sexual act directed against that person's will or not forcibly against the person's will where the victim is incapable of giving consent. Non-forcible sexual offenses are acts of unlawful, non-forcible sexual intercourse". *See Exhibit "B", p.104.* Sexual assault is defined as "[s]exual intercourse or deviate sexual intercourse without the victim's consent to it". *See Exhibit "B", p. 104.* The SJU Handbook instructs that "there are situations when a person may be considered incapable of giving consent such as, if he/she is…. [c]learly mentally or physically incapacitated,

---

[3] Harris admits that he became aware of Jane Doe's conversation with O.T. during the course of the later investigation into his sexual assault of Jane Doe. *See Exhibit "A", ¶ 40.*

for example, by alcohol and/or other drugs. A verbal 'no' even if it may sound indecisive or insincere, constitutes lack of consent. Further, it is not necessary that an individual resist an attack or otherwise affirmatively express lack of consent." *See Exhibit "B", p. 105.*

The SJU Handbook sets forth a process for handling student on student Sexual Offense violations, which is to follow the Community Standards Process, based on guidance from the United States Department of Education, Office for Civil Rights ("OCR").[4] *See Exhibit "B", p.103; Exhibit "C".* The Community Standards process is initiated by the filing of "an incident report by a Public Safety or Residence Life staff member or a written complaint prepared by any other member of the university community and directed to the Office of Community Standards". *See Exhibit "B", p. 30-31.* The incident report/complaint is then assigned to an administrator within the Division of Student Life. *See Exhibit "B", p. 32.* For serious violations including sexual offenses, the matter "shall be heard by an Administrative Hearing Officer or the Community Standards Board." *See Exhibit "B", p.32.* The Community Standards Board ("CSB") is a group of seventeen, consisting of seven students, five faculty, and five administrators/staff "who are trained to hear cases that involve more serious violations of the Community Standards." *See Exhibit "B", p. 33.* Five representatives of the CSB are selected to serve on the hearing panel to hear the case. *See Exhibit "B", p. 34.*

The respondent is notified of the alleged violation, by University email. *See Exhibit "B", p. 34.* In "the case of a CSB hearing, a pre-hearing meeting will be scheduled." *See Exhibit "B", p. 34.* Under the Sexual Violence Policy, when there is a report of a sexual offense, the Office of Public Safety and Security is to "conduct a prompt and thorough investigation and prepare a factual report". *See Exhibit "B", p. 107.*

---

[4] On April 4, 2011, the OCR issued a "Dear Colleague" letter outlining a mandate for how schools must handle claims of student on student sexual violence. A copy of the April 4, 2011 Dear Colleague letter is appended hereto as Exhibit "C".

At any time during this process, the respondent or the complainant can consult with an advisor from the community. *See Exhibit "B", p. 35.* The advisor is a member of the University community and may consult with the student throughout the Community Standards Process, which includes accompanying the student at the CSB hearing. *See Exhibit "B", p. 35.* The SJU Handbook specifically provides that non-university advisors, including parents and legal counsel, are not allowed to serve as advisors or attend the hearing." *See Exhibit "B", p. 35.* Trained advisors are available to students. *See Exhibit "B", p. 35.*

The SJU Handbook sets forth the procedures for the CSB hearing. The SJU Handbook advises that the "Community Standards Process is designed to encourage open discussion among the participants that promotes the understanding of the facts, the individuals involved, the circumstances under which the incident occurred, and the nature of the conduct." *See Exhibit "B", p. 35.* Hearings are to be private and, if necessary, separate facilities will be employed to ensure the personal safety and well-being of the complainant, respondent, and/or other witnesses. *See Exhibit "B", p. 35.* The SJU Handbook specifically advises that "[c]ivil or criminal rules of procedure and evidence do not apply." *See Exhibit "B", p. 35 (Emphasis Added).* The Vice President for Student Life /Assistant Provost shall make the final determination on the appropriateness of non-institutional information used at the hearing, including hearsay, that may be considered if it is material to the issue, not unduly repetitive, and the sort of information on which responsible persons are accustomed to rely in the conduct of serious affairs. *See Exhibit "B", p.35-36.*

After receiving information at the hearing, the CSB shall determine whether the respondent is responsible for violating any Community Standards. The CSB "evaluates the information received and considers credibility of information and witnesses when determining if the Community Standards were violated. This determination shall be based upon the facts of the

conduct alleged, and whether it is more likely than not that the student is responsible for the alleged violation(s)." *See Exhibit "B", p.* 36. If the CSB determines that a violation occurred, it shall impose sanctions, which range from a warning to expulsion. *See Exhibit "B", p. 37-38.* The SJU Handbook states that **"[s]ubsequent reviewers shall not determine anew whether there was a Community Standards violation."** *See Exhibit "B", p. 36*

In the case of crimes of violence or sexual harassment[5], the respondent and complainant both have the right to appeal the decision to the Vice President for Student Life /Assistant Provost within three days of notice of the decision. *See Exhibit "B", p. 39.* One of the options on appeal is remanding the case for reconsideration. *See Exhibit "B", p.* 39.

### C. The administrative disciplinary proceedings regarding the sexual assault by Harris on Jane Doe

In his complaint, Harris sets forth a procedure that he alleges occurred in the handling of Jane Doe's complaint that omits key and important steps and events in order to attempt to state a claim that SJU did not follow the above policies and regulations. According to Harris, an investigative report was prepared, including charges that Harris committed a forcible rape.[6] *See Exhibit "A", ¶ 67.* Harris acknowledges that he was first shown this report at the pre-hearing meeting, but that he voluntarily did not review the entire report. *See Exhibit "A", ¶ 67.* Harris subsequently was provided a second report, that included additional investigative findings, including information provided by O.T. and A.I.[7] *See Exhibit "A", ¶ 67.* SJU held the CSB hearing, in which Harris claims that Jane Doe and the witnesses were separately and privately

---

[5] According to the OCR, the term sexual harassment includes sexual violence. *See Exhibit "C".*
[6] Harris does not attach this report to his Complaint.
[7] Harris does not attach the second report to his Complaint.

questioned.[8]  *See Exhibit "A", ¶ 68.*  Harris claims that he was denied the opportunity to confront his accuser at this hearing.  *See Exhibit "A", ¶ 68.*  Harris further claims that the text messages were not included in the hearing.  *See Exhibit "A", ¶ 69.*  Harris does not claim that he was precluded from presenting any evidence at the hearing, including the text messages.  Harris avers that, following the hearing, **he was found guilty of (1) sexual assault** and (2) disrespecting another student and was suspended from SJU.  *See Exhibit "A", ¶ 70.*

Harris appealed the decision of the CSB.  *See Exhibit "A", ¶ 71.*  The matter was remanded to the CSB for further reconsideration.  *See Exhibit "A", ¶ 75.*  A **second hearing** was held before the CSB on January 11, 2013, at which time, according to Harris, the text messages were considered.  According the Harris, after reviewing the text messages and questioning Harris and Jane Doe about them, the CSB **once again found Harris guilty of violating the Community Standards by sexually assaulting Jane Doe**.  *See Exhibit "A", ¶ 77.*

### D.    The Complaint

Despite being found to have sexually assaulted Jane Doe after two separate CSB hearings, Harris filed this lawsuit in an attempt to further victimize and traumatize Jane Doe in an improper effort to try to relitigate the two CSB hearings.  Harris filed this Complaint on July 8, 2013, asserting the following claims against SJU:  (1) Breach of Contract, (2) Violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 et. seq.; (3) Negligence; and (4) Violation of the Unfair Trade Practices and Consumer Protection Law.  Harris also asserts causes of action against SJU, Jane Doe, and defendant Joseph Kalin (who performed the investigation into Harris' sexual assault on Jane Doe), individually, for:  (5) Defamation; (6)

---

[8] These claims are absolutely false.  In reality, Harris and Jane Doe participated in the hearing by telephone, which they both were provided the option of doing, and, at all times, were able to hear all of the testimony, including each other's testimony.  Further, during the hearing, Harris was asked if he had any questions for Jane Doe and he declined to ask any.

False Light; (7) Intentional Infliction of Emotional Distress; and (8) Negligent Infliction of Emotional Distress. Finally, Harris asserts a cause of action against Jane Doe only for (9) Intentional Interference with Contractual Relations. *See Exhibit "A"*.

In his cause of action for defamation, Harris alleges that the defamatory communications included, without limitation, Doe (a) stating to O.T. that a male student intimidated her into having sexual relations with him; (b) reporting Harris' sexual misconduct to SJU; (c) informing A.I. of Harris' sexual misconduct; (d) communicating Harris' sexual misconduct to the Panel; and (e) re-publishing the statements after these Defendants were made aware of the alleged falsity of the allegations against Harris. *See Exhibit "A", ¶ 113.* In his cause of action for False Light Invasion of Privacy, Harris alleges that Jane Doe made public statements about Harris which placed him in a false light. *See Exhibit "A", ¶ 123.* While these "public statements" are not identified in this Count, they are believed to be the statements alleged in paragraph 113 of the Complaint, which plaintiff incorporates into that cause of action. *See Exhibit "A", ¶ 113.*

## **Legal Argument**

### A.   **Standard of Review**

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *See Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007)). In order for a complaint to survive a motion to dismiss, it must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory". *See Twombly,* 550 U.S. 544, at 562, 127 S.Ct. at 1969.

**B.    Harris cannot relitigate the underlying findings against him by SJU and, as a result, has failed to state any claims against Jane Doe.**

Harris is attempting improperly to relitigate the finding of the CSB that Harris sexually assaulted Jane Doe, in Federal Court, which is not allowed, and he therefore is unable to set forth any claims upon which relief may be granted against Jane Doe. The relationship between a student and privately funded college, such as SJU, is contractual in nature. *Tran v. State Sys. of Higher Educ.*, 986 A.2d 179 (Pa. Commw. 2009); *Reardon v. Allegheny Coll.*, 926 A.2d 477, 481 (Pa. Super. 2007); *Psi Upsilon of Philadelphia v. Univ. of Pennsylvania*, 591 A.2d 755, 758 (Pa. Super. 1991); *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 573 A.2d 575 (Pa. Super. 1990). "Therefore, students who are being disciplined are entitled only to those procedural safeguards which the school specifically provides." *Boehm*, 573 A.2d 579 (citing *Corso v. Creighton Univ.*, 731 F.2d 529 (8th Cir. 1984)); *Williams v. Howard Univ.*, 528 F.2d 658 (D.C. Cir. 1976). A claim by a student that a private college has violated its procedures is a breach of contract case between private parties, which are adjudicated like all other breach of contract claims. *Murphy v. Duquesne University of the Holy Ghost*, 777 A.2d 418, 428 (Pa. 2001). Fourteenth Amendment due process and fundamental fairness issues do <u>not</u> apply. *Id.*; *Smith v. Gettysburg Coll.*, 22 Pa. D. & C. 3d 607, 1982 Pa. Dist. & Cnty. Dec. LEXIS 469, (1982). Moreover, there is a presumption of fairness in administrative proceedings which favors administrators and "alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Gorman v. Univ. of Rhode Island*, 837 F. 2d. at 15 (1st Cir. 1988) (citing *Duke v. North Texas State Univ.,* 469 F. 2d 829, 834 (5th Cir. 1972).

The interpretation of the contractual provisions is a question of law for the Court to decide. *See e.g. Calabrese v. Zeager,* 976 A.2d 1151, 1154 (Pa.Super. 2009), *Kraisinger v. Kraisinger,* 928 A.2d 333, 339 (Pa.Super. 2007); *Profit Wize Mktg. v. Wiest,* 812 A.2d 1270 (Pa. Super. 2002). When contracts with clear and unambiguous language are interpreted, only the

writing itself is examined to give effect to the parties' intent. *Osial v. Cook,* 803 A.2d 209, 213 (Pa. Super. 2002). Courts do not modify the plain meaning of the contract words "under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used." *Profit Wize,* 812 A.2d at 1274-75 (citing *Meeting House Lane, Ltd. v. Melso,* 628 A.2d 854, 857 (Pa. Super. 1993). As a matter of law, Courts should give meaning to the words contained in the contract. *Greater Nanticoke Area Sch. Dist. v. Greater Nanticoke Area Educ. Ass'n,* 760 A.2d 1214 (Pa. Commw. 2000); *Profit Wize*, 812 A.2d 1270 (Pa. Super. 2002). The ultimate goal of interpreting a contract is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. *Liddle v. Scholze*, 768 A.2d 1183, 1185 (Pa.Super. 2001). Where contract language is clear and unambiguous, the court shall interpret the agreement as expressed, rather than silently intended. *Steuart v. McChesney*, 498 Pa. 45, 49, 444 A.2d 659, 661 (1982).

In *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418 (Pa. 2001), Cornelius F. Murphy, Jr., a law school professor at Duquesne University of the Holy Ghost, had his tenure terminated for serious misconduct. After exhausting all of his remedies within the University, Murphy filed a breach of contract action claiming that he did not receive the process of tenure termination required by his employment contract. The Pennsylvania Supreme Court held that while Murphy "is free to assert in a court of law that the process of forfeiture that was afforded to him did not comply with the Contract's terms, he is **not free to demand that a jury re-consider and re-decide the merits of his termination**." *Id.* at 433 (emphasis added). Because the contract set forth precisely how the standard of determining whether Murphy had forfeited his tenure was to be evaluated and by who (the chief executive of the University), the court found that the contract reflected that forfeiture of tenure was considered to be a matter of the

University's self-governance, which the parties had kept for themselves to determine and not the courts. *Id.* The court stated that

> it would be unreasonable to believe that the parties intended that the process for deciding the matter of tenure forfeiture, which was so carefully elaborated in their Contract to the point of final determination, could be completely circumvented by the filing of a civil action. Rather, the detailed provisions of the Contract for deciding the matter have inherent in them the intent of the parties that that agreed-upon process was to be final.

*Murphy*, 777 A.2d. at 433-434. The Pennsylvania Supreme Court therefore held that Murphy was "**not entitled to litigate the merits of his termination in this breach of contract action.** That is to say, the questions as to whether he engaged in serious misconduct and whether his serious misconduct should have resulted in the forfeiture of tenure have been **conclusively and finally decided**." *Id.* at 434 (emphasis added).

Similarly, in *Reardon v. Allegheny Coll.*, 926 A.2d 477, 481 (Pa. Super. 2007), an Allegheny College student was accused of plagiarism by her professor and, after being found guilty of plagiarism by the College Judicial Board, filed a lawsuit alleging, *inter alia,* breach of contract. After finding that the case was to be guided by contract principles, and not due process concerns because Allegheny College is a private institution, the Superior Court of Pennsylvania found that it was **precluded from relitigating the actual decision of the Judicial Board**. The Court noted that

> "[a] distinction must be made between the allegation that Allegheny breached the terms of [the student handbook] by failing to adhere to its provisions, which is a reviewable claim, and the allegation that the way in which these provisions were implemented, or the outcome arrived at by such implementation, was unfair – **a claim which is *not* reviewable** according to the provisions of [the student handbook]."

*Reardon*, 926 A.2d at 482 (emphasis added, italics in original); *Murphy,* 777 A.2d at 429. The Court noted that "[w]hen a contract so specifies, generally applicable principles of contract law will suffice to insulate the institution's internal, private decisions from judicial review".

*Reardon,* 926 A.2d at 480-481 (citing *Murphy,* 777 A.2d at 429). The Superior Court concluded that the trial court properly dismissed the breach of contract claim because the plaintiff was "unable to contend Allegheny breached any of the terms contained in [the student handbook]. Thus, she is merely asking us to review the 'private, internal decisions' of the College, **something that is forbidden by the terms of both [the student handbook] and case law.**" *Id.*; *Murphy,* 777 A.2d at 429 (emphasis added).

In the case at bar, Harris alleges that he entered into a contract with SJU, which included the SJU Handbook, and that SJU was required to comply with the procedures set forth in the SJU Handbook. Harris does not claim that his contract with SJU is ambiguous. In addition to providing a detailed process for addressing claims of sexual violence, the SJU Handbook provides that the CSB determines if Community Standards have been violated. *See Exhibit "B",* p. 36. The SJU Handbook then specifically provides that **"[s]ubsequent reviewers shall not determine anew whether there was a Community Standards violation."** *See Exhibit "B",* p. 36. Hence, as in *Murphy,* it is clear that SJU, and Harris as the other party to this contract, agreed that the CSB was to make the final determination as to whether a violation of Community Standards was committed and that no further determination of the underlying, substantive issue was intended, either internally or externally.

