UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN HARRIS               :
                              :     CIVIL ACTION
          Plaintiff      :
                              :     NO. *13*-CV-3937
     v.                   :
                              :
SAINT JOSEPH'S UNIVERSITY   :
and                        :
JOSEPH KALIN              :
and                        :
JANE DOE                   :
                              :
         Defendants    :



FILED
SEP 03 2013
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## AMENDED CIVIL ACTION COMPLAINT

### PARTIES

1.     Plaintiff, Brian Harris ("Harris"), is an adult individual residing at 17 Duchess Path, Clifton Park, New York 12065.

2.     Defendant, Saint Joseph's University ("SJU"), is a Pennsylvania University, with its main campus located at 5600 City Avenue, Philadelphia, Pennsylvania 19131.

3.     At all times material hereto, SJU acted by and through its agents, servants, employees, workmen and/or representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of SJU's business, mission and/or affairs.

4.     Defendant, Joseph Kalin ("Kalin"), is an adult individual and who, upon information and belief, is, and was at all times material hereto, employed by SJU as a security officer or investigator, having a place of business located at 5600 City Avenue, Philadelphia, Pennsylvania 19131. As detailed below, Kalin was assigned by SJU to investigate the alleged incident involving *Harris and Defendant, Jane Doe.*

5.     Defendant, Jane Doe ("Doe"), is an adult individual who both at present, and at all times material hereto, is, and was, a matriculated student at SJU.[1]

6.     At all times material hereto, Doe resided at a SJU dormitory complex known as the "Villiger."

## JURISDICTION

7.     Plaintiff invokes this Court's jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §1681, *et seq.* and 28 U.S.C. §1331.

8.     Venue primarily lies in this district pursuant to 28 U.S.C. §1391(a) inasmuch as this is the district in which the instant claims arise.

9.     Jurisdiction is also claimed over the related common law state claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. §1367.

10.     Alternatively, Plaintiff invokes this Court's jurisdiction pursuant to 28 U.S.C. §1332, diversity of citizenship, with the amount in controversy exceeding $75,000.00, exclusive of interest and costs.

## FACTS

11.     At all times material hereto, Harris was a first year (freshman) student at SJU, residing at its main campus at a dormitory complex known as "Sourin," commencing August 25, 2012.

12.     At some time prior to November 16, 2012, Harris and Doe, the latter a member of SJU's girls' soccer team, became acquainted following which a friendship developed.

13.     Harris and Doe would see each other on campus and at social events.

14.     Harris later learned from one of Doe's friends that Doe "liked him."

---

[1] Per stipulation of counsel for the parties hereto, dated (and approved by the Court) on August 1, 2013 Doe's street address is deemed confidential (Stipulation, ¶2). All parties, through counsel, admit that Doe's residence is diverse from Harris' for purposes of federal diversity jurisdiction under 28 U.S.C. §1332 (Stipulation, ¶4).

15.     Harris obtained Doe's cell phone number and during the early evening hours of November 16, 2012, Harris sent Doe a text message, identifying himself.

16.     Thereafter, Harris and Doe began exchanging text messages, beginning with Harris' text message at 5:12 p.m. and ending with Doe's text message at 12:36 a.m. on November 17, 2012. Copies of these text messages (the "text messages") are collectively attached hereto as Exhibit "A."[2]

17.     During the initial exchange of text messages, Harris told Doe he obtained her cell phone number from a mutual friend, J.M.,[3] to which Doe responded, "Ha oh okay that's cool." Harris asked Doe what she was doing that evening to which Doe responded she did not know.

18.     Over an hour later, Harris texted Doe again, suggesting Doe should go to the Lax House, Doe replying she believed she would be. An hour later, it was determined neither Harris nor Doe would be participating in events at the Lax House and approximately 15 minutes later, Doe asked Harris if he was going any where that evening to which Harris said he was not, and proposed that Doe come to his room.

19.     Doe seemingly wanted to come to Harris' room but informed him she had already left the SJU campus but wanted to return. Doe told Harris she was in Manyunk and could not return herself. Later, Doe proposed that Harris come to Doe's dormitory room at Villiger.

20.     At 10:57 p.m. on November 17, 2012, Doe sent a text to Harris, asking if he was alone, to which Harris replied affirmatively. In response, Doe asked Harris if he could come "cuddle" with her.

---

[2] The attached text messages were redacted to remove Doe's actual name in accordance with the Stipulation.

[3] The names of all SJU students are to be identified by initials (Stipulation, ¶6).

21.     In modern parlance, the terms "cuddle" or "cuddling" are synonymous with, *inter alia*, "sex" or "having sex."

22.     Unsolicited, Doe further wrote that she was a "good cuddler," followed by the symbol ": ))," commonly used in text messaging to express a happy face.