While Harris may be able to challenge, under *Murphy* and *Reardon,* whether SJU complied with the contract in the way in which it adjudicated the sexual assault claim, **he cannot relitigate the actual finding by the CSB that Harris sexually assaulted Jane Doe**. **Harris' guilt for the sexual assault has therefore been <u>conclusively and finally</u> decided by SJU at the CSB hearing**. **The jury in this case cannot reconsider or alter that decision.**

As the decision that Harris sexually assaulted Jane Doe is conclusive and final and cannot be relitigated, Jane Doe cannot be found by this court to have made any statements regarding the

sexual assault that are false, defamatory, or place Harris in a false light. Likewise, as the decision that Harris sexually assaulted Jane Doe is conclusive and final, Jane Doe cannot be found to have intentionally or negligently inflicted any emotional distress on Harris or intentionally have interfered with the contract between SJU and Harris by simply reporting the sexual assault, as confirmed by the CSB, and then participating in the University proceeding. Moreover, the SJU Handbook specifically provides, and any civilized society encourages, that sexual assaults be reported. As a result, Harris has failed to state any claim against Jane Doe and all of his causes of action against her must be dismissed.[9]

### C. SJU provided Harris with the procedures and regulations set forth in the SJU Handbook, precluding all claims against Jane Doe based on alleged deficiencies in SJU's procedures.

Should the court determine that an analysis of whether SJU complied with its contract in its handling of Jane Doe's complaint is necessary in order to assess the viability of the claims against Jane Doe, it is clear that SJU provided Harris with the requisite procedures as set forth in the SJU Handbook. In cases involving sexual violence, the Handbook requires that the Respondent be notified of the complaint by University email (p. 34), the Respondent be provided a pre-hearing meeting (p. 34), the Respondent be provided a Community Standards Advisor if requested (p. 35), and a hearing before the CSB be held (p. 35-36). *See Exhibit "B",* pp. 34-36. The Handbook provides that non-University advisors, such as parents and legal counsel, are not allowed to serve as advisors or attend the hearing. *See Exhibit "B",* 35. For cases involving sexual offenses, a factual report is prepared after an investigation. *See Exhibit "B",* 107. At the CSB hearing, the Respondent is entitled under the procedures set forth in the SJU Handbook to a hearing in which there is an open discussion among the participants. *See Exhibit "B",* p. 35.

---

[9] Conversely, if the CSB had found that Jane Doe was not sexually assaulted, and Jane Doe had filed this lawsuit against Harris and SJU, Harris certainly would be making this exact same argument, that the findings of the CSB cannot be relitigated.

The Handbook discusses the testimony of witnesses and places no prohibition on the Respondent questioning witnesses or presenting his own witnesses or evidence. *See Exhibit "B", 35.* The Handbook provides that separate facilities may be used for the well-being of the parties or witnesses and that the hearing be private. *See Exhibit "B",* p. 35. The Handbook provides that formal civil and criminal rules of procedure do <u>not</u> apply and that hearsay may be considered. *See Exhibit "B", 35.* The Handbook provides that the decision shall be based on a more likely than not (preponderance of the evidence) standard. *See Exhibit "B", 36.* Finally, either party in a sexual offense case has the right to appeal the decision. *See Exhibit "B", 108.* These are the procedures that Harris "contracted" with SJU for, and are the only procedures that SJU is obligated to provide in order to comply with its contract.

Under Harris' version of events[10], he timely received notice of the complaint. He had a pre-hearing meeting. Harris was aware of key witnesses during the investigation that ultimately were called to testify at the hearing. Harris was provided a preliminary report, although he chose not to read all of it, and then a second report with additional information after SJU completed its investigation. Harris attended and participated in the CSB hearing. He does not claim that he was precluded from presenting any testimony, witnesses, or other evidence.

Harris claims that he did not have an opportunity to confront his accuser. *See Exhibit "A", ¶ 11.* The OCR issued its "Dear Colleague" on April 4, 2011 to address how allegations of sexual harassment, including sexual violence, are to be handled by schools under Title IX. OCR states in its letter that it "strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating

---

[10] While Harris conveniently omits several important facts from his version of the proceedings, such as the fact that he and Jane Doe participated by telephone, heard all of the testimony presented at the hearing, and that he was asked if he had any questions for Jane Doe, but declined to ask any, for purposes of this 12(B)(6) motion, his allegations must be taken as true.

or perpetuating a hostile environment." *See Exhibit "C"*, p. 12. Moreover, the SJU Handbook does not specifically provide the Respondent with the right to personally confront or cross-examine his accuser. As this is strongly discouraged by OCR and not mandated in the SJU Handbook, it is not a violation of the SJU procedures to preclude the Respondent from personally confronting his accuser as claimed by Harris. Consequently, Harris' claim that he was not afforded an opportunity to personally confront his accuser is without merit.

Harris further admits in his Complaint that he was provided notice of the decision, opportunity to appeal, and did appeal. In fact, Harris admits that he was provided a **second hearing by SJU, in which he presented additional evidence, which he claims to be the text messages**. After Harris was provided with this second hearing and he presented additional evidence in his defense, the CSB **once again** determined that Harris sexually assaulted Jane Doe. Even based on Harris' characterization of the actual proceedings in this matter, albeit inaccurate but taken as true for purposes of determining this motion only, it is clear that SJU complied with the procedures set forth in the SJU Handbook and to which Harris contracted. As such, there can be no breach of contract, no negligence in the manner in which the proceedings were handled, and no Title IX violation by SJU for failing to comply with the SJU Handbook procedures. As a result, the decision of the CSB cannot be assailed and, because the CSB found that Harris sexually assaulted Jane Doe, all claims against Jane Doe also fail.

> **D.** **Statements by Jane Doe regarding plaintiff sexually assaulting her are absolutely privileged and cannot form the basis of claims for defamation or false light invasion of privacy.**

Harris attempts to further victimize Jane Doe in this lawsuit by claiming that she is at fault for reporting his sexual assault for her, making claims that include defamation and false light invasion of privacy. If the court reaches the merits of these claims, there is no basis for them as Jane Doe's statements about the sexual assault are absolutely privileged.

15

A claim for defamation involves a communication that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from dealing with him." *Fogel v. Forbes, Inc.*, 500 F. Supp. 1081, 1084-85 (E.D. Pa. 1980), (quoting *Franklin Music Co. v. Am. Broad. Co.*, 616 F.2d 528, 541 (3d Cir. 1979)); Restatement (Second) of Torts § 559 (1977). In an action for defamation, the plaintiff must prove:

    (1) the defamatory character of the communication;
    (2) publication by the defendant;
    (3) its application to the plaintiff;
    (4) understanding by the recipient of its defamatory meaning;
    (5) understanding by the recipient of it as intended to be applied to plaintiff;
    (6) special harm to the plaintiff; and
    (7) abuse of a conditionally privileged occasion.

*Krajewski v. Gusoff*, 53 A.3d 793 (Pa. Super. 2012). Similar to defamation, false light invasion of privacy includes "publicity that unreasonably places the other in a false light before the public." *Curran v. Children's Serv. Ctr. of Wyoming County, Inc.*, 578 A.2d 8, 12 (Pa. Super. 1990).

Statements by Jane Doe regarding the sexual assault are **absolutely privileged** and cannot be the basis for a claim of defamation or false light invasion of privacy. It is axiomatic that a witness is absolutely privileged to publish alleged defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." *Restatement 2d of Torts, § 588.* Pennsylvania also applies this absolute privilege to **quasi-judicial proceedings**. *Milliner v. Enck*, 709 A.2d 417, 419 n.1 (Pa. Super. 1998). This includes hearings before tribunals that perform judicial functions, such as proceedings by administrative officers, boards, and commissions. *Id.*

In Pennsylvania, **quasi-judicial proceedings also include school administrative hearings and statements made that lead to such hearings.** In *Schanne v. Addis*, 898 F. Supp. 2d 751 (E.D.Pa. 2012), Schanne, a Lower Merion High School teacher had an inappropriate relationship with Addis, one of his students. Addis later confided in her neighbor, who was also a Lower Merion teacher, about the relationship. The next day, the neighbor informed the principal of Lower Merion and the principal, together with the Human Resources director, called to speak to Addis about the incident. Eventually, Addis signed an official statement regarding the relationship. On December 15, 2010, Schanne was summoned for a pre-termination *Loudermill* hearing. *See, Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487 (1985). Schanne was ultimately terminated on January 24, 2011.

After his termination, Schanne filed a lawsuit asserting that Addis has made three defamatory communications: her original conversation with her neighbor and then two phone calls with the Lower Merion principal and Human Resources director prior to signing her statement. The court granted summary judgment in Addis' favor because her statements served as the catalyst for Schanne's *Loudermill* hearing, and were therefore **absolutely privileged**. The court found that "the importance of encouraging current and former students to come forward outweighs the potential for a wrongly accused teacher to suffer from a defamatory accusation." *Schanne*, 898 F.Supp. 2d at 758.

SJU's CSB hearing is a quasi-judicial proceeding. Jane Doe's allegedly defamatory statements after the sexual assault by Harris include statements that were made in order to report Harris' actions that violated, among other things, SJU's Community Standards, and that ultimately led to the CSB hearing. The remaining alleged defamatory statements were made during the University's investigation of the sexual assault and the actual CSB hearing. As a

result, all of these statements leading to and during this quasi-judicial proceeding are absolutely privileged and cannot be the basis of claims for defamation and false light invasion of privacy.

Moreover, courts must also consider whether applying an absolute privilege in a given case would promote the privilege's purpose. When courts choose to apply the privilege, they deem the policy concerns, such as encouraging open communication without fear of retributive lawsuits, to outweigh the right of the defamation plaintiff to seek redress. *Pawlowski v. Smorto*, 588 A.2d 36, 42 (Pa. Super. 1991) (applying an absolute privilege to a report made by several attorneys to the District Attorney and State Police that another attorney committed perjury because that statement aligns with the policy reasons for the privilege: to "ensure free and uninhibited access to the judicial system."). Moreover, the motive of the speaker (be it malicious or not) is entirely irrelevant. *Id. At 41.*

There clearly is a public interest in victims of sexual violence, including women who believe that they have been victims of a sexual assault, coming forward to report these acts. Unfortunately, many women do not come forward to report acts of sexual violence. If a woman believes that she has been subjected to a sexual assault, but does not come forward for fear that she may not be believed and thereafter sued for defamation, the policy behind encouraging the reporting of such acts is thwarted.

It is such a situation as is occurring in this case that this public policy addresses. The purpose of quasi-judicial hearings, such as SJU provides, is to encourage women to come forward and report sexual assaults. Like criminal proceedings, they provide a "safe haven" where a woman will not be forced, under public scrutiny, to relive again and again the trauma she experienced. A women who has been victimized and sexually assaulted should not have to be afraid of reporting it because she may be forced to relive the trauma repeatedly, in this case at the **first CSB hearing**, **second CSB hearing**, and now in **this lawsuit**. If reporting incidents of

18

sexual violence that lead to quasi-judicial hearings is not privileged, the result will be the silencing of such reports and many other women having to endure the trauma of reliving such heinous acts over and over in the courts.  Hence, public policy dictates that victims of sexual violence be allowed to report what happened without fear of retribution, including lawsuits for defamation and invasion of privacy.  As a result, Jane Doe's statements are absolutely privileged and Harris' claims for defamation and false light must be dismissed.

### Conclusion

Because Harris cannot relitigate the decision of the CSB, the finding that he sexually assaulted Jane Doe is conclusive and final.  Therefore, he is unable to support his claim that Jane Doe made untrue statements and all of his claims against her fail.  In addition, whether SJU complied with its contract is not relevant to the determination of whether Harris has any viable claims against Jane Doe.  Even if it is, it is clear that the process Harris received met the procedures set forth in the SJU Handbook.  Moreover, Jane Doe's statements are absolutely privileged and cannot be the basis of claims for defamation and false light invasion of privacy.  Consequently, this Honorable Court should dismiss Plaintiff's Complaint and all claims against Jane Doe, with prejudice.

Respectfully submitted,

RAWLE & HENDERSON LLP

Dated: <u>August 15, 2013</u>     By: _____

Daniel J. Rucket, Esquire
I.D. No. 70009
The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4200
*Attorneys for Defendant Jane Doe*

"A"

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN HARRIS | : | |
| 17 Duchess Path | : | |
| Clifton Park, NY  12065 | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| SAINT JOSEPH'S UNIVERSITY | : | NO. |
| 5600 City Avenue | : | |
| Philadelphia, PA  19131 | : | |
| and | : | JURY TRIAL DEMANDED |
| JOSEPH KALIN | : | |
| c/o St. Joseph's University | : | |
| 5600 City Avenue | : | |
| Philadelphia, PA 19131 | : | |
| and | : | |
| | : | |
| JANE DOE | : | |
| | : | |
| | : | |
| Defendants | : | |

## CIVIL ACTION COMPLAINT

### PARTIES

1.      Plaintiff, Brian Harris ("Harris"), is an adult individual residing at 17 Duchess

Path, Clifton Park, New York 12065.

2.      Defendant, Saint Joseph's University ("SJU"), is a Pennsylvania University, with

its main campus located at 5600 City Avenue, Philadelphia, Pennsylvania 19131.

3.      At all times material hereto, SJU acted by and through its agents, servants,

employees, workmen and/or representatives who were acting in the course and scope of their

respective agency or employment and/or in the promotion of SJU's business, mission and/or

affairs.

4.      Defendant, Joseph Kalin ("Kalin"), is an adult individual and who, upon information and belief, is, and was at all times material hereto, employed by SJU as a security officer or investigator, having a place of business located at 5600 City Avenue, Philadelphia, Pennsylvania 19131.  As detailed below, Kalin was assigned by SJU to investigate the alleged incident involving Harris and Defendant, Jane Doe.

5.      Defendant,    Jane Doe ("Doe")     , is an adult individual who both at present, and at all times material hereto, is, and was, a matriculated student at SJU, residing at

6.      At all times material hereto, Doe  resided at a SJU dormitory complex known as the "Villiger."

## JURISDICTION

7.      Plaintiff invokes this Court's jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §1681, *et seq.* and 28 U.S.C. §1331.

8.      Venue primarily lies in this district pursuant to 28 U.S.C. §1391(a) inasmuch as this is the district in which the instant claims arise.

9.      Jurisdiction is also claimed over the related common law state claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. §1367.

10.      Alternatively, Plaintiff invokes this Court's jurisdiction pursuant to 28 U.S.C. §1332, diversity of citizenship, with the amount in controversy exceeding $75,000.00, exclusive of interest and costs.

## FACTS

11.      At all times material hereto, Harris was a first year (freshman) student at SJU, residing at its main campus at a dormitory complex known as "Sourin," commencing August 25, 2012.

12.     At some time prior to November 16, 2012, Harris and  Doe , the latter a member of SJU's girls' soccer team, became acquainted following which a friendship developed.

13.     Harris and  Doe  would see each other on campus and at social events.

14.     Harris later learned from one of  Doe's  friends that  Doe  "liked him."

15.     Harris obtained  Doe's  cell phone number and during the early evening hours of November 16, 2012, Harris sent  Doe  a text message, identifying himself.

16.     Thereafter, Harris and  Doe  began exchanging text messages, beginning with Harris' text message at 5:12 p.m. and ending with  Doe's  text message at 12:36 a.m. on November 17, 2012. Copies of these text messages (the "text messages") are collectively attached hereto as Exhibit "A."

17.     During the initial exchange of text messages, Harris told  Doe  he obtained her cell phone number from a mutual friend,   J.M.                          , to which Doe  responded, "Ha oh okay that's cool." Harris asked  Doe  what she was doing that evening to which  Doe  responded she did not know.

18.      Over an hour later, Harris texted  Doe  again, suggesting  Doe  should go to the Lax House,  Doe  replying she believed she would be. An hour later, it was determined neither Harris nor  Doe  would be participating in events at the Lax House and approximately 15 minutes later,  Doe  asked Harris if he was going any where that evening to which Harris said he was not, and proposed that  Doe  come to his room.

19.     Doe  seemingly wanted to come to Harris' room but informed him she had already left the SJU campus but wanted to return.  Doe  told Harris she was in Manyunk and could not return herself. Later,  Doe  proposed that Harris come to  Doe's  dormitory room at Villiger.

3

20.     At 10:57 p.m. on November 17, 2012,  Doe  sent a text to Harris, asking if he was alone, to which Harris replied affirmatively. In response,  Doe  asked Harris if he could come "cuddle" with her.

21.     In modern parlance, the terms "cuddle" or "cuddling" are synonymous with, *inter alia*, "sex" or "having sex."

22.     Unsolicited,  Doe  further wrote that she was a "good cuddler," followed by the symbol ": ))," commonly used in text messaging to express a happy face.