23.     Doe asked Harris if he was a "gooood cuddler," adding o's to the word "good" intimating great or very good. Harris replied he was.

24.     Doe then asked Harris if he would come to her dormitory room at Villiger, as she would be there soon; Harris replied he would.

25.     Later, Doe asked Harris to meet her at a party; however, Harris suggested she return to campus as he had been asked to leave his dormitory room by his roommate.

26.     Doe changed her mind, returned to her dormitory room and asked Harris to come there.

27.     Unsolicited and without suggestion or request by Harris, Doe asked Harris if he would sleep in her dormitory room. Harris replied he would.

28.     Doe then arranged for a male resident of Villiger to go to the front entrance of the Villiger building and allow Harris access.

29.     The male resident accompanied Harris to Doe's dormitory floor lobby from which Doe escorted Harris to her dormitory room.

30.     At Doe's invitation, Harris lay down on Doe's bed, with Doe lying next to him. The two began kissing and engaging in foreplay. They both voluntarily, and without force, suggestion or intimidation, removed their respective clothing.

31.     Harris asked Doe whether he should get a condom to which Doe replied affirmatively.

32.     Upon donning a condom, Harris and Doe freely and voluntarily engaged in sexual intercourse; the love making was consensual.

33.     At no time did Doe ask, or demand, that Harris leave her dormitory room; at no time did Doe tell Harris she did not want to engage in sexual intercourse with him.

34.     Following their love making, Doe left her dormitory room to go the bathroom, returning to the dormitory room approximately 3 to 4 minutes later.

35.     Upon her return, Doe got back into bed with Harris, embracing him as they slept into the morning of November 17, 2012.

36.     Later in the morning of November 17, 2012, Doe's roommate returned to the room upon which Harris gathered his belongings, and hugged and kissed Doe before leaving.

37.     Sometime later on November 17, 2012, Harris was informed by A.I.,[4] Resident Area Manager for Villiger, that Harris was being investigated and, possibly, accused of non-consensual sexual relations with Doe, an accusation which was not only wholly untrue but startling and unreasonable to Harris.

38.     Kalin was assigned by SJU to investigate Doe's claim of sexual misconduct against Harris.

39.     On November 19, 2012, Kalin met with Harris to interview him about the alleged incident. Harris, without acts or displays of aggression, and in compliance with SJU protocol governing investigations, voluntarily participated in same, explaining what occurred and providing Kalin with the text messages corroborating Harris' version of the events, which Kalin read but disregarded. Kalin appeared harsh and abusive, adopting and exhibiting personal animus towards Harris, in part, outside the course and scope of Kalin's employment with SJU,

---

[4] Stipulation, ¶6.

5

unnecessarily comparing Harris to "Jerry Sandusky" and feigning concern that Harris would retaliate against Kalin notwithstanding the clear absence of any such characteristic or intent on the part of Harris. Subsequently, Kalin purposely omitted the text messages from SJU's investigation file in hopes of insuring Harris' conviction for sexual misconduct.

40. During the investigation, Harris learned that during Doe's visit to the bathroom, her absence for no more than 3 to 4 minutes, Doe saw another student, O.T.[5]

41. While in the bathroom, Doe allegedly told O.T. she (Doe) had been intimidated into having sex with a male, identified by a name other than Harris. Doe allegedly told O.T. she (Doe) was unwilling or disinterested in reporting the incident; however, O.T. insisted she did, threatening to report the incident on Doe's behalf if Doe did not.

42. Notwithstanding these assertions, Doe did not ask for help, did not ask that Harris be evicted from her room, did not call security and did not leave the Villiger dormitory.

43. Conversely, after her brief absence, Doe returned to her dormitory room and got into bed with Harris with whom she remained, sleeping, for the next several hours. Harris left when Doe's roommate returned at 10:00 a.m.

## SJU INTERNAL POLICIES AND PROCEDURES

44. SJU issues to students a Student Handbook (the "Handbook") which sets forth standards of conduct expected of members of the SJU community, as well as policies and procedures for investigating and adjudicating complaints made by members of the SJU community. The Handbook is not the product of negotiation, but is one of adhesion, unilaterally drafted, imposed upon its student body by SJU, and is given to each student only after the student's acceptance by SJU.

---

[5] Stipulation, ¶6.

6

45.     The Handbook defines SJU community standards. Students are expected to: "1. Be Honest; 2. Have Respect for Self; 3. Have Respect for Others, their well-being and their property; and, 4. Have Respect for the Standards of the University and the laws of the larger community." The Handbook also defines and precludes sexual offenses such as rape, involuntary deviate sexual intercourse, sexual assault, aggravated indecent assault, indecent assault, and indecent exposure.