23.     Doe  then asked Harris if he was a "gooood cuddler," adding o's to the word "good" intimating great or very good.  Harris replied he was.

24.     Doe  then asked Harris if he would come to her dormitory room at Villiger, as she would be there soon; Harris replied he would.

25.     Later,  Doe  asked Harris to meet her at a party; however, Harris suggested she return to campus as he had been asked to leave his dormitory room by his roommate.

26.     Doe  changed her mind, returned to her dormitory room and asked Harris to come there.

27.     Unsolicited and without suggestion or request by Harris,  Doe  asked Harris if he would sleep in her dormitory room. Harris replied he would.

28.     Doe  then arranged for a male resident of Villiger to go to the front entrance of the Villiger building and allow Harris access.

29.     The male resident accompanied Harris to  Doe's  dormitory floor lobby from which  Doe  escorted Harris to her dormitory room.

30.     At  Doe's  invitation, Harris lay down on  Doe's  bed, with  Doe  lying next to him. The two began kissing and engaging in foreplay. They both voluntarily, and without force, suggestion or intimidation, removed their respective clothing.

4

31.     Harris asked Doe whether he should get a condom to which Doe replied affirmatively.

32.     Upon donning a condom, Harris and Doe freely and voluntarily engaged in sexual intercourse; the love making was consensual.

33.     At no time did Doe ask, or demand, that Harris leave her dormitory room; at no time did Doe tell Harris she did not want to engage in sexual intercourse with him.

34.     Following their love making, Doe left her dormitory room to go the bathroom, returning to the dormitory room approximately 3 to 4 minutes later.

35.     Upon her return, Doe got back into bed with Harris, embracing him as they slept into the morning of November 17, 2012.

36.     Later in the morning of November 17, 2012, Doe's roommate returned to the room upon which Harris gathered his belongings, and hugged and kissed Doe before leaving.

37.     Sometime later on November 17, 2012, Harris was informed by  A.I.

, Resident Area Manager for Villiger, that Harris was being investigated and, possibly, accused of non-consensual sexual relations with  Doe , an accusation which was not only wholly untrue but startling and unreasonable to Harris.

38.     Kalin was assigned by SJU to investigate Doe's claim of sexual misconduct against Harris.

39.     On November 19, 2012, Kalin met with Harris to interview him about the alleged incident. Harris, without acts or displays of aggression, and in compliance with SJU protocol governing investigations, voluntarily participated in same, explaining what occurred and providing Kalin with the text messages corroborating Harris' version of the events, which Kalin read but disregarded. Kalin appeared harsh and abusive, unnecessarily comparing Harris to

"Jerry Sandusky" and feigning concern that Harris would retaliate against Kalin notwithstanding the clear absence of any such characteristic or intent on the part of Harris.

40.     During the investigation, Harris learned that during Doe's visit to the bathroom, her absence for no more than 3 to 4 minutes, Doe saw another student, O.T.

41.     While in the bathroom, Doe allegedly told O.T. she (Doe) had been intimidated into having sex with a male, identified by a name other than Harris. Doe allegedly told O.T. she (Doe) was unwilling or disinterested in reporting the incident; however, O.T. insisted she did, threatening to report the incident on Doe's behalf if Doe did not.

42.     Notwithstanding these assertions, Doe did not ask for help, did not ask that Harris be evicted from her room, did not call security and did not leave the Villiger dormitory.

43.     Conversely, after her brief absence, Doe returned to her dormitory room and got into bed with Harris with whom she remained, sleeping, for the next several hours. Harris left when Doe's roommate returned at 10:00 a.m.

## SJU INTERNAL POLICIES AND PROCEDURES

44.     SJU issues to students a Student Handbook (the "Handbook") which sets forth standards of conduct expected of members of the SJU community, as well as policies and procedures for investigating and adjudicating complaints made by members of the SJU community.

45.     The Handbook defines SJU community standards. Students are expected to: "1. Be Honest; 2. Have Respect for Self; 3. Have Respect for Others, their well-being and their property; and, 4. Have Respect for the Standards of the University and the laws of the larger community." The Handbook also defines and precludes sexual offenses such as rape, involuntary

deviate sexual intercourse, sexual assault, aggravated indecent assault, indecent assault, and indecent exposure.

46.    Allegations of sexual offenses are required to be reported to the Office of Public Safety and Security. The Office of Public Safety and Security is then required to conduct a prompt and thorough investigation and prepare a factual report which is forwarded to the Student Life Administrator. Additionally, the Office of Public Safety and Security is required to advise the alleged victim regarding preservation of relevant evidence and to assist with access to hospitals specializing in rape treatment.

47.    The Handbook requires allegations of sexual misconduct, where both the accuser and the accused are students, be resolved by the Community Standards process.

48.    The Community Standards process is initiated when an incident report, completed by a Public Safety or Residence Life staff member, or a written complaint, prepared by any other member of the SJU community, is provided to the Office of Community Standards.

49.    Allegations of serious offenses, including sexual offenses, are resolved by an Administrative Hearing Officer or by the Community Standards Board.

50.    Administrative Hearing Officers are professional SJU staff members, usually in the office of Community Standards or Residence Life.

51.    The Community Standards Board ("CSB") is a seventeen-person board consisting of seven students, five faculty members, and five administrators/staff, all of whom are to be trained by SJU to hear cases involving serious Community Standards violations (Handbook, p. 33). A CSB panel is comprised of five representatives and must include one (1) faculty member, one (1) student, and one (1) administrator/staff. The CSB panel members are selected by the Moderator, a professional SJU staff member, who also advises the CSB on matters such as the

7

type of information that may help in determining if Community Standards were violated, prior sanctions, and facilitating the appropriate paperwork and record keeping.

52.     Upon receiving notice of a violation, the Community Standards office notifies the accused via University email, outlining the hearing process and, in the case of CSB hearings, setting forth a CSB pre-hearing.

53.     The Handbook guidelines afford both the accused and accuser with equal process in cases of sexual harassment. No such guarantees are made with respect to the accused and accuser in cases of sexual offenses, which are defined separately in the Handbook.

54.     At any time during the Community Standards process, the Vice-President for Student Life, Associate Provost, or a designee, may place a student on interim suspension provide guidelines for conditional attendance if the student is deemed to present a risk to the health, safety, or welfare of anyone within the SJU community. Interim suspension/conditional attendance decisions are made without notice or an opportunity to be heard on the part of the accused and no appeal of this decision may be taken.

55.     The Handbook proclaims the CSB hearing is designed to encourage open discussion among the participants that promotes the understanding of the facts, individuals involved, and conduct and circumstances surrounding the incident. Nevertheless, during the hearing, the accused, accuser, and witnesses are permitted to provide testimony in separate facilities such that an accused is deprived the opportunity to question and confront his accuser and witnesses to test their veracity and credibility.

56.     In addition to depriving an accused the ability to examine his accuser, the Handbook lacks any rules governing the type of testimony offered and affirmatively permits hearsay testimony, which could not be challenged even if the accused was permitted to question witnesses.

57.     Further, the Handbook lacks any rules requiring the disclosure of evidence to be submitted prior to the CSB hearing.

58.     In contrast, non-institutional information will only be considered by the CSB panel if deemed appropriate by the Vice-President for Student Life, Associate Provost, or a designee.

59.     The accused is not permitted to be accompanied by parents, counsel, or by any person other than a Community Standards advisor during the hearing.

60.     Following the hearing, the CSB panel evaluates the information received during the hearing, the facts of the conduct alleged, and determines whether it is more likely than not that the accused was responsible for the alleged violation; a mere 51% threshold for even the most severe of allegations.

61.     If the CBS panel finds responsibility on the part of the accused, the CSB panel determines the appropriate sanction, taking into consideration motivation, present attitude, past record (positive and negative), damage/harm severity, honesty, maturity, cooperation, willingness to make amends, and compliance with previous sanctions (Handbook, p. 36). The Handbook identifies 16 different sanctions, of which suspension is most severe after only expulsion and revocation of degree.

62.     After the CSB panel reaches its decision and issues sanctions, if any, the accused is notified in writing of the result and the result may be disclosed to others, including the SJU community.

63.     After the accused receives written notification of the CSB panel's decision, he has three (3) days to request an appeal. The appeal request is directed to the Vice President of Student for Student Life or Associate Provost and must demonstrate one or more of the following:

a.   A material failure to follow the procedures of the Community Standards process that affected the outcome.

b.   There is new information, sufficient to alter a decision that was not reasonably available at the time of the original hearing.

c.   The sanction(s) was not consistent for the violations of the Community Standards.

The Handbook further limits disclosure of relevant sanctions to the victim in cases of crimes of violence or sexual harassment.

64.   Once an appeal has been requested, the Vice President of Student for Student Life or Associate Provost, in concert with the Provost or designee, are required to make a decision within five (5) days of the appeal period expiration. The Vice President of Student for Student Life, Provost or a designee may: (a) replace the sanction; (b) remand the case for reconsideration; or, (c) direct the case for a new hearing.

65.   The Handbook requires Community Standards violations and sanctions to become part of a student's educational record. Student discipline records not relating to expulsion are to be maintained for five (5) years after conclusion of the last semester the student attended SJU. Case notes are not made part of the student's educational record and are destroyed upon conclusion of the appeal period.

66.   The Handbook reads, "[i]t has been and remains the policy of [SJU] to prohibit discrimination on the basis of sex/gender . . . ." and describes unacceptable conduct to include "decisions based on stereotypes or assumptions about the abilities, traits, or performance of individuals of a certain gender . . . ."

### THE HARRIS INVESTIGATION REPORT AND HEARING

67.   As part of SJU's investigation of Doe's claims of sexual misconduct against Harris, an investigation report (the "report") was prepared, including a charge against Harris

10

for forcible rape. The report was first shown to Harris at a prehearing conference held in the office of Keirsten White ("White"). Harris reviewed Doe's account, but not his own, innocently believing his account was accurately recorded based upon his interview with Kalin. However, the report shown to Harris at the prehearing was not the same report later presented to him at the hearing as the latter report included additional comments from A.I. and O.T. . This was the first time Harris saw the full report. He was never asked to execute or review his account, nor did he refuse to execute same. Harris never read what was written about him.

68.     On  December 4, 2012, a community standards board hearing was held before five panelists (the "Panel") selected by SJU:     N.K.                     ,     C.H.
,       K.B.                  ,           D.S.               ,          M.S. and White, during which DOE , Harris and  A.I.    were separately, and privately, questioned. Harris was denied an opportunity to confront his accuser(s) despite the glaring evidence contradicting  Doe's  baseless accusations.

69.     Critically, although earlier provided, the record before the Panel did not include the text messages (Exhibit "A").

70.     Following the hearing, Harris was found guilty of disrespecting another student and sexual assault, and was summarily suspended from the University by SJU.

71.     In accordance with SJU policy and procedure, Harris timely submitted an appeal, challenging the findings of the Panel as against the great weight of the evidence, and the Panel's failure to review the text messages which, on their face, contradicted  Doe's  baseless accusations of involuntary sexual contact.

72.     During the pendency of the appeal, Harris completed the first semester of his freshman year and thereafter left SJU's campus for the winter holiday break.

73.     As the second semester of the freshman year was about to begin, the appeal board had still not ruled upon the Panel's findings and Harris was hesitant to return to SJU in light of the then pending suspension. To accommodate Harris, SJU had first proposed that he be placed in alternative housing, be denied access to all privileges, and be limited to attending classes until the appeal board ruled.

74.     SJU subsequently removed the restrictions and allowed Harris to return to his dormitory room, attend classes and participate in campus activities. Notwithstanding, Harris sought to avoid social contact, embarrassed by Doe's baseless charges.

75.     On or about January 11, 2013, the appeal board, finding the text messages were critical to the investigation and, thus, necessary evidence, remanded the matter to the Panel for further consideration.

76.     On or about January 18, 2013, a second hearing was held before the Panel during which Harris and Doe were questioned regarding the text messages.

77.     Notwithstanding their respective explanations and, more importantly, the plain meaning of the text messages, themselves, the Panel upheld its earlier finding of guilt; Harris was denied a further appeal.

78.     As a direct result of the Panel's finding, Harris was suspended from SJU for a year and the conviction was noted on his school (SJU) record. Harris was notified of the suspension at 3:00 p.m. on Saturday, January 19, 2013 (of a holiday weekend) and was instructed to remove all of his belongings from his dormitory room and depart the campus promptly or he would be arrested for trespassing.

79.     At no time were the police or other governmental authorities ever contacted about the incident.

## COUNT I
### Harris v. SJU
### (Breach of Contract)

80.     Harris incorporates by reference the allegations of paragraphs 1 through 79 and makes them a part hereof as though they were more fully set forth at length herein.

81.     At all times material hereto, a contractual relationship existed between SJU and Harris. The Handbook was deemed part of that contract. Pursuant thereto, SJU was required to act in accordance with the Handbook in resolving complaints of misconduct and violations of SJU's policies and regulations, in the investigation of those complaints, in the process of adjudicating complaints of sexual misconduct, and in resolving appeals brought challenging disciplinary decisions.

82.     SJU breached its contract with Harris by failing to comply with the Handbook, a contract between Harris and SJU, by:

a.     Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

b.     Failing to provide adequate notice of the policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

c.     Conducting a cursory, superficial, and biased investigation into Doe's allegations, during which Kalin compared Harris to Jerry Sandusky, a publicized convicted pedophile;

d.     Causing a superficial, conclusory, and capricious "investigative" report to be created, which is utterly devoid of factual content and clearly biased in favor of the accuser;

e.     Failing to provide fair notice of the parameters of the charged offenses;

f.     Rendering a decision for interim suspension/conditional attendance based only upon a baseless charge without a meaningful opportunity to be heard;

g.     Failing to provide a proper community standards board pre-hearing given the gravity of the allege violation and consequences;

13

h.   Failing to adequately and impartially investigate the allegations against Harris;

i.   Failing to locate, preserve and/or present relevant information that would have established Doe's allegations were false;

j.   Failing to provide Harris with requested, relevant information, including the investigative report, prior to the community standards board hearing;

k.   Failing to provide Harris with basic due process, including the opportunity to confront and question Doe to test her veracity and credibility;

l.   Failing to provide Harris with basic due process, including the opportunity to confront and question O.T. to test the basis of her knowledge and credibility;

m.   Failing to provide Harris with basic due process, including the opportunity to confront and question Kalin to test the veracity of statements contained in his investigative report, as well as his credibility and bias;

n.   Failing to consider the text messages, which were previously provided, during the initial community standards board hearing;

o.   Considering the superficial, biased, and conclusory incident report during the community standards board hearing;

p.   Conducting an arbitrary community standards board hearing not governed by any standards and/or rules to ensure evidence and testimony is relevant, probative, and/or trustworthy;

q.   Conducting an arbitrary community standards board hearing with panel members not adequately trained or experienced in properly questioning witnesses as to their statements or evidence provided;

r.   Precluding Harris from having a person outside the SJU community attend the community standards board hearing to advise and/or support him;

s.   Rendering a decision Harris violated SJU rules applying an unreasonably lax standard of proof in light of the gravity of the charged offense and significance of the potential penalties;

t.   Remanding the matter to the same community standards board, which failed to consider the text messages, for *de novo* review;

u.   Failing to timely resolve the allegations against Harris;

14

> v.    Rendering a decision Harris violated SJU rules against the clear weight of the evidence;
>
> w.    Violating SJU policy against gender/sex based discrimination by establishing a *de facto* presumption Harris committed sexual assault on the basis of male stereotypes; and,
>
> x.    Providing a disciplinary process that was fundamentally unfair.

83.    As a direct and proximate of SJU's breach of contract, Harris has suffered damages including, without limitation, having his SJU school record improperly include a conviction and/or other finding of guilt of sexual misconduct (assault) based upon the unfounded charges brought against him, marring Harris' ability to enroll in another college or university of similar or greater stature as SJU, stigmatizing Harris with a finding of guilt for an act he did not commit, and monetary losses.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, for the following relief:

(a)    Mandating that SJU correct Harris' student record and/or file to remove the finding of guilt with respect to the charges brought against Harris by Doe ;

(b)    Mandating that SJU provide Harris with a letter or other written memorial confirming his student record and/or file has been expunged with respect to the finding of guilt for the charges brought against him by Doe ;

(c)    Awarding Harris compensatory damages in excess of Seventy-Five Thousand ($75,000.00) Dollars, together with interest and costs; and,

(d)    Such other relief which the Court deems just and proper under the circumstances.

## COUNT II
### Harris v. SJU
### (Violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 et seq.)

84. Harris incorporates by reference the allegations of paragraphs 1 through 83 and makes them a part hereof as though they were more fully set forth at length herein.