46.     Allegations of sexual offenses are required to be reported to the Office of Public Safety and Security. The Office of Public Safety and Security is then required to conduct a prompt and thorough investigation and prepare a factual report which is forwarded to the Student Life Administrator. Additionally, the Office of Public Safety and Security is required to advise the alleged victim regarding preservation of relevant evidence and to assist with access to hospitals specializing in rape treatment.

47.     The Handbook requires allegations of sexual misconduct, where both the accuser and the accused are students, be resolved by the Community Standards process.

48.     The Community Standards process is initiated when an incident report, completed by a Public Safety or Residence Life staff member, or a written complaint, prepared by any other member of the SJU community, is provided to the Office of Community Standards.

49.     Allegations of serious offenses, including sexual offenses, are to be resolved by an Administrative Hearing Officer or by the Community Standards Board.

50.     Administrative Hearing Officers are supposedly trained professional SJU staff members, usually in the office of Community Standards or Residence Life.

51.     The Community Standards Board ("CSB") is a seventeen-person board consisting of seven students, five faculty members, and five administrators/staff, all of whom are to be adequately trained by SJU to hear cases involving serious Community Standards violations. A

7

CSB panel is comprised of five representatives and must include one (1) faculty member, one (1) student, and one (1) administrator/staff. The CSB panel members are selected by the Moderator, an alleged professional SJU staff member, who also advises the CSB on matters such as the type of information that may help in determining if Community Standards were violated, prior sanctions, and facilitating the appropriate paperwork and record keeping.

52.     Upon receiving notice of a violation, the Community Standards office informs the accused via University email, outlining the hearing process and, in the case of CSB hearings, setting forth a CSB pre-hearing.

53.     Although the Handbook's guidelines are designed to afford both the accused and accuser equal process in cases of sexual harassment, no such guarantees are given in cases of alleged sexual offenses, which are defined separately in the Handbook.

54.     At any time during the Community Standards process, the Vice-President for Student Life, Associate Provost, or a designee, may place a student on interim suspension provide guidelines for conditional attendance if the student is deemed to present a risk to the health, safety, or welfare of anyone within the SJU community. Interim suspension/conditional attendance decisions are made without notice or an opportunity to be heard on the part of the accused and no appeal of this decision may be taken.

55.     Although the Handbook proclaims the CSB hearing is designed to encourage open discussion among the participants to promote an understanding of the facts, the individuals involved, and the conduct and circumstances surrounding the alleged incident, the accused, accuser, and witnesses provide testimony in separate facilities, purposely depriving the accused the opportunity to question and confront his accuser and witnesses to test their veracity and credibility.

56.     In addition to depriving an accused the ability to examine his accuser, the Handbook lacks any rules governing the type of testimony offered and affirmatively permits hearsay testimony which could not be challenged even if the accused was permitted to question witnesses.

57.     Further, the Handbook lacks any rules requiring the disclosure of evidence to be submitted prior to the CSB hearing.

58.     In contrast, non-institutional information will only be considered by the CSB panel if deemed appropriate by the Vice-President for Student Life, Associate Provost, or a designee.

59.     The accused is not permitted to be accompanied by parents, counsel, or by any person other than a Community Standards advisor during the hearing.

60.     Following the hearing, the CSB panel evaluates the information received during the hearing, the facts of the conduct alleged, and determines whether it is more likely than not that the accused was responsible for the alleged violation; a mere 51% threshold for even the most severe of allegations.

61.     If the CBS panel finds responsibility on the part of the accused, the CSB panel determines the appropriate sanction, taking into consideration motivation, present attitude, past record (positive and negative), damage/harm severity, honesty, maturity, cooperation, willingness to make amends, and compliance with previous sanctions. The Handbook identifies 16 different sanctions, of which suspension is most severe after only expulsion and revocation of degree.

62.     After the CSB panel reaches its decision and issues sanctions, if any, the accused is notified in writing of the result and the result may be disclosed to others, including the SJU community.

9

63. After the accused receives written notification of the CSB panel's decision, he has three (3) days to request an appeal. The appeal request is directed to the Vice President of Student for Student Life or Associate Provost and must demonstrate one or more of the following:

a. A material failure to follow the procedures of the Community Standards process that affected the outcome.

b. There is new information, sufficient to alter a decision that was not reasonably available at the time of the original hearing.

c. The sanction(s) was not consistent for the violations of the Community Standards.

The Handbook further limits disclosure of relevant sanctions to the victim in cases of crimes of violence or sexual harassment.

64. Once an appeal has been requested, the Vice President of Student for Student Life or Associate Provost, in concert with the Provost or designee, are required to make a decision within five (5) days of the appeal period expiration. The Vice President of Student for Student Life, Provost or a designee may: (a) replace the sanction; (b) remand the case for reconsideration; or, (c) direct the case for a new hearing.

65. The Handbook requires Community Standards violations and sanctions to become part of a student's educational record. Student discipline records not relating to expulsion are to be maintained for five (5) years after conclusion of the last semester the student attended SJU. Case notes are not made part of the student's educational record and are destroyed upon conclusion of the appeal period.