85. Title IX of the Education Act Amendment of 1972, 20 U.S.C. §1681 *et seq*. ("Title IX") is enforceable through an implied right of action affording an aggrieved individual pecuniary damages and equitable relief.

86. SJU violated Title IX in the manner in which it improperly adjudicated the baseless charge of sexual misconduct by Doe against Harris.

87. SJU receives federal funding in various manners including, without limitation, student loans given to students either directly by the federal government or by SJU with funds furnished by the federal government.

88. In virtually all cases of campus sexual misconduct, the accused student is male and the accusing student is female.

89. SJU, in the manner in which it approaches the investigation, adjudication, and appeal of allegations of sexual misconduct, and related claims made in connection to sexual misconduct, creates an environment in which a male accused is so fundamentally denied due process as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male students of educational opportunities on the basis of gender.

90. Harris, as a male student at SJU who has been subject to a school disciplinary action alleging a campus sexual misconduct, has been discriminated against by SJU on the basis of his gender in violation of Title IX.

91. As a result of SJU's Title IX violation, Harris has been seriously and irreparably damaged.

92.     As a direct and proximate result of SJU's Title IX violation, Harris has suffered damages including, without limitation, having his SJU school record improperly include a conviction and/or other finding of guilt of sexual misconduct (assault) based upon the unfounded charges brought against him, marring Harris' ability to enroll in another college or university of similar or greater stature as SJU, stigmatizing Harris with a finding of guilt for an act he did not commit, and monetary losses.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, for the following relief:

(a)     Mandating that SJU correct Harris' student record and/or file to remove the finding of guilt with respect to the charges brought against Harris by Doe ;

(b)     Mandating that SJU provide Harris with a letter or other written memorial confirming his student record and/or file has been expunged with respect to the finding of guilt for the charges brought against him by Doe ;

(c)     Awarding Harris compensatory damages in excess of Seventy-Five Thousand ($75,000.00) Dollars, together with interest and costs; and,

(d)     Such other relief which the Court deems just and proper under the circumstances.

### COUNT III
### Harris v. SJU
### (Negligence)

93.     Harris incorporates by reference the allegations of paragraphs 1 through 92 and makes them a part hereof as though they were more fully set forth at length herein.

94.     At all times material hereto, SJU had a duty to hire competent personnel, adequately train its personnel, adequately supervise its personnel, and terminate and/or sanction personnel for substandard performance.

95.     SJU owed a duty of care to Harris to ensure that its policies and procedures including, without limitation, those set forth in the Handbook were fair and reasonable, and a further duty to Harris to ensure that its staff and personnel were properly trained and supervised.

96.     SJU breached these duties of care owed to Harris and, independent of its breach of contract set forth above in Count I, was negligent the following respects:

a.     Failing to hire well-trained agents and employees, including, without limitation, investigators and community standards board panel members, including, without limitation, the proper selection of student panelist with requisite knowledge and majority;

b.     Failing to train its employees, agents or representatives in the proper method to thoroughly investigate and adjudicate, without bias, complaints of sexual misconduct;

c.     Failing to properly train its employees, agents or representatives regarding the requirements of Title IX;

d.     Failing to properly train its employees, agents or representatives in the discovery and preservation of relevant evidence;

e.     Failing to properly train its employees, agents or representatives in basic due process as it pertains to the investigation, adjudication, and appeal from adjudication of complaints of sexual misconduct;

f.     Failing to supervise its employees, agents or representatives to ensure complaints of sexual misconduct are adequately investigated and fairly adjudicated;

g.     Continuing to employ substandard employees, including investigators and community standards panel members; and,

h.     Failing to maintain proper policies and procedures designed to fairly, reasonably and properly adjudicate claims of sexual misconduct without bias or favor.

97.     As a direct and proximate of SJU's negligence, Harris has suffered damages including, without limitation, having his SJU school record improperly include a conviction and/or other finding of guilt of sexual misconduct (assault) based upon the unfounded charges

brought against him, marring Harris' ability to enroll in another college or university of similar or greater stature as SJU, stigmatizing Harris with a finding of guilt for an act he did not commit, and monetary losses.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, together with pre and post judgment interest, costs, and such other and further relief which the Court deems just and proper under the circumstances.

## COUNT IV
### Harris v. SJU
### (Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A. § 201-1, et seq.)

98.     Harris incorporates by reference the allegations of paragraphs 1 through 97 and makes them a part hereof as though they were more fully set forth at length herein.

99.     At all times material hereto, SJU offered for sale to the public, educational services.

100.    In connection with the sale of its educational services and collection of tuition, fees and costs related thereto, SJU committed various unfair and deceptive acts and practices in violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A. §201-1, et seq. ("UTPCPL"), including, but not limited to:

a.  Representing, warranting and guaranteeing in writing that SJU trained its employees and agents in the proper and unbiased investigation and adjudication of complaints of sexual misconduct, when in fact it had not;

b.  Representing that Harris would receive a fair and impartial hearing in connection with any allegation of sexual misconduct, when he would not;

c.  Representing that Harris would receive adequate notice of and due process in connection with allegations of sexual misconduct, when he would not; and,

d.  Misrepresenting SJU's compliance with Title IX;

19

101.    Harris relied upon the various warranties and misrepresentations of SJU in entering his agreement with SJU and in continuing to make payments to SJU.

102.    SJU's unfair and deceptive conduct constituted untrue representations of the characteristics and benefits of SJU's educational services; constituted untrue representations that SJU's educational services was of a particular standard or quality; constituted a failure to comply with the terms of a written guarantee or warranty; and constituted deceptive conduct which created a likelihood of confusion and misunderstanding—all within the meaning of §3 of the UTPCPL and §§2(4)(v), (vii), (xiv) and (xxi) of the UTCPL.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, for the following relief:

(a)    Find, determine and declare that SJU's business practices violate the UTPCPL;

(b)    Enjoin SJU from continuing to investigate and adjudicate claims of sexual misconduct in the manner prescribed by the Handbook;

(c)    Award actual and/or statutory damages including attorney's fees and costs; and,

(d)    Grant such any and other further relief that is just and proper under the circumstances.

## COUNT V
### Harris v. SJU, Doe and Kalin
### (Defamation)

103.    Harris incorporates by reference the allegations of paragraphs 1 through 102 and makes them a part hereof as though they were more fully set forth at length herein.

104.    SJU, Doe , and Kalin each made communications about Harris which were defamatory in nature.

105.   Specifically, each referred to Harris as the perpetrator of a sexual assault on Doe , even though they knew the allegations were false, or with reckless indifference to the truth or falsity of said allegations

106.   The defamatory communications tended to harm and did harm the reputation of Harris so as to lower him in the estimation of the community and to deter third persons from associating with him.

107.   The defamatory communications were intended to, and did, convey Harris' guilt of alleged misconduct involving moral turpitude.

108.   SJU, Doe and Kalin intended not only to deprive Harris of his good name, and to bring him into scandal and disrepute amongst his neighbors and peers, but also to limit Harris' future educational and employment prospects.

109.   The defamatory communications tended to, and did, blacken Harris' reputation and exposed him to public hatred, contempt and ridicule.

110.   The allegations against Harris were so inherently improbable that only a reckless and dishonest person would have conveyed them as there were obvious reasons to doubt Doe's  and Kalin's veracity and the accuracy of their reports.

111.   The defamatory communications were not statements of mere opinion.

112.   The defamatory communications were published in that they were made to third parties.

113.   The defamatory communications included, without limitation, the following:

    a.   On November 17, 2012, Doe stated to  O.T   a male student intimidated her into having sexual relations with him and although, upon information and belief, Doe  improperly identified Harris she was referring to Harris;

    b.   Thereafter, Doe reported Harris' alleged sexual misconduct to SJU which, in turn, assigned Kalin to investigate same;

    c.    Either Doe, Kalin or other SJU employees, agents or representatives informed Iannucci of Harris' alleged sexual misconduct;

    d.    Doe and/or Kalin communicated Harris' alleged sexually misconduct to the Panel; and,

    e.    The defamatory communications continued to be re-published after these Defendants were made aware of the falsity of the allegations against Harris.

114.    The defamatory communications were malicious, reckless, and negligently made.

115.    The defamatory communications were not justifiably published by any privilege.

116.    The defamatory communications referenced Harris by name to ensure those who received the communications knew they were about Harris.

117.    All persons receiving the communications understood the defamatory meaning of the communications.

118.    Harris was specially harmed from the publication of these defamatory communications

119.    Harris suffered actual loss to his reputation and personal humiliation,

120.    The defamatory communications let the audience to conclude that Harris lacked honor and integrity, and have grievously fractured his standing in respectable society.

121.    SJU's, Doe's and Kalin's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendants, Saint Joseph's University, Joseph Kalin and Jane Doe , jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand

($75,000.00) Dollars, punitive damages, together with pre and post judgment interest, costs, and such further and appropriate relief as determined by the Court.

**COUNT VI**
**Harris v. SJU,  Doe  and Kalin**
**(False Light)**

122.   Harris incorporates by reference the allegations of paragraphs 1 through 121 and makes them a part hereof as though they were more fully set forth at length herein.

123.   SJU,  Doe  and Kalin  each made public statements about Harris which placed him in a false light.

124.   These statements include allegations that Harris perpetrated a sexual assault on Doe   and was a danger to either  Doe  or to the SJU community.

125.   SJU,  Doe , and Kalin had knowledge of, or acted in reckless disregard as to, the falsity of these statements and the false light in which Harris would be placed.

126.   The false light in which Harris was placed is highly and unreasonably offensive

127.   Such false light has caused Harris to suffer mental anguish, shame, and humiliation.

128.   SJU's,  Doe's and Kalin's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendants, Saint Joseph's University, Joseph Kalin and   Jane Doe      , jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, punitive damages, together with pre and post judgment interest, costs, and such further and appropriate relief as determined by the Court.

### COUNT VII
### Harris v. SJU, Doe and Kalin
### (Intentional Infliction of Emotional Distress)

129.   Harris incorporates by reference the allegations of paragraphs 1 through 128 and makes them a part hereof as though they were more fully set forth at length herein.

130.   At all times material hereto, Doe, Kalin, and SJU, acting through its agents, servants, and employees, did by extreme, outrageous, intentional, willful, malicious and reckless conduct, humiliate, embarrass, shock and scar Harris.

131.   SJU, Doe and Kalin made public statements which were not true and took actions based upon false information to falsely portray Harris as a cruel sex offender, which was not true and caused him severe distress.

132.   SJU, Doe and Kalin made public statements which were not true and took actions based on false information which caused Harris extreme distress as the result of unjustly being suspended from school and not being able to participate in the campus life to which he had looked forward.

133.   SJU's, Doe's and Kalin's actions further distressed Harris due to the possibility of permanently being barred from campus and never being able to participate in the college experience to which he had looked forward.

134.   SJU's, Doe's and Kalin's actions further distressed Harris due to the possibility of facing criminal charges and being accused of a crime he never committed.

135.   As a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful and malicious conduct of SJU, Doe and Kalin, Harris suffered and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment and humiliation, all of which may be permanent in nature.

24

136.   SJU's, Doe's and Kalin's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendants, Saint Joseph's University, Joseph Kalin and   Jane Doe   , jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, punitive damages, together with pre and post judgment interest, costs, and such further and appropriate relief as determined by the Court.

## COUNT VIII
### Harris v. SJU,  Doe  and Kalin
### (Negligent Infliction of Emotional Distress)

137.   Harris incorporates by reference the allegations of paragraphs 1 through 136 and makes them a part hereof as though they were more fully set forth at length herein.

138.   At all times material hereto, SJU,  Doe and Kalin acted in a negligent manner for the reasons set forth above as a direct and proximate result of which Plaintiff suffered and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment and humiliation, all of which may be permanent in nature.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendants, Saint Joseph's University, Joseph Kalin and   Jane Doe    , jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, together with pre and post judgment interest, costs, and such further and appropriate relief as determined by the Court.

**Count IX**
**Harris v. Doe**
**(Intentional Interference with Contractual Relations)**

139.     Harris incorporates by reference the allegations of paragraphs 1 through 138 and makes them a part hereof as though they were more fully set forth at length herein.

140.     Harris has the right to pursue his contractual relationships free from interference on the part of other persons.

141.     At all times material hereto, Doe did willfully, maliciously, and improperly interfere with an existing contract between Harris and SJU by repeatedly meeting with SJU agents, servants, and/or employees and leveling false accusations against Harris which resulted in his suspension from SJU.

142.     Doe had no privilege, justification or legitimate interest for interfering with the contract between Harris and SJU.

143.     Doe , who intentionally and improperly interfered with the performance of this contract, is subject to liability.

144.     In intentionally accusing Harris of sexual assault, Doe was giving false information to SJU which Doe knew to be false.

145.     As a direct and proximate result of Doe's intentional interference of contract, Harris suffered suspension and expulsion, and financial harm stemming therefrom.

146.     Doe's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Jane Doe , for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, punitive damages, pre and post judgment interest,

costs, and such further relief to which the Court deems just and proper under the circumstances.

Respectfully submitted,

THE CHARTWELL LAW OFFICES, LLP

BY: _____

KENNETH M. DUBROW, ESQUIRE
I.D. NO. 34665
1735 Market Street, 29th Floor
Philadelphia, PA 19103
(215) 972-7006

Attorney for Plaintiff,
Brian Harris

Harris, Brian (44982)/Pleadings/Complaint

"A"

Transcription of text messages between Brian Harris and Jane Doe

Exactly as it appears on Brian Harris' phone


November 16

Brian 5:12pm: Whats up Jane   it's Brian from sourin

Jane   *5:29pm: heyy what's up*

Brian 5:33pm: Jack gave your number hah

Jane   *5:44pm: Haha oh okay that's cool*

Brian 5:56pm: What are you doing tonight

Jane   *6:09pm: I'm not sure yet hbu?*

Brian 7:21pm: Lax house you should go

Jane   *7:42pm ohh ok I think we aree*

Brian 8:40pm: I guess its not going. on anymore?

Jane   *8:44pm: Hhaha yeahh I guess not!*

Jane   *9:32pm: where are you going tonighttttt*

Brian 9:40pm: Where are you? I don't know if I am going anywhere

Brian 9:48pm: Come to my room and hangout everybodys gone somewhere

Jane   *9:49pm: wahh! No I already left :(*

Brian 9:49pm: Where'd you go?

Jane   *9:51pm: idk I wanna go backkk*

Brian 9:52pm: Come back now please!! Im alone idk where everyone is

Jane   *9:54pm: nooo ☹ithink I'm in manyunk i cant come back by myselffff*

Brian 10:03pm: If I come will you go back with me?

Jane   *10:12pm: yess definitely but idk where I amm*

Brian 10:15pm: Get an address! Ill be alone is that cool?

Jane    10:25pm: I'll tryyy and get one! And yesss

Brian 10:26pm: Text Mr back whenever you can

Jane    10:29pm: okaayyyy!! idk if I can leave ash shes so drunk

Brian 10:30pm: Whaaaaat your gunna just leave me here! Come on Jane

Jane    10:37pm: I'm sorry!!! I'm trying!!! if I cant when I come bback to villiger with mee

Brian 10:39pm: Come back now!! Haha

Jane    10:40pm: I'm trying!! idkk hoe haha

Brian 10:44pm: You're killinme. You know that

Jane    10:45pm: I seriously am trying

Brian 10:48pm: I know don't worry. Just come back too late haha

Jane    10:54pm: haha I'm really trying I promiseee

Brian 10:54pm: Are you girls at the baseball house

Jane    10:55pm: girls socccerrr

Brian 10:55pm: Isn't that like 10 mins from school walking distance?

Jane    10:56pm: noo the one in manyunk

Jane    10:57pm: are you alone in sourin?!

Brian 10:58pm: Yea.I'm bored I'm watching some Netflix ....loser right? Hah

Jane    11:00pm: aww ☹ come cuddddle with mr

Brian 11:01pm: I am when you get back hah

Jane    11:04pm: yayyy I'm a good cuddler :))

Brian 11:06pm: Then ill be expecting nothing less than excellence

Jane    11:10pm: are you a gooood cuddler

Brian 11:20pm: I'm great you better know it

Jane    11:22pm: I think im coming back sooooon

Brian 11:23pm: I'm being sexiled Sooo...hurry hah

Jane      *11:26pm: whatt!!! Come to villkiger*

Brian 11:35pm: Right now?