66. The Handbook reads, "[i]t has been and remains the policy of [SJU] to prohibit discrimination on the basis of sex/gender . . . ." and describes unacceptable conduct to include

"decisions based on stereotypes or assumptions about the abilities, traits, or performance of individuals of a certain gender . . . ."

## THE HARRIS INVESTIGATION REPORT AND HEARING

67.     As part of SJU's investigation of Doe's claims of sexual misconduct against Harris, an investigation report (the "report") was prepared, including a charge against Harris for forcible rape. The report was first shown to Harris at a prehearing conference held in the office of Keirsten White ("White"). Afforded only a limited time within which to review the report, Harris read Doe's account of the alleged incident, not his own, innocently believing his account was accurately recorded in the report based upon his interview with Kalin. However, the report shown to Harris at the prehearing was not the same report later presented to him at the hearing as the latter report included additional comments from A.I. and O.T. This was the first time Harris saw the full report, thereby violative of SJU's policies and procedures as set forth in the Handbook. He was never asked to execute or review his account, nor did he refuse to execute same. Harris never read what was written about him.

68.     On December 4, 2012, a community standards board hearing was held before five panelists (the "Panel") selected by SJU: Nancy Komada ("Komada"), Chris Heasley ("Heasley"), Keith Brown ("Brown"), Dorian Sanders ("Sanders"), Melanie Solano ("Solano") and White, during which Doe, Harris and  were separately, and privately, questioned. Harris was denied an opportunity to confront his accuser(s) despite the glaring evidence contradicting Doe's baseless accusations.

69.     Critically, although earlier provided but purposely omitted by Kalin, the record before the Panel did not include the text messages (Exhibit "A").

70.     Following the hearing, Harris was found guilty of disrespecting another student and sexual assault, and was summarily suspended from the University by SJU.

11

71.     In accordance with SJU policy and procedure, Harris timely submitted an appeal, challenging the findings of the Panel as against the great weight of the evidence, and the Panel's failure to review the text messages which, on their face, contradicted Doe's baseless accusations of involuntary sexual contact.

72.     During the pendency of the appeal, Harris completed the first semester of his freshman year and thereafter left SJU's campus for the winter holiday break.

73.     As the second semester of the freshman year was about to begin, the appeal board had still not ruled upon the Panel's findings and Harris was hesitant to return to SJU in light of the then pending suspension. To accommodate Harris, SJU had first proposed that he be placed in alternative housing, be denied access to all privileges, and be limited to attending classes until the appeal board ruled.

74.     SJU subsequently removed the restrictions and allowed Harris to return to his dormitory room, attend classes and participate in campus activities. Notwithstanding, Harris sought to avoid social contact, embarrassed by Doe's baseless charges.

75.     On or about January 11, 2013, the appeal board, finding the text messages were critical to the investigation and, thus, necessary evidence, remanded the matter to the Panel for further consideration.

76.     On or about January 18, 2013, a second hearing was held before the Panel during which Harris and Doe were questioned regarding the text messages.

77.     Notwithstanding Harris' and Doe's respective explanations and, more importantly, the plain meaning of the text messages, themselves, the Panel upheld its earlier finding of guilt; Harris was denied a further appeal. The Panel renewed the conviction in the face of the gender bias influence created by SJU, SJU's reluctance to allow the Panel to change its decision despite the exculpatory nature of the text messages evidentiary weight, thereby, in

12

effect, denying Harris the benefit of his bargain incident to the contract created by the Handbook.

78.     As a direct result of the Panel's finding and its refusal to reverse its earlier conviction in light of SJU's gender bias mandate, Harris was suspended from SJU for a year and the conviction was noted on his school (SJU) record. Harris was notified of the suspension at 3:00 p.m. on Saturday, January 19, 2013 (of a holiday weekend) and was instructed to remove all of his belongings from his dormitory room and depart the campus promptly or he would be arrested for trespassing.

79.     At no time were the police or other governmental authorities ever contacted about the incident.

## COUNT I
### Harris v. SJU
### (Breach of Contract)

80.     Harris incorporates by reference the allegations of paragraphs 1 through 79 and makes them a part hereof as though they were more fully set forth at length herein.

81.     At all times material hereto, a contractual relationship purportedly existed between SJU and Harris. The Handbook, the terms of which were unilaterally drafted by SJU, was deemed part of that contract. Pursuant thereto, SJU was required to act in accordance with the Handbook in resolving complaints of misconduct and violations of SJU's policies and regulations, in the investigation of those complaints, in the process of adjudicating complaints of sexual misconduct, and in resolving appeals brought challenging disciplinary decisions.