Jane      *11:37pm: sooon I'll be back soon*

Brian 11:38pm: Alright let me know when you are close

Jane      *11:40pm: okayy I willli*

Jane      *11:42pm: waittt I'm watching overtime wherever the fuck I am I'll be back afte thattt*

Brian 11:48pm: Damn girl

Jane      *11:48pm: I'm sowwwy*

Jane      *11:53pm: you better not fall asleep in meee*

Brian 11:53pm: I'm.here om watching the game

Jane      *11:54pm: don't fallll asleep!!!*

Brian 11:55pm: Im waiting for you

Jane      *11:57pm: if you fall asleeeep I swear...*

Brian 11:57pm: I'm.wide awake were watching a movie

Jane      *11:58pm: okaayyy goooood!! Watch the game it's 73-70 and 20 seconds lefty*

Brian 11:59pm: I know I'm watching it too!!

November 17

Jane      *12:00am: yayayyay!!! I'm gonna Die if we Winn*

Brian 12:01am: We wonnnnnn

Jane      *12:02am: Yahayyayaya dyinggg*

Brian 12:02am: Are you gunna come back now?

Jane      *12:03am: Yesssss*

Jane      *12:09: comeee tooo a softball party!*

Brian 12:11am: No come back

Brian 12:20am: Please I'm kicked outta my room

Jane    *12:23am: wait never mind I don't wanna goo*

Brian 12:23am: So your on your way back?

Jane    *12:24am: I am backkkkk*

Brian 12:24am: Can I.come over

Jane    *12:24am: I am backkkkk*

Jane    *12:24am: I'm backkk!!*

Brian 12:25am: Well?

Brian 12:28am: Go to sourin and pick me up

Jane    *12:29am: come to villiger!!!!*

Brian 12:30am: Which entrance?

Jane    *12:30am: just walkkkkkkkkk*

Brian 12:30am: Meet me outside

Brian 12:32am: I'm outside

Jane    *12:32am: Sleep over!!!!*

Brian 12:33am: I will

Brian 12:34am: I'm outside the main entrance

Brian 12:35am: I'm freezing hurry!!!

Jane    *12:35am: okay!!! Someones signing you in I'm coming*

Jane    *12:36am: okkkk!!!*


November 17


Brian 5:07pm: Wanna stay over tonight

Brian 5:12pm: Sorry Nevermind I can't

"B"

# 2012/2013 Hawk Year Student Handbook/Planner

## *Campus Guide*
## *Policies and Regulations*

**GENERAL INFORMATION**

Name: _____

Address: _____

City, State, Zip: _____

Phone: _____   Cell: _____

E-mail: _____

**EMERGENCY CONTACT:**

Name: _____

Phone: _____

Relationship: _____

Saint Joseph's University
Office of Student Life
5600 City Avenue
Philadelphia, PA 19131-1395
www.sju.edu

# University Policies, Regulations, Statements and Guidelines

Students must accept responsibility for their behavior and be willing to forgo some freedoms to create an environment that is conducive to the educational, social and spiritual development of all members of the University community. To guarantee the continuation of a positive, safe and educational setting, the University has adopted an array of policies and regulations. Should any member of the University community violate established policy, the University has in place processes intended to educate and in some cases discipline the violator, and thus deter further violations by that and/or other individuals. This handbook includes most policies in full, as well as some excerpts from more lengthy policies. Students having questions about any of the policies should contact the Office of the Vice President for Student Life/Associate Provost.

## COMMUNITY RELATIONS

Saint Joseph's University is strengthened as an institution by the vitality of Wynnefield, Overbrook Farms, and Merion Station neighborhoods. The campus is situated on City Avenue in a unique urban-suburban hybrid of communities. These neighborhoods contribute greatly to the diversity of the educational opportunities available to students. The University expects students to behave as exemplary citizens when in the surrounding neighborhoods and to demonstrate respect and concern for all members of the local community. For more information contact the Office of External Affairs at 610-660-1226.

## COMMUNITY STANDARDS

www.sju.edu/communitystandards

Approved by University Council: April, 2008; Revised July 2010, July 2011, July 2012

The Mission Statement of Saint Joseph's University shapes the responsibilities and privileges afforded to members of the University community. These Community Standards are designed to foster a community conducive to achieving the mission of the University. Rooted in the Catholic Jesuit tradition, Saint Joseph's University aims to create and to sustain an educational environment that facilitates students' academic, personal, and spiritual development. At the core of these values is the Ignatian tradition of "cura personalis," which affirms the goodness, the worth and the dignity of every human being. Students affirm this commitment through adherence to the standards of conduct established within our

community.
In the broadest terms, all members of the Saint Joseph's University community are expected to:
• Be honest;
• Have respect for self;
• Have respect for others, their well-being and their property; and
• Have respect for the standards of the University and the laws of the larger community.

<u>To Whom Do the Community Standards Apply?</u>
By voluntarily choosing to affiliate with Saint Joseph's University, all student members of the University are expected to uphold the standards of this community. This includes students who have been notified of their admission to the University and/or who are matriculated, enrolled or registered in any University academic program or activity, at the graduate or undergraduate level. Students on a leave of absence and persons who were students when they allegedly violated the Community Standards are also included. The Community Standards shall apply to conduct that occurs on University premises and at University sponsored events both on and off campus. The Community Standards may also apply to off campus behavior of students, including those who are participating in study abroad programs.  Students who do not fully comply with the Educational Housing District Law (www. sju.edu/och) may be prohibited in participating in student clubs/organizations/teams (i.e., providing accurate off campus residential address).  Students are responsible for the behavior of their guests. The Vice President for Student Life/Associate Provost (VPSL)/designee shall decide whether certain conduct will commence the application of the Community Standards based on the fact and circumstances of each case.

<u>What Conduct Would Violate the Community Standards?</u>
Any behavior that violates standards set forth in the Student Handbook, the University Catalog, approved organizational constitutions and by-laws, room/board contracts and other University bulletins, as well as behavior that fails to meet the four University Expectations outlined above may violate the Community Standards. Specifically, any student or student organization alleged to have committed or alleged to have

attempted to commit any of the following acts is subject to the Community Standards process outlined in this document. This is not an all-inclusive list.

1. Physically abusing or threatening another person, or engaging in any other conduct that threatens or endangers the health or safety of another person (e.g. stalking).

2. Committing a sexual offense (see Sexual Violence Policy).

3. Hazing (see Policy on Hazing).

4. Violating the drug policy (see Drug Policy).

5. Violating the alcohol policy (see Alcohol Policy).

6. Using, possessing, selling, or distributing fireworks, firearms, or other dangerous items (see Firearms Policy).

7. Using fire to endanger, to harm another person or to destroy property; misusing or damaging fire safety equipment; initiating a false report; and/or failing to evacuate a building during an alarm.

8. Engaging in conduct that is verbally or physically offensive and interferes with others' ability to receive educational benefits (see Policy Prohibiting Harassment).

9. Bullying another person (see Bullying Policy).

10. Destroying, damaging, or stealing private, public, or University property, or possessing stolen property.

11. Failing to comply with the directions of University personnel (e.g. Residence Life and Public Safety staff) who are acting in the performance of their duties. This includes failing to respond to a request for identification, or providing false identification.

12. Entering and/or using University premises, facilities or property without authorization; possessing, duplicating, or using keys or access cards without authority.

13. Engaging in lewd, obscene, or indecent behavior, including making lewd, obscene, or indecent gestures.

14. Using slurs or other derogatory language based on race, gender, ethnicity, religion, sexual orientation, or other discriminatory basis.

15. Violating the sexual activity policy (see Sexual Activity Policy).

16. Violating the University's computing policies (see Guidelines for the Use of Computing and Network Resources at Saint Joseph's University).

17. Making an audio or video recording of any person without that person's consent and/or prior knowledge.

18. Willfully interfering with, attempting to interfere with or disrupting the conduct of classes or other university activities.
19. Substantially interfering with the right to freedom of expression.
20. Misrepresenting identity or age; forging or altering records including University identification card or parking permits.
21. Engaging in illegal gambling activities (see Statement on Illegal Gambling).
22. Failing to comply with sanctions imposed for earlier Community Standards violations or interfering with the University Community Standards process (e.g. retaliatory action).
23. Violating residence life policies, e.g., quiet hours, guest policy (see Residence Life Policies).
24. Violating the student vehicle policy (see Student Vehicle Policy).
25. Littering.
26. Smoking in unauthorized locations.
27. Violating any federal, state, or local law or any University policy, rule, or regulation.
NOTE: Violations of the University's Academic Honesty Policy are addressed according to the process set forth in the Academic Honesty Policy, rather than under the Community Standards.

**What Should Be Done if Present During a Violation?**
When a student knowingly is in the presence of a violation of Community Standards, the University expects him or her to do one or more of the following: notify University staff, ask the individual(s) to stop, or remove himself or herself from the situation immediately.  All students should recognize that their presence during a violation may subject them to disciplinary action.

**What if Conduct May Also be a Violation of Law?**
University Community Standards proceedings may be instituted for conduct that potentially violates both criminal law and the University's Community Standards without regard to pending criminal arrest or prosecution. Proceedings in accordance with the Community Standards process may be carried out prior to, simultaneously with, or following criminal proceedings. Determinations made or sanctions imposed in

accordance with the Community Standards process shall not be subject to change solely because criminal charges arising out of the same facts were dismissed, reduced, or resolved in favor of the criminal law defendant. The University may refer violations of the law to local law enforcement agencies.

**What Should Be Done If You or Someone You Know Needs Help?**
The welfare of each person in the Saint Joseph's University community is paramount, and SJU encourages students to offer help and assistance to others in need.  Because the University understands that fear of disciplinary action may deter requests for emergency assistance, this statement was created to alleviate such concerns and reduce hesitation by SJU students to seek help.

Students are expected to immediately report conduct or activity which poses a danger to the community or its members. For example, all students are expected to seek appropriate assistance for themselves or others in situations where help is needed to ensure proper care of a person who is significantly intoxicated or under the influence of drugs.  Students should not hesitate to seek help because of fear of disciplinary action. In most circumstances, the help seeker and the student in need will not be charged with a policy violation under the University Community Standards system.  Although students may be required to meet with a University official regarding the incident, Saint Joseph's University will support and encourage this behavior by treating it as a health and safety matter, not as a disciplinary incident.  In rare circumstances, such as cases of repeated, flagrant, or serious violations of the Community Standards (e.g. bodily harm, sexual violence, physical or verbal abuse or harassment, distribution of drugs, hazing, theft) or violations that caused the harm to another person requiring emergency response, a student's behavior may be considered more than a health and safety matter.

**How does the Community Standards Process Begin?**
Any member of the University community ("complainant") may file a complaint against a student(s) or student organization ("respondent") alleging violation of the Community Standards. An incident report completed by a Public Safety or Residence Life staff member or a written complaint prepared by any other member of the University community and directed to

the Office of Community Standards[1] begins the process. In the case when the University initiates an incident report, it becomes the complainant. A complaint shall be submitted as soon as possible after the event takes place, preferably within one week; however, the timeliness of a complaint shall be determined by the Vice President for Student Life/Associate Provost based on the fact and circumstances presented.

**Can there be an Interim Suspension /Conditional Attendance?**
If at any time during the Community Standards process, the Vice President for Student Life (VPSL)/Associate Provost/designee deems a student's continued presence to be a risk to the health, safety, or welfare of anyone within the University community or to the student him or herself, that student may be placed on interim suspension (immediate separation from the University) or be given guidelines for conditional attendance (e.g. housing/class relocation) by the VPSL/designee. During this time, the student may be denied access to the residence halls, and/or to the campus (including classes), and/or all other University activities or privileges for which the student might otherwise be eligible. There is no appeal of this status, but the University shall make every effort to conduct the Community Standards process without undue delay. The student shall remain on an interim suspension or on conditional attendance until the hearing and/or appeal process determines his/her status. In addition, at any time after the filing of a complaint, the Office of Community Standards may place a registration hold on the record of any student pending the outcome of proceedings or enforcement of a sanction. A registration hold may prevent, among other things, registration, the release of transcripts, and the awarding of a degree.

**What if the Respondent Withdraws from the University during the Community Standards Process?**
If a respondent voluntarily withdraws from the University while a complaint is pending, a registration hold shall be placed on the respondent's account and the respondent shall not be permitted to re-enroll until after the complaint has been resolved. In most cases, the Community Standards process shall continue and a decision may be rendered based

[1]The Director of Community Standards is Kiersten White. Telephone 610-660-1046 or email at kwhite@sju.edu

on available information whether or not the respondent is available. No student may be found to have violated the Community Standards solely because the student failed to appear. If the complaint cannot be resolved because the complainant, witnesses, or evidence are not available, in most cases re-enrollment shall be denied. Permission for readmission shall be granted at the discretion of the Vice President for Student Life/Associate Provost.

**What is the Community Standards Process?**
When an incident report/complaint is received, the report/complaint is assigned to an administrator within the Division of Student Life. The following options are available for case resolution (as determined by the Office of Community Standards):
1. Alternative Resolution Hearing, in most cases, with a member of the Division of Student Life.
2. Administrative Hearing, in most cases, with a member of Residence Life or Community Standards professional staff.
3. Peer Review Board Hearing with a four or five person panel consisting of students.
4. Community Standards Board Hearing with a five person panel consisting of faculty, administrators/staff, and students.

In most cases, allegations of less serious violations shall be heard by an Administrative Hearing Officer or the Peer Review Board, or addressed through alternative resolution. Generally, more serious violations including significant interpersonal conflicts/sexual offenses shall be heard by an Administrative Hearing Officer or the Community Standards Board. Mediation will not be used to resolve sexual offense complaints.

**Who is the Alternative Resolution or Administrative Hearing Officer?**
Any professional staff member of the University community may serve as a Hearing Officer to hear a complaint. In most cases, the Hearing Officer is a member of the Office of Community Standards or Office of Residence Life. The Office of Community Standards determines who shall hear a case.

**What is the Peer Review Board?**
The Peer Review Board (PRB) is a group of students who are

trained to hear specific cases. The PRB includes the following members:

**Board** –Students are selected by a committee composed of the Vice President for Student Life/Associate Provost (VPSL)/ designee, the Chairs of the PRB, and the Presidents of the University Student Senate, the Greek Council, and the Student Union Board.

**Chairpersons** – Two non-voting student members are selected annually by agreement of the President of the University Student Senate, and the VPSL/designee.

**Moderator** – The Moderator is selected from the professional staff of Student Life by the VPSL for a term of at least two semesters. The Moderator shall advise the PRB on matters such as the type of information that may help in determining if Community Standards were violated and precedents in sanctions. The Moderator shall also facilitate the appropriate paperwork and record keeping, as well as reserve the hearing space.

When a hearing is necessary, the moderator selects five student representatives (or four, with the agreement of the respondent and complainant) to serve on a hearing panel to hear the case. Board Members shall disqualify themselves from serving on a Peer Review Board case if they believe in good faith that they cannot be objective in the matter. The respondent and complainant may object to a member for cause in writing at least 48 hours before the hearing. The Moderator shall rule on all objections and replace any disqualified members.

### What is the Community Standards Board?

The Community Standards Board (CSB) is a group of students, faculty, and administrators/staff who are trained to hear cases that involve more serious violations of the Community Standards. The CSB includes the following members:

**Board** – The Community Standards Board is a seventeen-person board, consisting of seven students, five faculty members, and five administrators/staff. Five student members are selected from the Peer Review Board by the Peer Review Board Moderator, and two graduate student members are appointed by the Dean of each school; the five faculty members are selected by the Faculty Senate; and the five administrators/ staff are appointed by the Vice President for Student Life/

Associate Provost (VPSL). The term of membership on the Community Standards Board shall be two years for faculty and administrators/staff and one year for students, running from September to September. Terms are renewable.

**Chairperson** – The Chairperson is a voting member, who is selected by the Moderator on a case-by-case basis.

**Moderator** – The Moderator is selected from the professional staff of Student Life by the Vice President for Student Life/Associate Provost for a term of at least two semesters. The Moderator shall advise the CSB on matters such as the type of information that may help in determining if Community Standards were violated and prior sanctions relating to similar conduct. The Moderator shall also facilitate the appropriate paperwork and record keeping, as well as reserve the hearing space.

When a hearing is necessary, the Moderator selects five representatives to serve on a hearing panel to hear the case. The composition of each panel shall consist of at least one faculty member, one student, and one administrator/staff. Board Members shall disqualify themselves from serving on a Community Standards Board case if they believe in good faith that they cannot be objective in the matter. The respondent and complainant may object to a member for cause in writing at least 48 hours before the hearing. The Moderator shall rule on all objections and replace any disqualified members.