82.     The contract between Harris and SJU imposed upon SJU a duty of good faith and fair dealing including, *inter alia*, a duty to conduct a diligent, unbiased, and meaningful investigation and adjudication; not sham formalities designed to ratify an arbitrary decision already made.

13

83.     SJU breached its contract with Harris by failing to comply with the Handbook, a

contract between Harris and SJU, including, without limitation, SJU's implicit duties of good

faith and fair dealing in connection therewith, by:

a.      Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

b.      Failing to provide adequate notice of the policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

c.      Conducting a cursory, superficial, and biased investigation into Doe's allegations, during which Kalin compared Harris to Jerry Sandusky, a publicized convicted pedophile;

d.      Causing a superficial, conclusory, and capricious "investigative" report to be created, which is utterly devoid of factual content and clearly biased in favor of the accuser and later changing the content of same after first providing an incomplete report to Harris for limited review;

e.      Failing to provide fair notice of the parameters of the charged offenses;

f.      Rendering a decision for interim suspension/conditional attendance based only upon a baseless charge without a meaningful opportunity to be heard;

g.      Failing to provide a proper community standards board pre-hearing given the gravity of the allege violation and consequences by, *inter alia,* not providing Harris with a full and complete copy of the investigative report;

h.      Failing to adequately and impartially investigate the allegations against Harris by, *inter alia,* ignoring text messages between Harris and Doe which were provided during the investigation;

i.      Failing to locate, preserve and/or present relevant information that would have established Doe's allegations were false;

j.      Failing to provide Harris with requested, relevant information, including the complete investigative report, prior to the community standards board hearing;

k.      Failing to provide Harris with basic due process, including the opportunity to confront and question Doe to test her veracity and credibility;

14

l.    Failing to provide Harris with basic due process, including the opportunity to confront and question O.T. to test the basis of her knowledge and credibility particularly where O.T. was given a different name for Harris;

m.    Failing to provide Harris with basic due process, including the opportunity to confront and question Kalin to test the veracity of statements contained in his investigative report, as well as his credibility and bias;

n.    Failing to consider the text messages, which were previously provided, during the initial community standards board hearing;

o.    Considering the superficial, biased, and conclusory incident report during the community standards board hearing;

p.    Conducting an arbitrary community standards board hearing not governed by any standards and/or rules to ensure evidence and testimony is relevant, probative, and/or trustworthy;

q.    Precluding Harris from having a person outside the SJU community attend the community standards board hearing to advise and/or support him;

r.    Rendering a decision Harris violated SJU rules applying an unreasonably lax standard of proof in light of the gravity of the charged offense and significance of the potential penalties;

s.    Remanding the matter to the same community standards board, which failed to consider the text messages, for *de novo* review;

t.    Failing to timely resolve the allegations against Harris;

u.    Rendering a decision Harris violated SJU rules against the clear weight of the evidence inasmuch as the Panel was duty-bound to reinstate the conviction in light of SJU's gender biased mandate, policies and procedures;

v.    Violating SJU policy against gender/sex based discrimination by establishing a *de facto* presumption Harris committed sexual assault on the basis of male stereotypes; and,

w.    Providing a disciplinary process that was fundamentally unfair.

84.    As a direct and proximate result of SJU's breach of contract, Harris has suffered damages including, without limitation, having his SJU school record improperly include a conviction and/or other finding of guilt of sexual misconduct (assault) based upon the

unfounded charges brought against him, marring Harris' ability to enroll in another college or university of similar or greater stature as SJU, stigmatizing Harris with a finding of guilt for an act he did not commit, and monetary losses.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, for the following relief:

(a)    Mandating that SJU correct Harris' student record and/or file to remove the finding of guilt with respect to the charges brought against Harris by Doe;

(b)    Mandating that SJU provide Harris with a letter or other written memorial confirming his student record and/or file has been expunged with respect to the finding of guilt for the charges brought against him by Doe;

(c)    Awarding Harris compensatory damages in excess of Seventy-Five Thousand ($75,000.00) Dollars, together with interest and costs; and,

(d)    Such other relief which the Court deems just and proper under the circumstances.

## COUNT II
### Harris v. SJU
### (Violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 et seq.)

85.    Harris incorporates by reference the allegations of paragraphs 1 through 84 and makes them a part hereof as though they were more fully set forth at length herein.

86.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX") is enforceable through an implied right of action affording an aggrieved individual pecuniary damages and equitable relief.

87.    SJU receives federal funding in various manners including, without limitation, student loans given to students either directly by the federal government or by SJU with funds furnished by the federal government.

16

88.     Title IX actions are typically brought by the accuser and seldom brought by the accused, exposing higher learning institutions, such as SJU, to significant financial repercussions including, but not limited to, withdrawal of federal funding.

89.     In virtually all cases of campus sexual misconduct, the accused student is male and the accusing student is female.