### What Happens Before the Hearing?

Upon receiving notice of an alleged violation, the appropriate Hearing Officer or Moderator shall notify the respondent via University email. The process of the hearing will be outlined in the notice. In addition, in the case of a CSB hearing, a pre-hearing meeting will be scheduled. In order to schedule a hearing, class schedules are reviewed to find a common available time. Students are expected to attend their hearings or to forfeit the opportunity to provide information orally. The respondent's failure to attend the hearing does not limit the Hearing Officer, PRB, or CSB from making a decision based upon available information. If a student misses a hearing due to an emergency, it is the student's responsibility to contact the Hearing Officer or Moderator within 24 hours after the scheduled hearing. No student may be found to have violated

the Community Standards solely because the student failed to appear.

In matters involving allegations of sexual harassment, the respondent and complainant are entitled to equal process. Complaints will be resolved promptly, normally in no more than 60 days.

### What is a Community Standards Advisor?
At any time during the Community Standards process, the respondent or complainant may consult with an advisor from the community. An advisor is a member of the University community who is permitted to consult with the student throughout the process, including accompanying the student at a hearing. Advisors are not to speak or ask questions on behalf of the student during the hearing. Non-University advisors, including parents and legal counsel, are not allowed to serve as advisors or attend the hearing. The Office of Community Standards has the final determination as to who may serve as an advisor. Trained advisors are listed on the Community Standards website (www.sju.edu/communitystandards), and available in the Office of Community Standards (Campion 239).

### What are the Hearing Procedures?
The Community Standards process is designed to encourage open discussion among the participants that promotes the understanding of the facts, the individuals involved, the circumstances under which the incident occurred, and the nature of the conduct. However, during the hearing, accommodations such as providing separate facilities, to ensure the personal safety and well-being of the complainant, respondent, and/or other witnesses, may be employed. Hearings shall be private.

Community Standards proceedings are not criminal or civil proceedings, but rather, internal administrative determinations of violations of institutional policy. Civil or criminal rules of procedure and evidence do not apply. The Vice President for Student Life/Associate Provost (VPSL)/designee shall make the final determination on the appropriateness of non-institutional information (i.e. polygraph test results, drug test results). Information, including hearsay, may be considered if material to the issue, not unduly repetitious, and the sort of information

on which responsible persons are accustomed to rely in the conduct of serious affairs. After receiving information at the hearing, the Hearing Officer, Peer Review Board, or Community Standards Board shall determine, as to each respondent and as to each potential violation of the Community Standards, whether the respondent(s) is responsible for violating the Community Standards. The Hearing Officer, PRB, or CSB evaluates the information received and considers credibility of information and witnesses when determining if the Community Standards were violated. This determination shall be based upon the facts of the conduct alleged, and whether it is more likely than not that the student is responsible for the alleged violation(s). Subsequent reviewers shall not determine anew whether there was a Community Standards violation.

### What Factors are Considered in Sanctioning?

If the Hearing Officer, PRB, or CSB determines that there was a violation of the Community Standards, a sanction(s) shall be imposed. In addition to the egregiousness of the violation itself, the following shall be considered in determining sanctions: motivation; present attitude; past record, both positive and negative; the severity of the damage, injury, harm, or disruption, or the potential for such; honesty; maturity; cooperation; willingness to make amends; and compliance with previous sanctions.

### What are Likely Sanctions for Community Standards Violations?

A student or student organization found responsible for violating the Community Standards may expect to receive one or more of the following sanction(s).

1. **Warning**. Written or verbal notice given and kept on file.
2. **Program Attendance or Facilitation**. Expectation to attend or facilitate an educational program(s).
3. **Writing Assignment**. Requirement to complete a relevant research and/or reflection paper.
4. **Discretionary Sanctions**. Requirement to complete and/or participate in work assignments, community service, University services or programs, or other related discretionary assignments.
5. **Loss of Privileges**. Denial of specific privileges for a defined period of time (e.g. guest, computer, housing selection,

visitation, dining services, University representation, co-curricular activities, athletic participation, work study position, leadership role).

6. **Counseling Assessments/Meetings**. Assignment to complete a number of counseling sessions including but not limited to anger management, alcohol or drug assessments, and alcohol education classes.

7. **Fines**. Requirement to pay a specified monetary fee to the University. Fine money shall be used for educational and non-alcoholic alternative programs.

8. **Restitution**. Requirement to make payment to the University, other persons, groups, or organizations for damages.

9. **Administrative Relocation in University Housing**. Requirement to be placed in an assigned or relocated space in University housing.

10. **Disciplinary Probation**. A period of fixed duration, during which the status of a student or organization at the University may be evaluated. This includes the possibility of more severe sanctions if the student or organization is found responsible for violating the Community Standards during the probationary period.

11. **Deferred Suspension**. A designated period of time during which a student is given the opportunity to demonstrate the ability to abide by the community's expectations of behavior articulated in the Community Standards. If the student is found in violation of any University standard during the time of deferred suspension, a suspension may take effect immediately without further review. Additional sanctions appropriate to the new violation may also be issued.

12. **Removal from University Residence**. Separation from the residence halls for a defined period of time. The student may be prohibited from participating in the University dining program. The student shall be barred from entering all residences within the University residential community during the time of removal from campus housing.

13. **Suspension**. Separation from the University for a specified period of time. The student or student organization shall not participate in any University-sponsored activity and may be banned from the University premises. The University will not accept any credits earned from another institution during this period toward a University degree. In the case of residence hall groups, this sanction may include the disbanding of

a living unit, and in the case of a student organization, this may include the removal of recognition. Reinstatement shall require the approval of the Vice President for Student Life/ Associate Provost.

14. **Expulsion**. Permanent separation from the University and University facilities.

15. **Revocation of Admission and/or Degree**. Admission to or a degree awarded from the University may be revoked at any time for fraud, misrepresentation, or another violation of Community Standards in obtaining the degree, or for other serious violations committed by a student prior to graduation.

16. **Withholding Degree**. The University may withhold awarding a degree otherwise earned until the completion of the process set forth in the Community Standards, including the completion of all sanctions imposed, if any.

Failure to abide by or complete any sanction shall be considered an additional violation of the Community Standards.

For Title IX violations, the University will take specific steps to prevent reoccurences of any harassment and to correct discriminatory effects on the complainant and others, if appropriate.

**How is the Respondent Notified of the Outcome of a Hearing?**
The respondent shall be notified in writing, at a minimum in the form of an email to the official SJU student account, of the outcome of a hearing, in most cases within three business days after the hearing. The University does not disclose the results of a hearing other than to the respondent; however, it may disclose results expressly permitted by law, for example:

• The proper University authorities shall be notified of any sanction.

• Parents of students under age 21 may be informed of Community Standards violations with respect to the use or possession of alcohol or controlled substances.

• In some cases as consistent with applicable considerations, parents of dependent students may be notified of the outcome of a hearing or scheduled for a meeting with staff regarding the student's status at the University.

• The University will notify in writing the alleged victim of a crime of violence or sexual harassment, or to the alleged

victim's next of kin (if the victim dies as a result of the crime or offense), the outcome and sanctions of the complaint related to the victim. The final results of these proceedings may also, in some cases, be disclosed to the University community.

**What is the Appeals Process?**
In cases of crimes of violence or sexual harassment, both the respondent and complainant shall have the right to appeal the decision.  For all other cases, the respondent shall have the right to appeal the decision.   Appeals are considered under the following criteria. Requests for appeals shall be directed in writing to the Vice President for Student Life/Associate Provost (VPSL) within three business days of written notification of the action taken by the Hearing Officer, PRB, or CSB. The appeal should be delivered to the Vice President for Student Life/Associate Provost in Campion 238 or emailed to studentappeals@sju.edu. The appeal process is reserved only for serious cases, for example, when the outcome may have been sanctions 12 through 16 listed above. In the written appeal, evidence of one or more of the following must be clearly demonstrated:
1. A material failure to follow the procedures of the Community Standards process that affected the outcome.
2. There is new information, sufficient to alter a decision that was not reasonably available at the time of the original hearing.
3. The sanction(s) was not consistent for the violation(s) of the Community Standards.  Relevant sanctions are only disclosed to the victim in cases of crimes of violence or sexual harassment.
Appeals submitted for other reasons or past the three business day time limit shall not be considered. The Vice President for Student Life/Associate Provost in concert with the Provost/designee may review all available information pertaining directly to the appeal, and in most cases shall make a decision within 5 business days of the appeal request period expiring. The VPSL and Provost/designee may 1) replace the sanction with another which may be more severe, less severe, or otherwise different; 2) remand the case for reconsideration; 3) direct the case for a new hearing. The VPSL and Provost/designee will convey his/her decision in writing to both parties, in the case of sexual harassment.  The decision made on appeal will be final.  If the VPSL and Provost/designee find

no merit to the appeal, the decision of the original hearing shall stand. While an appeal is pending, sanctions are not in effect unless the VPSL imposes an interim suspension/conditional attendance as highlighted above. In cases where the VPSL and/or the Provost/designee is/are a party to the hearing, a designee(s) will hear the appeal.

**What is the Policy on Retention of Discipline Records?**
Community Standards violations and sanctions shall not be made part of the student's permanent academic record, but shall become part of the student's educational record. Student discipline records not relating to expulsion from the University are kept for five years after the conclusion of the semester last attended by the student.  Student discipline records relating to expulsion from the University are kept permanently.  Case notes shall not be made a part of the student's educational record, and will be destroyed upon the conclusion of the appeal period.   Records are maintained by the Office of Community Standards and are generally confidential except in the case of subpoena, student consent (including background checks), or as provided above.

**Interpretation and Revision**
Any question of interpretation regarding the Community Standards shall be referred to the Vice President for Student Life/Associate Provost (VPSL) for final determination. A review of the Community Standards shall be coordinated by the VPSL every three years, but may be revised when deemed appropriate.

### ACADEMIC HONESTY POLICY

*[This policy was approved by the University Council on May 20, 1982, revised by University Council April 20, 1995, and approved by the President April 27, 1995, and further amended by the University Council October 21, 2004 and March 19, 2009.]*

The University exists primarily to sustain the pursuit of knowledge. Learning, to have true value, must be linked to a sense of honesty and integrity. It is the responsibility of every person in the academic community—faculty members, students, administrators—to ensure that dishonesty is not tolerated.

Personal and communal integrity have always been

to the University. Students involved in activity of this nature will be subject to disciplinary action and/or counseling.

Approved by University Council on March 16, 2006 and approved by the President on May 25, 2006.

Please Note: Due to recent guidance from the Office for Civil Rights, the process for *Student on Student* Sexual Offense violations will follow the Community Standards process and **not** the process stated below.  An update to the entire policy is forthcoming.

A. *Purpose*
It is the purpose of this document to state Saint Joseph's University's (SJU) policy on sexual offenses and to identify and describe procedures and resources available to those individuals who believe they have been a victim or victims of a sexual offense, and to identify the possible sanctions for violations of this policy, the appeals procedures and educational programs.

B. *Policy*
Saint Joseph's University will not tolerate sexual offenses, whether forcible or non-forcible, on its campus or at University-sponsored events, by any member of the SJU community (faculty, students, administrators, and staff including union members). A definition of sexual offenses is contained in C below. The University also reserves the right, in its sole discretion, to take action under this Policy for off-campus behavior. Sexual offenses are not only a violation of law and reprehensible in any context, but are a matter of particular concern in an academic community in which students, faculty and staff are related by strong bonds of dependence and trust.

A member of the Saint Joseph's community charged with a sexual offense may be prosecuted under applicable criminal statutes of the location where the offense occurred, and may, whether or not criminal charges are filed, be subject to internal University disciplinary proceedings.

An individual who believes that he or she has been a victim of a

sexual offense is encouraged to report the matter immediately to the Office of Public Safety and Security (610-660-1111), and/or the local police (911).  Evidence including clothing, drinks, glasses, bed linens, etc. should be preserved.  In order to preserve evidence of body hairs and fluids, a victim should be medically examined as soon as possible and before any showering, bathing or other clean up occurs.  Support is available as set forth later in this policy under Section H.  These support services are also available for individuals who are not sure if they are victims of a sexual offense.

While it is best to report the offense immediately, it can be reported at any time.

C. *Sexual Offenses*

The Federal Uniform Crime Reporting Program defines a forcible sexual offense as any sexual act directed against that person's will; or not forcibly against the person's will where the victim is incapable of giving consent. Non-forcible sexual offenses are acts of unlawful, non-forcible sexual intercourse and include incest and statutory rape. Certain conduct that may be a violation of the University's Sexual Offense Policy may also be considered crimes under Pennsylvania law (See, among other websites, http://www.pitt.edu/~weinberg/sexual.htm. Such potential crimes include, but are not limited to:

1. Rape.  Sexual intercourse obtained through force or threat of force or without the victim's consent. Sexual intercourse includes vaginal, anal, or oral sex.  Ejaculation is not necessary, but there must be some penetration, however slight.

2. Involuntary deviate sexual intercourse. Oral or anal sexual intercourse obtained through force or threat of force or without the victim's consent.

3. Sexual assault.  Sexual intercourse or deviate sexual intercourse without the victim's consent.

4. Aggravated indecent assault.  The penetration, however slight, of the genitals or anus by a part of the offender's body for any purpose other than good faith medical, hygienic or law enforcement procedures, by force or threat of force or without the victim's consent.

5. Indecent assault.  Any touching of the intimate parts of a person, by force or threat of force or without the victim's consent.

6. Indecent exposure.  Exposure of genitals in any public place or any place where the conduct is likely to offend, affront or alarm.

There are situations when a person may be considered incapable of giving consent such as, if he/she is: asleep, unconscious and/or losing and regaining consciousness, or clearly mentally or physically incapacitated, for example, by alcohol and/or other drugs. A verbal "no" even if it may sound indecisive or insincere, constitutes lack of consent. Further, it is not necessary that an individual resist an attack or otherwise affirmatively express lack of consent.

Use of alcohol and/or other drugs shall not diminish one's responsibility to obtain consent. Being in an on-going relationship does not preclude the possibility of sexual misconduct occurring within that relationship.

D. *Report Procedures*
1. Office of Public Safety and Security (610-660-1111).  A report of a sexual offense should be made to the Office of Public Safety and Security.  This can be done by calling (610) 660-1111.  The Office of Public Safety and Security will provide information about filing criminal charges.  If the person making the report of a sexual offense so desires, the Office of Public Safety and Security will assist her or him in contacting the local police. This office will also provide information for contacting a member of REPP (Rape Education and Prevention Program; beeper number 610-733-9650, available 24 hours a day) if she or he so desires.

2. Police.  The matter may be reported directly to the police in the location where the offense occurs.  Nine-one-one (911) may be called for both the Philadelphia and Lower Merion police.  If the police are handling the matter, the Office of Public Safety and Security may defer or postpone its investigation.

3. Reports to Campus Security Authorities. Any University

"campus security authority" as defined by the federal Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, who receives a report of a sexual offense, must report the offense to the Office of Public Safety and Security. A "campus security authority" is defined as: (1) a campus police or security department; (2) any other individual who has responsibility for campus security, e.g., an individual who is responsible for monitoring entrance into the University's property; or (3) an official of an institution who has significant responsibility for student and campus activities, including student housing, student discipline and campus judicial proceedings.

Specifically exempted from the definition of campus security authorities are pastoral or professional counselors when acting in that capacity. A pastoral counselor is defined as "a person associated with a religious order or denomination, is recognized by that religious order or denomination as someone who provides confidential counseling, and is functioning within the scope of recognition as a pastoral counselor." A professional counselor is defined as "a person whose official responsibilities include providing mental health counseling to members of the institution's community and who is functioning within the scope of his or her license or certification."

Examples in the federal regulations of persons with "significant responsibility for student and campus activities" include an administrator who oversees student housing, a student center, or student extra-curricular activities; a director of athletics or team coach; or a faculty advisor to a student group. The federal regulations further provide: "A single teaching faculty member is unlikely to have significant responsibility for student and campus activities, except when serving as an advisor to a student group. A physician in a campus health center or a counselor in a counseling center whose only responsibility is to provide care to students is unlikely to have significant responsibility for student and campus activities. Also, clerical staff are unlikely to have significant responsibility for student and campus activities."

Student resident assistants or other persons with significant responsibility for student and campus activities who receive a

report of a sexual offense must report the offense to the Office of Public Safety and Security within twenty-four (24) hours of receiving report of the alleged offense.

E. *University Response When There is a Report of a Sexual Offense*
1. Immediate medical and/or psychological assistance will be made available to the person making the report of a sexual offense. Security will provide transportation to a hospital that specializes in rape treatment, if appropriate, and the University Counseling Center staff member on duty will be notified, if requested.

2. The Office of Public Safety and Security will provide guidance to the individual concerning the preservation of relevant evidence.