90.     SJU has historically and systematically rendered verdicts against males in sexual assault cases on the basis of sex in violation of Title IX.

91.     Male students at SJU, such as Harris, are discriminated against solely on the bases of sex and are invariably found guilty, regardless of the evidence, or lack thereof.

92.     Evidence of SJU's impermissible gender bias against Harris in the investigation and adjudication of Doe's accusations included, but were not limited to, the following:

      a.    Disregarding the exculpatory text messages given to Kalin by Harris during the investigation of Doe's claims;

      b.    Condoning Kalin's harsh and abusive attitude towards Harris, comparing Harris to "Jerry Sandusky," and feigning concern that Harris would retaliate against Doe during the investigation of Doe's claims;

      c.    Failing to provide Harris with the opportunity to review SJU's entire investigative report presented to him at the hearing prior thereto;

      d.    Failing to consider the exculpatory text messages during the initial CSB hearing although same had been previously provided; and,

      e.    Remanding the case to the same community standards board for consideration of the text messages despite its previous determination Harris was guilty of the offenses charged; and,

      f.    Denying Harris the right to confront and cross-examine his accusers.

93.     SJU violated Title IX in the manner in which it improperly adjudicated the baseless charge of sexual misconduct by Doe against Harris.

94.     SJU, in the manner in which it approaches the investigation, adjudication, and appeal of allegations of sexual misconduct, and related claims made in connection to sexual misconduct, creates an environment in which a male accused is so fundamentally denied due process as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male students of educational opportunities on the basis of gender.

95.     Harris, as a male student at SJU who has been subject to a school disciplinary action alleging a campus sexual misconduct, has been discriminated against by SJU on the basis of his gender in violation of Title IX.

96.     As a direct and proximate result of SJU's Title IX violation, Harris has been seriously and irreparably damaged.

97.     As a further direct and proximate result of SJU's Title IX violation, Harris has suffered damages including, without limitation, having his SJU school record improperly include a conviction and/or other finding of guilt of sexual misconduct (assault) based upon the unfounded charges brought against him, marring Harris' ability to enroll in another college or university of similar or greater stature as SJU, stigmatizing Harris with a finding of guilt for an act he did not commit, and monetary losses.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, for the following relief:

(a)     Mandating that SJU correct Harris' student record and/or file to remove the finding of guilt with respect to the charges brought against Harris by Doe;

(b)     Mandating that SJU provide Harris with a letter or other written memorial confirming his student record and/or file has been expunged with respect to the finding of guilt for the charges brought against him by Doe;

(c)     Awarding Harris compensatory damages in excess of Seventy-Five Thousand ($75,000.00) Dollars, together with interest and costs; and,

(d)     Such other relief which the Court deems just and proper under the circumstances.

### COUNT III
### Harris v. SJU
### (Negligence)

98.     Harris incorporates by reference the allegations of paragraphs 1 through 97 and makes them a part hereof as though they were more fully set forth at length herein.

99.     In addition to breaching its express and implied contractual obligations to Harris (as set forth above), SJU separately, and independent of its contractual obligations, breached its duty of care owed to Harris.

100.    At all times material hereto, SJU had a duty to hire competent personnel, adequately train its personnel, adequately supervise its personnel, and terminate and/or sanction personnel for substandard performance.

101.    SJU owed a separate duty of care to Harris to ensure that its staff and personnel were properly trained and supervised.

102.    SJU breached these duties of care owed to Harris and, independent of its breach of contract set forth above in Count I, was negligent the following respects:

    a.    Failing to hire well-trained agents and employees, including, without limitation, investigators and community standards board panel members, including, without limitation, the proper selection of student panelist with requisite knowledge and majority;

    b.    Failing to train its employees, agents or representatives in the proper method to thoroughly investigate and adjudicate, without bias, complaints of sexual misconduct;

    c.    Failing to properly train its employees, agents or representatives regarding the requirements of Title IX;

19

<ol type="a" start="4">
<li style="list-style-type:none">d.    Failing to properly train its employees, agents or representatives in the discovery and preservation of relevant evidence;</li>
<li style="list-style-type:none">e.    Failing to properly train its employees, agents or representatives in basic due process as it pertains to the investigation, adjudication, and appeal from adjudication of complaints of sexual misconduct;</li>
<li style="list-style-type:none">f.    Failing to supervise its employees, agents or representatives to ensure complaints of sexual misconduct are adequately investigated and fairly adjudicated; and,</li>
<li style="list-style-type:none">g.    Continuing to employ substandard employees, including investigators and community standards panel members.</li>
</ol>

103.    At all times material hereto, SJU knew, or in the exercise of reasonable care, should have known, that its agents and employees were inadequately trained, lacked the requisite skill, and/or were not suited to conduct investigations and adjudication of claims of sexual misconduct in a campus setting.