3. The Director of Residence Life, in consultation with other offices, as necessary, will make changes in the academic, living and/or employment situation of a student who has reported a sexual offense if such changes are reasonably feasible. The appropriate Administrative Officer (defined in E8) will make changes in the academic or employment situation of an employee or faculty member who has reported a sexual offense if such changes are reasonably feasible.

4. Any member of the University community who is charged with a violation of this policy may be placed on immediate suspension, and/or barred from University property, pending the outcome of the process, if that individual poses a threat to the health, safety or welfare of the University community, as determined by the Administrative Officer (or in the case of a student, by the Vice-President for Student Life) with the authorization of the President. In the case of an employee or faculty member, the Administrative Officer shall also determine whether such suspension is to be with or without pay.

5. The Office of Public Safety and Security will conduct a prompt and thorough investigation and prepare a factual report that will be conveyed to the Administrative Officer (defined below in E8) and/or if the alleged offender is a student, to the Student Life Administrator, as defined by the Community Standards set

forth in the Student Handbook.

6. Student Process. When the alleged offender is a student, the offense will be handled under the Community Standards and Disciplinary Process as a violation, along with any other alleged violations of the Community Standards in connection with the incident. In most cases, allegations of a sexual offense shall be heard by the Community Standards Board, consistent with published Community Standards processes. Both parties (the accused and the alleged victim) may have a support person from the SJU community who may accompany him/her during the hearing. The support person may only speak to the respective accused/alleged victim and/or respond to questions put directly to him/her from the administrator during the hearing. Either party shall have the right to appeal the decision.

7. Non-Student Process. When the alleged offender is a faculty member or non-faculty employee, the following shall occur:

a. The investigative report from the Office of Public Safety and Security will be made available to the appropriate Administrative Officer (defined below in E8) in preparation for administrative review. Both formal and informal administrative review procedures will be available and are specified below according to whether the accused is a non-faculty employee or faculty member. Both parties (the accused and the alleged victim) may have a support person from the SJU community accompany him/her during any of the procedures of this policy. The support person may only speak to the respective accused/alleged victim and/or respond to questions put directly to him/her from the administrator during the hearing.

b. The appropriate Administrative Officer will promptly review the facts developed by the investigation and make a determination as to whether there is reason to believe that a violation of this policy has occurred, that is, s/he will determine that either an offense may have occurred, did occur, or that there is insufficient evidence to substantiate the allegation(s) of an offense. If the Administrative Officer finds such reason, s/he may attempt to bring about an informal resolution between the person making the report of a sexual offense and the accused. However, the person

making the report of a sexual offense shall not be pressured or required to enter into any such informal resolution.

c. In the event that an informal resolution is not reached, the following procedures will be pursued:

(i) When the accused is a non-faculty employee (including union members):

The Administrative Officer will conduct a hearing and/or meet with all parties involved. The Administrative Officer will prepare a written report, including findings and recommended sanction(s) and convey it to both parties. The Administrative Officer shall implement the sanction(s) in consultation with the Vice President overseeing the employee's department.

(ii) When the accused is a member of the faculty:

The Administrative Officer will prepare a written report, including findings and recommended sanction(s) and convey it to both parties. The Administrative Officer shall implement the sanction(s) in consultation with the University's Chief Academic Officer. If dismissal is recommended, the procedures outlined in the Faculty Handbook regarding Separation and Appeals Procedures shall be followed.

d. Either party has the right to appeal as set forth below (Section G). The outcome of the appeal process will be final.

8. Administrative Officer. The administrative officers are:

| Alleged Offender | Administrative Officer |
|---|---|
| Faculty | Faculty Member's Dean |
| Non-Faculty Employees (including union members) | Director of Human Resources |

The Administrative Officer may designate another individual to act in his or her place. In a situation where the President concludes that the participation of any of these individuals would compromise the impartiality of the process or have the appearance of partiality, the President may designate another individual to act as the Administrative Officer. The alleged offender may appeal this appointment in writing directly to the President, giving reasonable and specific cause for his/her appeal of the President's appointment. Should the President deny that appeal, the alleged offender may appeal the President's appointment through established University grievance procedures.

### F. *Sanctions*

A sanction will be imposed for violation of this policy. The University has wide discretion as to the sanctions that may be imposed.

Faculty and Non-Faculty Employees (including Union Members). The sanctions that will be imposed for violation of this policy may include discipline, suspension and/or dismissal. If the sanction is suspension, then the applicable Administrative Officer shall identify whether it is with or without pay.

Students. The sanctions that may be imposed for violation of this policy include, but are not limited to, removal from the residence community, removal from participation in extracurricular activities, suspension from the University and/or expulsion from the University. Appropriate sanctions may also be imposed upon groups or organizations found to have violated this policy. Both the accuser and accused shall be informed of the University's final determination in a disciplinary proceeding and any sanction imposed against the accused.

### G. *Appeal Procedures*

1. Students. Appeals shall be heard by the Vice President for Student Life and Provost in accordance with the procedures set forth in the Student Handbook, provided that either the alleged offender or alleged victim may appeal a decision of the Student Life Administrator.

2. Non-Faculty Employees (including Union Employees). Either party may appeal a decision by the Administrative Officer by notifying the Appeals Officer identified below in writing within 5 business days of the decision of the Administrative Officer. The Appeals officer will convey his/her decision in writing to both parties. The decision made on appeal will be final, subject to any further rights of appeal under an applicable collective bargaining contract.

| Alleged Offender | Appeals Officer |
| --- | --- |
| Non-Faculty Employees | Vice President for Financial Affairs |
| Union Employees | Vice President for Administrative Services |

3. Faculty. Either party may appeal a decision by the

Administrative Officer to the University's Chief Academic Officer, by written notice of appeal within 5 business days of the decision of the Administrative Officer. With respect to any sanction, faculty shall have such appeals rights as are set forth in the Faculty Handbook.

H. *Resources*

Saint Joseph's University has developed a Rape Education and Prevention Program (REPP) and trained teams to assist an individual who has reported a sexual offense. The team will consist of at least two community members who have received training in rape crisis counseling. One person will be designated as the advocate who will stay with the individual throughout all examinations and questioning, if desired. The role of the advocate will be to provide support, inform the individual of all options and rights, advise regularly about the status of the case and accompany the individual throughout disciplinary, administrative or criminal proceedings, as needed.

REPP's web site, http://www.sju.edu/cas/sociology/rape_education/index.html contains information about reporting sexual offenses, medical treatment, victims' rights, criminal and disciplinary proceedings, the need for professional counseling, campus personnel and services available for victim assistance, information about testifying in court, feelings and reactions experienced by most victims and ways to deal with feelings. The purpose of this information and the advocate is to enable the individual who reports a sexual offense to make informed choices, NOT to pressure or convince her/him to take any particular course of action.

The Counseling Center (610-660-1090) offers confidential counseling to students for a wide variety of concerns, including the psychological effects of sexual offenses. Referral for in-patient or outpatient psychiatric care is also available to students, faculty and staff.

| Resources | Phone Numbers |
|---|---|
| • Security | 610-660-1111 |
| • REPP | 610-733-9650 |
| • Counseling Center | 610-660-1090 |
| • Human Resources | 610-660-3309 |

I. *Education*

Rape education and prevention resources are available on the University web site at http://www.sju.edu/academics/cas/sociology/rape_ education/index.html The Office of Public Safety and Security annually publishes campus security reports that include statistics on campus crimes and arrests for certain specified categories of offenses. The report also describes policies related to campus security. The reports are distributed electronically to all current students and employees and, upon request, to applicants for enrollment or employment, and are available on the University's web site at http://www.sju.edu/security/annual_report.htm The student newspaper regularly publishes "incidents of crime" on and around campus. These periodic reports are supplied by the Office of Public Safety and Security on a weekly basis during the fall and spring semesters. In addition, the Office of Public Safety and Security conducts an annual security presentation to incoming first year students and transfer students at Orientation. This presentation includes information about how to develop personal protection plans, including protection against rape. The distribution of the Student Handbook which contains the Sexual Offense Policy, and additional programming during new student orientation and during the first few weeks of the semester continues this educational effort.

During the course of the academic year, Student Life sponsors or co-sponsors at least one program each semester on acquaintance rape and/or gender issues.

J. *Consultation regarding this Policy, Sexual Offenses, and Sexual Harassment*

A sexual offense differs from sexual harassment.  Examples of sexual offenses are identified in Section C of this document. Sexual harassment is defined in Section IV of the Policy Prohibiting Harassment.  This latter policy can be found on the University web site at http://www.sju.edu/resources/humanresources/harassment.html and in the faculty, staff, and student handbooks.

Any member of the Saint Joseph's university community may contact the Chair or any member of the Harassment Advisory Team if s/he feels that s/he is the victim of sexual harassment. (http://www.sju.edu/resources/humanresources/harassment.html)

"C"



# UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

April 4, 2011

Dear Colleague:

Education has long been recognized as the great equalizer in America. The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing all students with an educational environment free from discrimination is extremely important. The sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX. In order to assist recipients, which include school districts, colleges, and universities (hereinafter "schools" or "recipients") in meeting these obligations, this letter[1] explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence.[2] Sexual violence, as that term is used in this letter, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol. An individual also may be unable to give consent due to an intellectual or other disability. A number of different acts fall into the category of sexual violence, including rape,

---

[1] The Department has determined that this Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at:* http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/012507_good_guidance.pdf. OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This letter does not add requirements to applicable law, but provides recipients and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to us at the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, DC 20202.

[2] Use of the term "sexual harassment" throughout this document includes sexual violence unless otherwise noted. Sexual harassment also may violate Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c), which prohibits public school districts and colleges from discriminating against students on the basis of sex, among other bases. The U.S. Department of Justice enforces Title IV.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX.

The statistics on sexual violence are both deeply troubling and a call to action for the nation. A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.[3] The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college.[4] According to data collected under the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), in 2009, college campuses reported nearly 3,300 forcible sex offenses as defined by the Clery Act.[5] This problem is not limited to college. During the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools.[6] Additionally, the likelihood that a woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.[7] The Department is deeply concerned about this problem and is committed to ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities.

This letter begins with a discussion of Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence. These requirements are discussed in detail in OCR's *Revised Sexual Harassment Guidance* issued in 2001 (*2001 Guidance*).[8] This letter supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence. This letter concludes by discussing the proactive efforts schools can take to prevent sexual harassment and violence, and by providing examples of remedies that schools and OCR may use to end such conduct, prevent its recurrence, and address its effects. Although some examples contained in this letter are applicable only in the postsecondary context, sexual

---

[3] CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY: FINAL REPORT xiii (Nat'l Criminal Justice Reference Serv., Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. This study also found that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol. *Id.* at xviii.

[4] *Id.* at 5-5.

[5] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at* http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf. Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. 34 C.F.R. Part 668, Subpt. D, App. A.

[6] SIMONE ROBERS ET AL., INDICATORS OF SCHOOL CRIME AND SAFETY: 2010 at 104 (U.S. Dep't of Educ. & U.S. Dep't of Justice, Nov. 2010), *available at* http://nces.ed.gov/pubs2011/2011002.pdf.

[7] ERIKA HARRELL & MICHAEL R. RAND, CRIME AGAINST PEOPLE WITH DISABILITIES, 2008 (Bureau of Justice Statistics, U.S. Dep't of Justice, Dec. 2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/capd08.pdf.

[8] The *2001 Guidance* is available on the Department's Web site at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. Schools' obligations and the appropriate response to sexual harassment and violence committed by employees may be different from those described in this letter. Recipients should refer to the *2001 Guidance* for further information about employee harassment of students.

harassment and violence also are concerns for school districts. The Title IX obligations discussed in this letter apply equally to school districts unless otherwise noted.

## Title IX Requirements Related to Sexual Harassment and Sexual Violence

### Schools' Obligations to Respond to Sexual Harassment and Sexual Violence

Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX.[9]

As explained in OCR's *2001 Guidance*, when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment.[10]

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

---

[9] Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in this letter also apply to gender-based harassment. Gender-based harassment is discussed in more detail in the *2001 Guidance,* and in the 2010 Dear Colleague letter on Harassment and Bullying, which is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[10] *See, e.g.*, *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as…severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.[12] Schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures. Because of these requirements, which are discussed in greater detail in the following section, schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence. OCR recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.

Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct. The specific steps in a school's

---

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at n.1.

[12] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999).

investigation will vary depending upon the nature of the allegations, the age of the student or students involved (particularly in elementary and secondary schools), the size and administrative structure of the school, and other factors. Yet as discussed in more detail below, the school's inquiry must in all cases be prompt, thorough, and impartial. In cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.[13]

Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution) before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited.[14] The school also should tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

As discussed in the *2001 Guidance*, if the complainant continues to ask that his or her name or other identifiable information not be revealed, the school should evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. Thus, the school may weigh the request for confidentiality against the following factors: the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the alleged harasser's rights to receive information about the allegations if the information is maintained by the school as an "education record" under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. Part 99.[15] The school should inform the complainant if it cannot ensure confidentiality. Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence. Examples of such steps are discussed later in this letter.

Compliance with Title IX, such as publishing a notice of nondiscrimination, designating an employee to coordinate Title IX compliance, and adopting and publishing grievance procedures, can serve as preventive measures against harassment. Combined with education and training programs, these measures can help ensure that all students and employees recognize the

---

[13] In states with mandatory reporting laws, schools may be required to report certain incidents to local law enforcement or child protection agencies.

[14] Schools should refer to the *2001 Guidance* for additional information on confidentiality and the alleged perpetrator's due process rights.

[15] For example, the alleged harasser may have a right under FERPA to inspect and review portions of the complaint that directly relate to him or her. In that case, the school must redact the complainant's name and other identifying information before allowing the alleged harasser to inspect and review the sections of the complaint that relate to him or her. In some cases, such as those where the school is required to report the incident to local law enforcement or other officials, the school may not be able to maintain the complainant's confidentiality.

nature of sexual harassment and violence, and understand that the school will not tolerate such conduct. Indeed, these measures may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment. Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond. More detailed information and examples of education and other preventive measures are provided later in this letter.

**Procedural Requirements Pertaining to Sexual Harassment and Sexual Violence**

Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:

(A) Disseminate a notice of nondiscrimination;[16]

(B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX;[17] and

(C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.[18]

These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination. They are discussed in greater detail below. OCR advises recipients to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in this letter and the *2001 Guidance.* Recipients should then implement changes as needed.

(A) _Notice of Nondiscrimination_

The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner.[19] The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator.

The notice must be widely distributed to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant persons. OCR recommends that the notice be prominently posted on school Web sites and at various

---

[16] 34 C.F.R. § 106.9.
[17] *Id*. § 106.8(a).
[18] *Id*. § 106.8(b).
[19] *Id*. § 106.9(a).

locations throughout the school or campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. The notice should be available and easily accessible on an ongoing basis.

Title IX does not require a recipient to adopt a policy specifically prohibiting sexual harassment or sexual violence. As noted in the *2001 Guidance*, however, a recipient's general policy prohibiting sex discrimination will not be considered effective and would violate Title IX if, because of the lack of a specific policy, students are unaware of what kind of conduct constitutes sexual harassment, including sexual violence, or that such conduct is prohibited sex discrimination. OCR therefore recommends that a recipient's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment, including sexual violence, and that the policy include examples of the types of conduct that it covers.

(B) *Title IX Coordinator*

The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX.[20] The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. The Title IX coordinator or designee should be available to meet with students as needed. If a recipient designates more than one Title IX coordinator, the notice should describe each coordinator's responsibilities (*e.g.*, who will handle complaints by students, faculty, and other employees). The recipient should designate one coordinator as having ultimate oversight responsibility, and the other coordinators should have titles clearly showing that they are in a deputy or supporting role to the senior coordinator. The Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.

Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate. Because sexual violence complaints often are filed with the school's law enforcement unit, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence. In addition, these employees should receive copies of the school's Title IX policies. Schools should instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents. The school's Title IX coordinator or designee should be available to provide assistance to school law enforcement unit employees regarding how to respond appropriately to reports of sexual violence. The Title IX coordinator also should be given access to school law enforcement unit investigation notes

---

[20] *Id.* § 106.8(a).

and findings as necessary for the Title IX investigation, so long as it does not compromise the criminal investigation.

(C) *Grievance Procedures*

The Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.[21] The grievance procedures must apply to sex discrimination complaints filed by students against school employees, other students, or third parties.

Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints. Therefore, a recipient may use student disciplinary procedures or other separate procedures to resolve such complaints. Any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary procedures, however, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution.[22] These requirements are discussed in greater detail below. If the recipient relies on disciplinary procedures for Title IX compliance, the Title IX coordinator should review the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.[23]

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

---

[21] *Id.* § 106.8(b). Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination.