104.    As a direct and proximate result of SJU's negligence, Harris has suffered damages including, without limitation, having his SJU school record improperly include a conviction and/or other finding of guilt of sexual misconduct (assault) based upon the unfounded charges brought against him, marring Harris' ability to enroll in another college or university of similar or greater stature as SJU, stigmatizing Harris with a finding of guilt for an act he did not commit, and monetary losses.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, together with pre and post judgment interest, costs, and such other and further relief which the Court deems just and proper under the circumstances.

## COUNT IV
## Harris v. SJU
## (Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A. § 201-1, et seq.)

105.    Harris incorporates by reference the allegations of paragraphs 1 through 104 and makes them a part hereof as though they were more fully set forth at length herein.

106.    At all times material hereto, SJU offered for sale to the public, educational services.

107.    In connection with the sale of its educational services and collection of tuition, fees and costs related thereto, SJU committed various unfair and deceptive acts and practices in violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A. §201-1, et seq. ("UTPCPL"), including, but not limited to:

  a.    Representing, warranting and guaranteeing in writing that SJU trained its employees and agents in the proper and unbiased investigation and adjudication of complaints of sexual misconduct, when in fact it had not;

  b.    Representing that Harris would receive a fair and impartial hearing in connection with any allegation of sexual misconduct, when he would not;

  c.    Representing that Harris would receive adequate notice of and due process in connection with allegations of sexual misconduct, when he would not; and,

  d.    Misrepresenting SJU's compliance with Title IX;

108.    Relying upon these various warranties and misrepresentations, Harris purchased, *inter alia*, educational services from SJU for which he remitted payment in the form of tuition and fees.

109.    Harris relied upon the various warranties and misrepresentations of SJU in entering his agreement with SJU and in continuing to make payments to SJU.

110.    SJU's unfair and deceptive conduct constituted untrue representations of the characteristics and benefits of SJU's educational services; constituted untrue representations that

SJU's educational services was of a particular standard or quality; constituted a failure to comply with the terms of a written guarantee or warranty; and constituted deceptive conduct which created a likelihood of confusion and misunderstanding—all within the meaning of §3 of the UTPCPL and §§2(4)(v), (vii), (xiv) and (xxi) of the UTCPL.

111.    As a result of SJU's deceptive conduct and Harris justifiable reliance upon SJU's misrepresentations, Harris suffered losses including, but not limited to, the loss of tuition and fee payments and costs for room and board.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Saint Joseph's University, for the following relief:

(a)    Find, determine and declare that SJU's business practices violate the UTPCPL;

(b)    Award actual and/or statutory damages including attorney's fees and costs; and,

(c)    Grant such any and other further relief that is just and proper under the circumstances.

### COUNT V
### Harris v. SJU, Doe and Kalin
### (Defamation)

112.    Harris incorporates by reference the allegations of paragraphs 1 through 111 and makes them a part hereof as though they were more fully set forth at length herein.

113.    SJU, Doe, and Kalin each made communications about Harris which were defamatory in nature.

114.    Specifically, each referred to Harris as the perpetrator of a sexual assault on Doe, even though they knew the allegations were false, or with reckless indifference to the truth or falsity of said allegations

22

115.     The defamatory communications tended to harm and did harm the reputation of Harris so as to lower him in the estimation of the community and to deter third persons from associating with him.

116.     The defamatory communications were intended to, and did, convey Harris' guilt of alleged misconduct involving moral turpitude.

117.     SJU, Doe and Kalin intended not only to deprive Harris of his good name, and to bring him into scandal and disrepute amongst his neighbors and peers, but also to limit Harris' future educational and employment prospects.

118.     The defamatory communications tended to, and did, blacken Harris' reputation and exposed him to public hatred, contempt and ridicule.

119.     The allegations against Harris were so inherently improbable that only a reckless and dishonest person would have conveyed them as there were obvious reasons to doubt Doe's and Kalin's veracity and the accuracy of their reports.

120.     The defamatory communications were not statements of mere opinion.

121.     The defamatory communications were published in that they were made to third parties.

122.     The defamatory communications included, without limitation, the following:

   a.     On November 17, 2012, Doe stated to O.T. a male student intimidated her into having sexual relations with him and although, upon information and belief, Doe improperly identified Harris she was referring to Harris;

   b.     Thereafter, Doe reported Harris' alleged sexual misconduct to SJU which, in turn, assigned Kalin to investigate same;

   c.     Either Doe, Kalin or other SJU employees, agents or representatives informed A.I. of Harris' alleged sexual misconduct;

   d.     Doe and/or Kalin communicated Harris' alleged sexually misconduct to the Panel; and,

23

          e.      The defamatory communications continued to be re-published after these Defendants were made aware of the falsity of the allegations against Harris.