[22] These procedures must apply to all students, including athletes. If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaints must not be addressed solely by athletics department procedures. Additionally, if an alleged perpetrator is an elementary or secondary student with a disability, schools must follow the procedural safeguards in the Individuals with Disabilities Education Act (at 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.519, 300.530-300.537) as well as the requirements of Section 504 of the Rehabilitation Act of 1973 (at 34 C.F.R. §§ 104.35-104.36) when conducting the investigation and hearing.

[23] A school may not absolve itself of its Title IX obligations to investigate and resolve complaints of sexual harassment or violence by delegating, whether through express contractual agreement or other less formal arrangement, the responsibility to administer school discipline to school resource officers or "contract" law enforcement officers. *See* 34 C.F.R. § 106.4.

*Prompt and Equitable Requirements*

As stated in the *2001 Guidance*, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint;[24] and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

As noted in the *2001 Guidance*, procedures adopted by schools will vary in detail, specificity, and components, reflecting differences in the age of students, school sizes and administrative structures, State or local legal requirements, and past experiences. Although OCR examines whether all applicable elements are addressed when investigating sexual harassment complaints, this letter focuses on those elements where our work indicates that more clarification and explanation are needed, including:

(A) *Notice of the grievance procedures*

The procedures for resolving complaints of sex discrimination, including sexual harassment, should be written in language appropriate to the age of the school's students, easily understood, easily located, and widely distributed. OCR recommends that the grievance procedures be prominently posted on school Web sites; sent electronically to all members of the school community; available at various locations throughout the school or campus; and summarized in or attached to major publications issued by the school, such as handbooks, codes of conduct, and catalogs for students, parents of elementary and secondary students, faculty, and staff.

(B) *Adequate, Reliable, and Impartial Investigation of Complaints*

OCR's work indicates that a number of issues related to an adequate, reliable, and impartial investigation arise in sexual harassment and violence complaints. In some cases, the conduct

---

[24] "Outcome" does not refer to information about disciplinary sanctions unless otherwise noted. Notice of the outcome is discussed in greater detail in Section D below.

may constitute both sexual harassment under Title IX and criminal activity. Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.

A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation. For instance, if a complainant wants to file a police report, the school should not tell the complainant that it is working toward a solution and instruct, or ask, the complainant to wait to file the report.

Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[25] Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement.

As noted above, the Title IX regulation requires schools to provide equitable grievance procedures. As part of these procedures, schools generally conduct investigations and hearings to determine whether sexual harassment or violence occurred. In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* Like Title IX,

---

[25] In one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances.

Title VII prohibits discrimination on the basis of sex.[26] OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[27] OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings.[28] Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.[29] For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's

---

[26] *See, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment). The *2001 Guidance* noted (on page vi) that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." *See also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[27] OCR's Case Processing Manual is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

[28] The Title IX regulations adopt the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. *See* 34 C.F.R. § 106.71 ("The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). The Title VI regulations apply the Administrative Procedure Act to administrative hearings required prior to termination of Federal financial assistance and require that termination decisions be "supported by and in accordance with the reliable, probative and substantial evidence." 5 U.S.C. § 556(d). The Supreme Court has interpreted "reliable, probative and substantial evidence" as a direction to use the preponderance standard. *See Steadman v. SEC*, 450 U.S. 91, 98-102 (1981).

[29] Access to this information must be provided consistent with FERPA. For example, if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records. Additionally, access should not be given to privileged or confidential information. For example, the alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history.

statement without also allowing the complainant to review the alleged perpetrator's statement.

While OCR does not require schools to permit parties to have lawyers at any stage of the proceedings, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment. OCR also recommends that schools provide an appeals process. If a school provides for appeal of the findings or remedy, it must do so for both parties. Schools must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

All persons involved in implementing a recipient's grievance procedures (*e.g.*, Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures. The training also should include applicable confidentiality requirements. In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence.[30] Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Public and state-supported schools must provide due process to the alleged perpetrator. However, schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant.

(C) *Designated and Reasonably Prompt Time Frames*

OCR will evaluate whether a school's grievance procedures specify the time frames for all major stages of the procedures, as well as the process for extending timelines. Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment. For example, the resolution of a complaint involving multiple incidents with multiple complainants likely would take longer than one involving a single incident that

---

[30] For instance, if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner.

occurred in a classroom during school hours with a single complainant.

(D) _Notice of Outcome_

Both parties must be notified, in writing, about the outcome of both the complaint and any appeal,[31] _i.e._, whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently. Title IX does not require the school to notify the alleged perpetrator of the outcome before it notifies the complainant.

Due to the intersection of Title IX and FERPA requirements, OCR recognizes that there may be confusion regarding what information a school may disclose to the complainant.[32] FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's "education record." However, as stated in the _2001 Guidance_, FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student. This includes an order that the harasser stay away from the harassed student, or that the harasser is prohibited from attending school for a period of time, or transferred to other classes or another residence hall.[33] Disclosure of other information in the student's "education record," including information about sanctions that do not relate to the harassed student, may result in a violation of FERPA.

Further, when the conduct involves a crime of violence or a non-forcible sex offense,[34] FERPA permits a postsecondary institution to disclose to the alleged victim the final results of a

---

[31] As noted previously, "outcome" does not refer to information about disciplinary sanctions unless otherwise noted.

[32] In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964, title IX of Education Amendments of 1972, title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. _See 2001 Guidance_ at vii.

[33] This information directly relates to the complainant and is particularly important in sexual harassment cases because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether he or she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the rest of the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

[34] Under the FERPA regulations, crimes of violence include arson; assault offenses (aggravated assault, simple assault, intimidation); burglary; criminal homicide (manslaughter by negligence); criminal homicide (murder and

disciplinary proceeding against the alleged perpetrator, regardless of whether the institution concluded that a violation was committed.[35] Additionally, a postsecondary institution may disclose to anyone—not just the alleged victim—the final results of a disciplinary proceeding if it determines that the student is an alleged perpetrator of a crime of violence or a non-forcible sex offense, and, with respect to the allegation made, the student has committed a violation of the institution's rules or policies.[36]

Postsecondary institutions also are subject to additional rules under the Clery Act. This law, which applies to postsecondary institutions that participate in Federal student financial aid programs, requires that "both the accuser and the accused must be informed of the outcome[37] of any institutional disciplinary proceeding brought alleging a sex offense."[38] Compliance with this requirement does not constitute a violation of FERPA. Furthermore, the FERPA limitations on redisclosure of information do not apply to information that postsecondary institutions are required to disclose under the Clery Act.[39] Accordingly, postsecondary institutions may not require a complainant to abide by a nondisclosure agreement, in writing or otherwise, that would prevent the redisclosure of this information.

## Steps to Prevent Sexual Harassment and Sexual Violence and Correct its Discriminatory Effects on the Complainant and Others

### Education and Prevention

In addition to ensuring full compliance with Title IX, schools should take proactive measures to prevent sexual harassment and violence. OCR recommends that all schools implement preventive education programs and make victim resources, including comprehensive victim services, available. Schools may want to include these education programs in their (1) orientation programs for new students, faculty, staff, and employees; (2) training for students who serve as advisors in residence halls; (3) training for student athletes and coaches; and (4) school assemblies and "back to school nights." These programs should include a

---

non-negligent manslaughter); destruction, damage or vandalism of property; kidnapping/abduction; robbery; and forcible sex offenses. Forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include rape, sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 99, App. A.

[35] 34 C.F.R. § 99.31(a)(13). For purposes of 34 C.F.R. §§ 99.31(a)(13)-(14), disclosure of "final results" is limited to the name of the alleged perpetrator, any violation found to have been committed, and any sanction imposed against the perpetrator by the school. 34 C.F.R. § 99.39.

[36] 34 C.F.R. § 99.31(a)(14).

[37] For purposes of the Clery Act, "outcome" means the institution's final determination with respect to the alleged sex offense and any sanctions imposed against the accused. 34 C.F.R. § 668.46(b)(11)(vi)(B).

[38] 34 C.F.R. § 668.46(b)(11)(vi)(B). Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the person is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses include incest and statutory rape. 34 C.F.R. Part 668, Subpt. D, App. A.

[39] 34 C.F.R. § 99.33(c).

discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies.

The education programs also should include information aimed at encouraging students to report incidents of sexual violence to the appropriate school and law enforcement authorities. Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved.[40] As a result, schools should consider whether their disciplinary policies have a chilling effect on victims' or other students' reporting of sexual violence offenses. For example, OCR recommends that schools inform students that the schools' primary concern is student safety, that any other rules violations will be addressed separately from the sexual violence allegation, and that use of alcohol or drugs never makes the victim at fault for sexual violence.

OCR also recommends that schools develop specific sexual violence materials that include the schools' policies, rules, and resources for students, faculty, coaches, and administrators. Schools also should include such information in their employee handbook and any handbooks that student athletes and members of student activity groups receive. These materials should include where and to whom students should go if they are victims of sexual violence. These materials also should tell students and school employees what to do if they learn of an incident of sexual violence. Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence.

**Remedies and Enforcement**

As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. In addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies. Examples of these actions are discussed in greater detail below.

Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation. When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the

---

[40] The Department's Higher Education Center for Alcohol, Drug Abuse, and Violence Prevention (HEC) helps campuses and communities address problems of alcohol, other drugs, and violence by identifying effective strategies and programs based upon the best prevention science. Information on HEC resources and technical assistance can be found at www.higheredcenter.org.

complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain. In addition, schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement.[41]

Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred.

When OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population. When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

Schools should proactively consider the following remedies when determining how to respond to sexual harassment or violence. These are the same types of remedies that OCR would seek in its cases.

Depending on the specific nature of the problem, remedies for the complainant might include, but are not limited to:[42]

- providing an escort to ensure that the complainant can move safely between classes and activities;
- ensuring that the complainant and alleged perpetrator do not attend the same classes;
- moving the complainant or alleged perpetrator to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;
- providing counseling services;
- providing medical services;
- providing academic support services, such as tutoring;

---

[41] The Clery Act requires postsecondary institutions to develop and distribute a statement of policy that informs students of their options to notify proper law enforcement authorities, including campus and local police, and the option to be assisted by campus personnel in notifying such authorities. The policy also must notify students of existing counseling, mental health, or other student services for victims of sexual assault, both on campus and in the community. 20 U.S.C. §§ 1092(f)(8)(B)(v)-(vi).
[42] Some of these remedies also can be used as interim measures before the school's investigation is complete.

- arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record; and
- reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the harassment and the misconduct that may have resulted in the complainant being disciplined.[43]

Remedies for the broader student population might include, but are not limited to:

*Counseling and Training*

- offering counseling, health, mental health, or other holistic and comprehensive victim services to all students affected by sexual harassment or sexual violence, and notifying students of campus and community counseling, health, mental health, and other student services;
- designating an individual from the school's counseling center to be "on call" to assist victims of sexual harassment or violence whenever needed;
- training the Title IX coordinator and any other employees who are involved in processing, investigating, or resolving complaints of sexual harassment or sexual violence, including providing training on:
  o the school's Title IX responsibilities to address allegations of sexual harassment or violence
  o how to conduct Title IX investigations
  o information on the link between alcohol and drug abuse and sexual harassment or violence and best practices to address that link;
- training all school law enforcement unit personnel on the school's Title IX responsibilities and handling of sexual harassment or violence complaints;
- training all employees who interact with students regularly on recognizing and appropriately addressing allegations of sexual harassment or violence under Title IX; and
- informing students of their options to notify proper law enforcement authorities, including school and local police, and the option to be assisted by school employees in notifying those authorities.

*Development of Materials and Implementation of Policies and Procedures*

- developing materials on sexual harassment and violence, which should be distributed to students during orientation and upon receipt of complaints, as well as widely posted throughout school buildings and residence halls, and which should include:
  o what constitutes sexual harassment or violence
  o what to do if a student has been the victim of sexual harassment or violence
  o contact information for counseling and victim services on and off school grounds
  o how to file a complaint with the school
  o how to contact the school's Title IX coordinator

---

[43] For example, if the complainant was disciplined for skipping a class in which the harasser was enrolled, the school should review the incident to determine if the complainant skipped the class to avoid contact with the harasser.

- o what the school will do to respond to allegations of sexual harassment or violence, including the interim measures that can be taken
- requiring the Title IX coordinator to communicate regularly with the school's law enforcement unit investigating cases and to provide information to law enforcement unit personnel regarding Title IX requirements;[44]
- requiring the Title IX coordinator to review all evidence in a sexual harassment or sexual violence case brought before the school's disciplinary committee to determine whether the complainant is entitled to a remedy under Title IX that was not available through the disciplinary committee;[45]
- requiring the school to create a committee of students and school officials to identify strategies for ensuring that students:
  - o know the school's prohibition against sex discrimination, including sexual harassment and violence
  - o recognize sex discrimination, sexual harassment, and sexual violence when they occur
  - o understand how and to whom to report any incidents
  - o know the connection between alcohol and drug abuse and sexual harassment or violence
  - o feel comfortable that school officials will respond promptly and equitably to reports of sexual harassment or violence;
- issuing new policy statements or other steps that clearly communicate that the school does not tolerate sexual harassment and violence and will respond to any incidents and to any student who reports such incidents; and
- revising grievance procedures used to handle sexual harassment and violence complaints to ensure that they are prompt and equitable, as required by Title IX.

*School Investigations and Reports to OCR*
- conducting periodic assessments of student activities to ensure that the practices and behavior of students do not violate the school's policies against sexual harassment and violence;
- investigating whether any other students also may have been subjected to sexual harassment or violence;
- investigating whether school employees with knowledge of allegations of sexual harassment or violence failed to carry out their duties in responding to those allegations;
- conducting, in conjunction with student leaders, a school or campus "climate check" to assess the effectiveness of efforts to ensure that the school is free from sexual harassment and violence, and using the resulting information to inform future proactive steps that will be taken by the school; and

---

[44] Any personally identifiable information from a student's education record that the Title IX coordinator provides to the school's law enforcement unit is subject to FERPA's nondisclosure requirements.
[45] For example, the disciplinary committee may lack the power to implement changes to the complainant's class schedule or living situation so that he or she does not come in contact with the alleged perpetrator.

- submitting to OCR copies of all grievances filed by students alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals.

## Conclusion

The Department is committed to ensuring that all students feel safe and have the opportunity to benefit fully from their schools' education programs and activities. As part of this commitment, OCR provides technical assistance to assist recipients in achieving voluntary compliance with Title IX.

If you need additional information about Title IX, have questions regarding OCR's policies, or seek technical assistance, please contact the OCR enforcement office that serves your state or territory. The list of offices is available at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. Additional information about addressing sexual violence, including victim resources and information for schools, is available from the U.S. Department of Justice's Office on Violence Against Women (OVW) at http://www.ovw.usdoj.gov/.[46]

Thank you for your prompt attention to this matter. I look forward to continuing our work together to ensure that all students have an equal opportunity to learn in a safe and respectful school climate.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights

---

[46] OVW also administers the Grants to Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program. This Federal funding is designed to encourage institutions of higher education to adopt comprehensive, coordinated responses to domestic violence, dating violence, sexual assault, and stalking. Under this competitive grant program, campuses, in partnership with community-based nonprofit victim advocacy organizations and local criminal justice or civil legal agencies, must adopt protocols and policies to treat these crimes as serious offenses and develop victim service programs and campus policies that ensure victim safety, offender accountability, and the prevention of such crimes. OVW recently released the first solicitation for the Services, Training, Education, and Policies to Reduce Domestic Violence, Dating Violence, Sexual Assault and Stalking in Secondary Schools Grant Program. This innovative grant program will support a broad range of activities, including training for school administrators, faculty, and staff; development of policies and procedures for responding to these crimes; holistic and appropriate victim services; development of effective prevention strategies; and collaborations with mentoring organizations to support middle and high school student victims.

<u>**CERTIFICATE OF SERVICE**</u>

I, Daniel J. Rucket, do hereby certify that I caused a true and correct copy of Defendant Jane Doe's Motion to Dismiss Plaintiff's Complaint For Failure to State a Claim Upon Which Relief Can Be Granted to be filed electronically and it is available for viewing and downloading from the ECF system.  Service upon the parties listed below was made electronically on August 16, 2013.

Respectfully submitted,

RAWLE & HENDERSON LLP

Dated: <u>August 15, 2013</u>            By: _____

Daniel J. Rucket, Esquire
I.D. No. 70009
The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4200
*Attorneys for Defendant Jane Doe*