123.     The defamatory communications were malicious, reckless, and negligently made.

124.     The defamatory communications were not justifiably published by any privilege.

125.     The defamatory communications referenced Harris by name to ensure those who received the communications knew they were about Harris.

126.     All persons receiving the communications understood the defamatory meaning of the communications.

127.     Harris was specially harmed from the publication of these defamatory communications

128.     Harris suffered actual loss to his reputation and personal humiliation,

129.     The defamatory communications let the audience to conclude that Harris lacked honor and integrity, and have grievously fractured his standing in respectable society.

130.     SJU's, Doe's and Kalin's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendants, Saint Joseph's University, Joseph Kalin and Lindsey Doe, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, punitive damages, together with pre and post judgment interest, costs, and such further and appropriate relief as determined by the Court.

## COUNT VI
### Harris v. SJU, Doe and Kalin
### (False Light)

131.     Harris incorporates by reference the allegations of paragraphs 1 through 130 and makes them a part hereof as though they were more fully set forth at length herein.

132.     SJU, Doe and Kalin each made public statements about Harris which placed him in a false light.

133.     These statements include allegations that Harris perpetrated a sexual assault on Doe and was a danger to either Doe or to the SJU community.

134.     SJU, Doe, and Kalin had knowledge of, or acted in reckless disregard as to, the falsity of these statements and the false light in which Harris would be placed.

135.     The false light in which Harris was placed is highly and unreasonably offensive

136.     Such false light has caused Harris to suffer mental anguish, shame, and humiliation.

137.     SJU's, Doe's and Kalin's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendants, Saint Joseph's University, Joseph Kalin and Lindsey Doe, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, punitive damages, together with pre and post judgment interest, costs, and such further and appropriate relief as determined by the Court.

25

## COUNT VII
### Harris v. SJU, Doe and Kalin
### (Intentional Infliction of Emotional Distress)

138.    Harris incorporates by reference the allegations of paragraphs 1 through 137 and makes them a part hereof as though they were more fully set forth at length herein.

138.    At all times material hereto, Doe, Kalin, and SJU, acting through its agents, servants, and employees, did by extreme, outrageous, intentional, willful, malicious and reckless conduct, humiliate, embarrass, shock and scar Harris.

139.    SJU, Doe and Kalin made public statements which were not true and took actions based upon false information to falsely portray Harris as a cruel sex offender, which was not true and caused him severe distress.

140.    SJU, Doe and Kalin made public statements which were not true and took actions based on false information which caused Harris extreme distress as the result of unjustly being suspended from school and not being able to participate in the campus life to which he had looked forward.

141.    SJU's, Doe's and Kalin's actions further distressed Harris due to the possibility of permanently being barred from campus and never being able to participate in the college experience to which he had looked forward.

142.    SJU's, Doe's and Kalin's actions further distressed Harris due to the possibility of facing criminal charges and being accused of improper conduct he never committed.

143.    As a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful and malicious conduct of SJU, Doe, and Kalin, Harris suffered and will continue to suffer, *inter alia*, severe emotional distress, mental anguish, embarrassment and humiliation, all of which may be permanent in nature.

144. SJU's, Doe's and Kalin's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendants, Saint Joseph's University, Joseph Kalin and Lindsey Doe, jointly and severally, for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, punitive damages, together with pre and post judgment interest, costs, and such further and appropriate relief as determined by the Court.

## Count IX
### Harris v. Doe
### (Intentional Interference with Contractual Relations)

145. Harris incorporates by reference the allegations of paragraphs 1 through 144 and makes them a part hereof as though they were more fully set forth at length herein.

146. Harris has the right to pursue his contractual relationships free from interference on the part of other persons.

147. At all times material hereto, Doe did willfully, maliciously, and improperly interfere with an existing contract between Harris and SJU by repeatedly meeting with SJU agents, servants, and/or employees and leveling false accusations against Harris which resulted in his suspension from SJU.

148. Doe had no privilege, justification or legitimate interest for interfering with the contract between Harris and SJU.

149. Doe, who intentionally and improperly interfered with the performance of this contract, is subject to liability.

150. In intentionally accusing Harris of sexual assault, Doe was giving false information to SJU which Doe knew to be false.

27

151.     As a direct and proximate result of Doe's intentional interference of contract, Harris suffered suspension and expulsion, and financial harm stemming therefrom.

152.     Doe's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Harris, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Brian Harris, demands that judgment be entered in his favor and against Defendant, Lindsey Doe, for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, punitive damages, pre and post judgment interest, costs, and such further relief to which the Court deems just and proper under the circumstances.

Respectfully submitted,

THE GHARTWELL LAW OFFICES, LLP

BY:

KENNETH M. DUBROW, ESQUIRE
I.D. NO. 34665
1735 Market Street, 29th Floor
Philadelphia, PA 19103
(215) 972-7006

Attorney for Plaintiff,
Brian Harris