IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

BRIAN HARRIS,                    : CIVIL ACTION NO. 13-3937
                                 :
            Plaintiff            :
                                 :
                                 :
                                 :
                                 :
                                 :
                                 :
       v                         :
                                 :
                                 :
                                 :
                                 :
                                 :
                                 :
                                 :
SAINT JOSEPH'S                   :
UNIVERSITY, et al                : Philadelphia, Pennsylvania
                                 : November 18, 2013
            Defendant            : 10:06 a.m.

- - -

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE L. FELIPE RESTREPO
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:      KENNETH M. DUBROW, ESQUIRE
                        The Chartwell Law Offices LLP
                        BNY Mellon Center
                        29th Floor
                        1735 Market Street
                        Philadelphia, PA  19103


For the Defendant:      JAMES A. KELLER, ESQUIRE
                        Saul Ewing LLP
                        3800 Centre Square West
                        1500 Market Street
                        Philadelphia, PA  19102

Transcribers Limited

17 Rickland Drive
Sewell, NJ 08080
856-589-6100 · 856-589-9005

2

1    Audio Operators:        Nelson Malave

2    Transcribed By:         Ritajean Wioncek

3                                 -   -   -

4              Proceedings recorded by electronic sound
     recording; transcript produced by computer-aided
5    transcription service.

6                                 -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following was heard in open court at

2     10:05 a.m.)

3               THE COURT:  How are you, sir?

4               MR. DUBROW:  Good.  Thank you.

5               THE COURT:  Mr. Rucket.

6               MR. RUCKET:  Good morning, Your Honor.

7               THE COURT:  How are you?  And Mr. -- is it

8     Keeley?

9               MR. KEELEY:  Good morning, Your Honor.

10              THE COURT:  How are you?

11              MR. KEELEY:  Good.  Thank you.

12              THE COURT:  All right.  This would be Mr.

13    Keller's motion to dismiss, is that correct?

14              MR. KELLER:  That's correct, Your Honor.

15              THE COURT:  Why don't we do this in order of

16    counts?  All right.  So let's just go count -- we'll

17    address Count 1 through Count 8.  We'll start with Count

18    1.  What's your argument on Count 1?  I've read your

19    papers.  What do you think I need -- what else do you

20    think I need to know, so to speak?

21              MR. KELLER:  Well, Your Honor, may I raise a

22    threshold issue --

23              THE COURT:  Sure.

24              MR. KELLER:  -- before we get there?  So,

25    there are multiple attorneys here from FIRE.  They filed

Argument - Keller                                    4

1  a motion for leave to intervene that has not been ruled

2  upon.

3             THE COURT:  Granted.

4             MR. KELLER:  Okay.  Therefore, I have not had

5  a chance to respond to their brief, substantively.

6             THE COURT:  You can do it today.

7             MR. KELLER:  Okay.  Thank you, Your Honor.

8             THE COURT:  All right.  Go ahead.

9             MR. KELLER:  On Count 1, the breach of

10  contract claim, Your Honor, the -- the gist of the

11  plaintiff's argument is this, I don't like your process;

12  I don't like the outcome.  I'm a male, and therefore,

13  lots of things flow from those three facts.

14             THE COURT:  What's your understanding of what

15  the -- what's the contract?  My understanding, according

16  to the Complaint, it's the handbook.

17             MR. KELLER:  The disciplinary proceeding set

18  for in the handbook, that's correct.

19             THE COURT:  So is there a contract here?

20             MR. KELLER:  Yes.  We -- we don't disagree

21  that the --

22             THE COURT:  So you do agree there is a

23  contract?

24             MR. KELLER:  The disciplinary process, the

25  community standards process set forth in the handbook is

1      a contract, yes.

2                  THE COURT:  All right.  So your argument is,

3      there was no breach of that contract --

4                  MR. KELLER:  Correct.

5                  THE COURT:  -- because the contract was

6      complied with, given the process that was exercised.

7                  MR. KELLER:  That's correct.

8                  THE COURT:  That's the essence of your

9      argument?

10                 MR. KELLER:  That's it, Your Honor.  Yes, and

11     the -- the plaintiff's argument is, essentially, your --

12     your contract failed to have these things I think it

13     should have had.

14                 THE COURT:  Because they didn't like the

15     result.

16                 MR. KELLER:  Yes, that's different than you

17     did not comply with the contract.

18                 THE COURT:  All right.

19                 MR. KELLER:  That's the gist of the argument

20     on Count 1.  I can go into more detail --

21                 THE COURT:  No, no.  I get it.

22                 MR. KELLER:  -- but that's the heart of it.

23                 THE COURT:  I just wanted to make sure I

24     understand it.

25                 MR. KELLER:  Okay.  Sure.

1           THE COURT:  So let me hear from Mr. Dubrow on

2     Count 1.

3           MR. DUBROW:  If Your Honor pleases, it seems

4     as if the argument advanced by the defendant is sour

5     grapes.  We didn't like what happened, so therefore --

6           THE COURT:  Right.

7           MR. DUBROW:  -- we contend there's a breach of

8     contract.  It is a rather detailed amended complaint

9     that was filed in this action.  We went to great lengths

10    to show what the supposed contract revisions required

11    and how they failed.

12          Now, we can talk about specifics.  We can talk

13    about the fact that, from the very simplistic one, that

14    a report of the investigation was to have been provided

15    to the accused before the hearing.  A report was

16    provided to him, and then a supplemental report was

17    given to him, at the time of the hearing, which in my

18    view is, clearly, a breach of the contract.

19          There was a promise of an investigation, a

20    thorough investigation.  What did we have?  We had

21    review of hearsay statements from a woman in a bathroom.

22    We had an accusation that my client was intimidating to

23    an investigator who felt that he was going to be "beat

24    up".  Your Honor, if you saw my client, he's about 98

25    pounds dripping wet, and comparisons to Jerry Sandusky,

1    but the most critical thing -- the most critical thing

2    is that -- the single most important piece of evidence

3    in this entire equation is the series and exchange of

4    text messages.

5              THE COURT:  That were considered on remand, as

6    it were, right?

7              MR. DUBROW:  Well, let's talk about that for a

8    second.  Because in my view, that die was cast, because

9    you have to look at this case from its totality.  We

10   have asserted not only did St. Joe breach it's contract

11   by failing to consider the most important exculpatory

12   evidence in this case, at the early stages of the

13   proceeding, at the initial hearing.

14             But if you take that juxtaposed with the

15   entire gender bias that St. Joe employs, by the time

16   that hearing was held and a finding made, without that

17   exculpatory evidence, and then it went up on appeal and

18   was remanded, in my view, the die was cast.  They

19   weren't changing that verdict.  The breach had already

20   occurred and the damage suffered.

21             So the mere fact that they conveniently say,

22   oh, oh, we did consider those text messages.  We did

23   remand it.  We did have a second hearing, but we

24   convicted you anyway, I think they -- there's a little

25   more that needs to be shown than simply connecting the

1    dots.

2              THE COURT:  Let me ask you something.

3              MR. DUBROW:  Yes, Your Honor.

4              THE COURT:  If you take this argument to its

5    logical extreme, let's assume the result had gone the

6    other way, could Ms. Doe have said, hey, the contract's

7    been breached, because I don't like the result?  Could

8    she?

9              MR. DUBROW:  If she felt -- if she felt that

10   certain contractual obligations on the part of St. Joe,

11   as recited in the handbook, and let me give you a

12   footnote on the handbook for a second.

13             THE COURT:  No, hold on.

14             MR. DUBROW:  Okay.  Well, let me --

15             THE COURT:  I'm -- you know, here's the

16   question.

17             MR. DUBROW:  Okay.

18             THE COURT:  Could she have, then, complained,

19   if she didn't like the result?

20             MR. DUBROW:  Absolutely.  If she felt -- if

21   the result was predicated by a breach of the St. Joe

22   contract, including the implied covenant of good faith,

23   which was also pled, which is part and parcel of the

24   contract, but it's not a separate and distinct claim.

25   It's part and parcel of the contract.

1            If she felt that St. Joe did not honor its

2       duties and obligations under that contract, why couldn't

3       she sue?  So this is not, simply, oh, the loser's asking

4       the Court to review what they did.  It is the victim, in

5       my view, the plaintiff, who's been victimized, not only

6       by an inadequate procedure, but a procedure poorly

7       implemented, for a host of reasons, all articulated in

8       the amended complaint.

9            THE COURT:  I get it.  So that, at the end of

10      the day, then, under your matrix, the loser of the

11      hearing could go to Federal Court and say, hey, there's

12      a violation of the contract; I want to do this all over

13      again in Federal Court?

14            MR. DUBROW:  No.  What I'm saying is, if there

15      was a breach of the contract, he or she has the right to

16      the right.  The case law allows it.

17            THE COURT:  Well, if there was, but so if she

18      felt her rights were violated, she could go and -- she

19      could do the exact same thing that Mr. Harris has done?

20            MR. DUBROW:  Well, when you say her rights

21      were violated, are you talking about --

22            THE COURT:  The contract was violated.

23            MR. DUBROW:  Yes.

24            THE COURT:  Okay.

25            MR. DUBROW:  Why not?

1           THE COURT:  I just wanted to make sure I

2     understand that --

3           MR. DUBROW:  Of course.

4           THE COURT:  -- under your matrix, then, the

5     loser, as it were, in front of the community -- CSB,

6     right, Community Standards Board?

7           MR. DUBROW:  Yes.

8           THE COURT:  Could, then, come to Federal Court

9     and say, hey, my -- the contract was violated, I want a

10    hearing?

11          MR. DUBROW:  Absolutely.

12          THE COURT:  Okay.  Okay.

13          MR. DUBROW:  No different than any other

14    breach of contract claim.

15          THE COURT:  Right.

16          MR. DUBROW:  But let me just add, since --

17    since I'm here on that contract issue.

18          THE COURT:  Hm-hmm.

19          MR. DUBROW:  Yes, we plead, in the amended

20    complaint, that the handbook is a contract.  St. Joe

21    insisted it's a contract.  I am troubled, however, by

22    page three of the handbook that says it's not a

23    contract.  And that fact, alone, creates a little bit of

24    a divot here, that alone, should defeat a motion to

25    dismiss, because I don't know what St. Joe means by that

1    reference.  And if St. Joe is stating the position that

2    it's not a contract, I want to know what other things

3    St. Joe is relying upon.

4            THE COURT:  Well, they're telling me it is a

5    contract, that's right?  St. Joe's is not disputing this

6    a contract, Mr. Keller, right?

7            MR. KELLER:  The disciplinary procedures set

8    for the Community Standards Procedures, in forma

9    contract.  There are six or seven Pennsylvania cases

10   confirming that those procedures set for the contract.

11   The entire document, which, as we point out, it's got

12   maps; it's got class schedules, that -- the whole thing

13   is not a contract.  But the disciplinary procedures set

14   forth in the handbook are a contract.

15           THE COURT:  Are a contract.

16           MR. KELLER:  Correct.

17           MR. DUBROW:  It's not as clear, but if that's

18   the position, that's the position.

19           THE COURT:  I told -- well, we're here now, so

20   that's St. Joe's position.

21           MR. DUBROW:  That's St. Joe's position, and my

22   position is, is that's the contract upon I claim my

23   breach.  However, I point out to the Court, it's an

24   involved -- it's included in a document that reads, this

25   is not a contract, just bringing it to the Court's

1    attention.

2              THE COURT:  I get that, that the relevant

3    portion of this handbook is a contract.  And St. Joseph

4    just told us as much.

5              MR. DUBROW:  The relevant portion of this

6    handbook is a contract, as articulated by St. Joe, a

7    contract by adhesion, a contract that's take it or leave

8    it, a contract that St. Joe's drafted, a contract that

9    St. Joe's sought to implement, of course.

10             THE COURT:  It was a contract.  Okay.  All

11   right.  Does Mr. --

12             MR. KELLER:  Your Honor, may I briefly

13   respond?

14             THE COURT:  Sure.  Yes.

15             MR. KELLER:  Just to --

16             THE COURT:  Well, let's go down -- straight

17   down --

18             MR. KELLER:  Yes.

19             THE COURT:  -- the aisle.  Mr. Cohn, do you

20   weight in on this issue or not, the contract issue?

21             MR. COHN:  No, Your Honor, we're only here to

22   argue over our motion, whether or not it be granted.  Do

23   you need us?

24             THE COURT:  Oh, so you're --

25             MR. COHN:  So I think you've granted it.

1            THE COURT:  You're done.  Okay.

2            MR. COHN:  So we're now -- now, we're here to

3       listen, and -- and --

4            THE COURT:  All right.  All right.  I'm sorry,

5       Mr. Keller.  Go ahead.

6            MR. RUCKET:  Your Honor, if I may?

7            THE COURT:  Go ahead.

8            MR. RUCKET:  If I may, Dan Rucket, Your Honor.

9            THE COURT:  Sure.

10           MR. RUCKET:  We address this in our brief, as

11      well, but plaintiff is trying to have it both ways,

12      here, on the contract issue.

13           THE COURT:  Now, Mr. Rucket, you represent

14      Jane Doe.

15           MR. RUCKET:  I represent Jane Doe.

16           THE COURT:  She's not sued in Count 1.

17           MR. RUCKET:  No, but we have our own motion --

18           THE COURT:  She's not sued in Count 1.

19           MR. RUCKET:  -- to dismiss, which part --

20           THE COURT:  But she's not a player in Count 1,

21      right?  Count 1 is a breach of contract --

22           MR. RUCKET:  Count 1 is not against her, but

23      it --

24           THE COURT:  -- against St. Joseph's

25      University.

1          MR. RUCKET:  Yes, Your Honor, but it goes to

2     the claims against her, because if the procedures are

3     found to have been properly followed, then they're --

4     then the finding against her, which we argue is binding

5     anyway, but if the procedures that St. Joe implemented

6     were properly followed, then that finding is conclusive,

7     no matter what, and there could be no claim against her,

8     because you can't relitigate that.  So it --

9          THE COURT:  Okay.

10          MR. RUCKET:  -- does go to the claims against

11     her in our motion to dismiss, so if I could just weigh

12     in on the contract issue, which --

13          THE COURT:  All right.  Sure.

14          MR. RUCKET:  -- we do address in our brief.

15     Plaintiff is trying to have it both ways here.  They

16     allege a breach of contract.  If you look at the amended

17     complaint, specifically, alleges a contract, in four

18     different paragraphs.

19          Particularly, if you look at paragraph 83,

20     they plead, "St. Joe's breached the contract by failing

21     to comply with the handbook, a contract between

22     plaintiff and St. Joe's University."

23          So they pled an actual contract, that the

24     handbook was a contract, but when faced with an argument

25     that St. Joe's actually did comply, now, all of a

1   sudden, it's ambiguous.  It's confusing.  It's a

2   contract of adhesion.  They cannot have it both ways.

3   In order to prove a breach of contract claim, they must

4   have a contract, which they have pled is the handbook.

5                THE COURT:  Okay.  I'm sorry, Mr. Keller.  Do

6   you want to respond to Mr. Dubrow's argument?

7                MR. KELLER:  Thank you, Your Honor, yes, just

8   very briefly.  So a few things are important.  Some of

9   the words that you heard from plaintiff are the exact

10  problem with the plaintiff's complaint.  You heard words

11  like, the guilty verdict, exculpatory evidence.  The

12  plaintiff continues to confuse criminal process or even

13  civil litigation with an internal administrative

14  proceeding.

15               The St. Joe's handbook, which is incorporated

16  in the plaintiff's complaint, page 35 -- and this is

17  Exhibit A to our motion to dismiss -- says, "Community

18  Standards proceedings are not criminal or civil

19  proceedings, but rather, internal administrative

20  determinations of violations of institutional policy."

21               This is a Community Standards process, where

22  the St. Joseph's community decides whether, based on the

23  conduct alleged, the particular plaintiff is someone

24  they want to be a member of their community or not.  If

25  not, for how long they feel like he should be suspended

1    from the community -- he or she.  And Your Honor hit the

2    nail on the head, if in every case -- in every single

3    conduct case, every single conduct case, there's going

4    to be a complaining student and a responding student.

5              They're both going to be of some gender, one

6    way or the other.  And if in every case, the unhappy

7    party gets to come to Federal court and say, I think you

8    breached the contract; I don't like the outcome, and by

9    the way, because I'm of a certain gender, male or

10   female, I think there was Title 9 discrimination, every

11   single internal disciplinary process is going to end up

12   in Federal court.

13             That's not what courts are here to do,

14   respectfully.  There's case law in Pennsylvania, which

15   we cite, that states, "It has been said that courts are

16   reluctant to interfere in the disciplinary proceedings

17   of a private college, because they're internal

18   disciplinary proceedings where the college decides

19   whether someone has violated their community standards

20   or not."

21             Not whether they're guilty, beyond a

22   reasonable doubt, in a criminal proceedings, not whether

23   they're liable in a civil action.  It's, have you

24   violated our community standards or not?  And the

25   plaintiff's specific allegations of breach, we go

1    through each one, pages and pages, and say, they haven't

2    -- what they've pled, and this is what <u>Twombly</u> talks

3    about, "A court is not required to accept conclusory,

4    legal allegations cast in the form of factual

5    allegations, if those conclusions cannot reasonably be

6    drawn from the facts alleged."

7         That's what the plaintiff does.  They say,

8    well, you failed to do this; you failed to do that.  In

9    our motion to dismiss, we say, what's the factual

10   predicate for that?  The plaintiff's reply doesn't

11   answer that all.  They even move to a contract of

12   adhesion argument or a good faith argument.

13        They don't respond to the paragraph by

14   paragraph argument we make, explaining why each of their

15   allegations of breach, either isn't something based in

16   the contract.  It's, I wish the contract said something

17   else or there's no factual predicate for it.  You failed

18   to have proper procedures.  Well, how?  Explain what --

19   what in the contract.

20        And the things -- in fact, the things you

21   heard there, I don't think you considered the text

22   messages or I don't you considered them -- there's no

23   contractual requirement considering text messages one

24   way or the other or, geez, you can't consider it on

25   remand.  These are -- the contractual requirements are

1    set forth in the handbook, as an internal administrative

2    proceeding.  St. Joe's filed the internal administrative

3    proceeding, and the plaintiff doesn't like the outcome.

4              And Your Honor's right, that if in every case

5    where somebody doesn't like the outcome, they have a

6    breach of contract case, they have a Title 9 case, they

7    have a negligence case, we're going to be here all the

8    time, Your Honor, and that's not what courts are meant

9    to do, respectfully.

10             THE COURT:  So at the end of the day, you're

11   telling me whatever due process was prescribed by the

12   handbook was complied with?

13             MR. KELLER:  Yes, as pled.  The plaintiff, in

14   paragraphs 44 to 66, goes through, in detail, all of the

15   procedures that were provided, and then says, but I

16   don't like it.  I don't like the way it happened in my

17   case.

18             THE COURT:  Right.  Briefly.

19             MR. DUBROW:  What's the expression, a few good

20   apples can ruin the bunch?  We're not here about every

21   internal disciplinary proceeding that St. Joe's

22   conducted.  We're here about one.  We're here about one

23   that didn't go right, wasn't done right, wasn't followed

24   right, wasn't -- wasn't accomplished correctly.  That's

25   what this case is all about.

1          We've articulated a basis for that.  For the

2     Court to say, well, wait a minute, for me to allow this

3     case, am I opening up a floodgate?  No.  What the court

4     is saying is, there's 22 line-ups.  They're all good,

5     except for one.  Am I, now, going to open the door for

6     the other 21 line-ups?  No.

7          You're going to look at this case.  St. Joe

8     comes to us and says, wait a second.  We have prescribed

9     these internal disciplinary procedures.  We have

10    prescribed what is supposed to be done.  We have

11    admittedly taken the bare bones, based upon this

12    infamous "dear colleague" letter, which FIRE can

13    address.

14         So they have knowingly taken the barest of

15    bones to allow for internal disciplinary procedure,

16    stripping the accused of any concept of fairness, let

17    alone due process.  And while the courts do say, yes, we

18    show some deference, the internal procedures, the courts

19    also say that, the only caveat to this principle is that

20    the disciplinary procedures established by the

21    institution must be fundamentally fair.

22         Now, am I simply saying that these procedures

23    were not fundamentally fair because of the outcome?  No,

24    I'm saying that these procedures were so unfundamentally

25    fair that this outcome was made the moment of

1    accusation.  So if St. Joe or any other university is

2    going to prescribe and enact disciplinary procedures,

3    those procedures must be in compliance with applicable

4    law, and they must be implemented in accordance with the

5    contract, not simply because, well, we did this, as

6    again, what I said earlier.

7              Based upon the compelling evidence in this

8    case, simply saying we connected the dots just isn't

9    enough.  And this plaintiff has the right to come into

10   this court and challenge the contract claim.

11             Thank you.

12             THE COURT:  Thank you.  With respect to the

13   Title 9 claim, Mr. Keller, Count 2?

14             MR. KELLER:  Yes, Your Honor, well I would

15   circle back to what I just stated, which is, in

16   literally every disciplinary proceeding, there's a

17   complaining party.  There's a responding party.  They're

18   each of some gender, and the fact that there's an

19   outcome that one of them does not like, does not make a

20   Title 9 claim.  It does not, so --

21             THE COURT:  What about the Iqbal type argument

22   you made, with respect to Count 2?  Did they satisfy

23   Iqbal, the pleading requirements?

24             MR. KELLER:  No.  No, they did not.  And in

25   fact, they did exactly what Iqbal prohibits, and I can

1    tell you the paragraph -- I have it tabbed here.  Hold

2    on one second.  So here's the allegation -- it's

3    paragraph 92.  "Evidence of St. Joe's impermissible

4    gender bias includes, but is not limited to, the

5    following."

6              Okay.  So here's where they're going to tell

7    us how his gender impacted what St. Joe's did in an

8    impermissible way.  Disregarding the text messages.  And

9    in what does -- explain to us, please -- explain to us

10   why that's just not a conclusory allegation, the gender

11   influence of that.  In what way?  Did people say, we're

12   disregarding the text messages because you're a male.

13   In every case where there's a man, we disregard text

14   messages?  Well, we would -- the hearing panel -- we

15   would consider these text messages, but because you're a

16   male, we won't.

17             Nothing close to that.  It's a conclusory

18   statement of gender bias, followed by the same conduct

19   they complained about for the breach of contract count.

20   "Condoning Kalin's harsh and abusive attitude towards

21   Harris."  Again, no allegation, no specific allegation,

22   beyond a conclusory statement that that has anything to

23   do with gender.

24             Failing to consider the text messages, again.

25   Remanding the case to the Board.  Denying Harris the

1    right to confront and cross-examine his accusers.  Those

2    specific -- and that's -- those are the specific

3    allegations.  They say, see gender bias.

4              Not one of those allegations, not one, has any

5    specific allegation of how gender impacted those -- even

6    if those could form a Title 9 claim, and we, of course,

7    argue they couldn't -- there's no allegation of how

8    gender impacted anything that St. Joe's did, none, other

9    than a conclusory statement, under Twombly, based on

10   gender bias, things happened I didn't like.  That's it,

11   Your Honor.  There's not specific factual allegations of

12   how the things the plaintiff thinks were incorrect were

13   based on bias.

14             THE COURT:  Mr. Dubrow, do you need more than

15   you pled?

16             MR. DUBROW:  No, Your Honor.

17             THE COURT:  Why not?

18             MR. DUBROW:  Because Youssef tells me that

19   I've pled the correct -- the Youssef decision tells me

20   that what I've pled was sufficient, and even though

21   facts give rise to multiple claims, doesn't mean they're

22   mutually exclusive.

23             THE COURT:  Was Youssef pre or post-Trumble?

24             MR. DUBROW:  I believe Youssef was post-

25   Trumble.

1          THE COURT:  Was it pre or post-<u>Trumble</u>?

2          MR. RUCKET:  I think it was in '90s, Your

3     Honor.

4          MR. DUBROW:  It's pre.  It was in '90, I'm

5     sorry.

6          THE COURT:  Way before <u>Trumble</u>.

7          MR. DUBROW:  Yes.

8          THE COURT:  So how can you -- how can you

9     suggest that --

10         MR. DUBROW:  If it's <u>Trumble</u> --

11         THE COURT:  -- <u>Youssef</u> does -- <u>Trumble</u> and

12    <u>Youssef</u> were different analysis, right?

13         MR. DUBROW:  Yes, but what <u>Trumble</u> is telling

14    us is about the specificity.  We aren't alleging

15    specificity.  You want to talk about what gender bias

16    is?  Let's see, a person is accused of having sexual

17    misconduct with a woman, and he's compared to a "male

18    child pedophile".  Jerry Sandusky.  That sound a little

19    gender biased?  I think so.

20         The fact that the text messages, which is,

21    basically, the "booty call" from the girl, are omitted

22    from the record.  That's not gender bias?  What more do

23    we need to plead?  We've pled sufficient facts that give

24    rise to an inference, and that's all we need to show, a

25    short and plain statement of facts, putting them on

1   notice to the defense, so they may prepare the defense.

2              We have shown that what St. Joe's did in this

3   instance was gender biased.  We don't have to show every

4   aspect.  That's what discovery is all about.  This

5   simply gets us through the door, and we had pled

6   sufficiently, under <u>Twombly</u> or any other case.  We have

7   alleged sufficient facts to show that there was

8   potential or not -- not actual gender bias employed

9   here.

10             THE COURT:  Okay.

11             MR. KELLER:  Your Honor, may I very, very

12  briefly?

13             THE COURT:  Briefly.

14             MR. KELLER:  I promise.  So it's interesting

15  to me that the plaintiff cites to <u>Youssef</u>, because in

16  his reply, plaintiff says, <u>Youssef</u> is not binding upon

17  this Court.  We, of course, think it is, but I just

18  found it interesting that they now rely upon <u>Youssef</u>.

19             THE COURT:  Well, <u>Youssef</u> is, what, a Second

20  Circuit decision, right?

21             MR. KELLER:  It is.  That sets forth --

22             THE COURT:  So is it binding on this Court?

23             MR. KELLER:  It's the best analog to this type

24  of case.

25             THE COURT:  Is it binding on this Court?

```
1              MR. KELLER:  No.
2              THE COURT:  All right.
3              MR. KELLER:  No, there is no Third Circuit
4    case directly on point with a disciplinary proceeding.
5              THE COURT:  I couldn't find any.
6              MR. KELLER:  Nope, there's not.  There's not,
7    Your Honor.  It's been adopted by a number of other
8    circuits, but you're correct, there is not a binding
9    Third Circuit case.  The other, briefly, what Iqbal says
10   is, "Determining whether a complaint states a plausible
11   claim for relief, will be a context-specific task that
12   requires the reviewing court to draw on its judicial
13   experience and common sense."
14             And I just wanted to mention that, because
15   what we're faced with, common sense applies when we're
16   making an analysis at the 12(b)6 stage.  And what the
17   plaintiff has done, and in my view has confirmed they've
18   done, said things I didn't like happened, and I'm a
19   male, and that's enough to show gender bias under Title
20   9.
21             Common sense tells you that can't be right,
22   and -- and that's not the standard.  There needs to be
23   some showing of how the gender impacted the outcome, a
24   pleading -- how the gender impacted the outcome or a
25   pleading as to how female students in this case, in the
```

1    same situation, are treated differently.

2                    THE COURT:  What about the reference to Mr.

3    Sandusky, suggesting that Mr. Harris was akin to Mr.

4    Sandusky.

5                    MR. KELLER:  I would argue, Your Honor, there

6    needs to be some pleading that says -- and you're just

7    like all those male pedophiles, like Sandusky.  It -- it

8    -- one, frankly, it doesn't make sense.

9                    THE COURT:  Well, but I mean, I --

10                    MR. KELLER:  This is not -- this is not a

11   case --

12                    THE COURT:  -- understand Mr. Dubrow's

13   argument to be that, putting Sandusky's name into play,

14   everybody knows who -- at least around here -- knows who

15   Sandusky was and what he did.  That's what I understand

16   Mr. Dubrow to be telling me, and you're telling me that

17   that's enough, that he had to elaborate on who Sandusky

18   was and what he did, and there's a correlation between

19   Mr. Harris' conduct and Mr. Sandusky's conduct?

20                    MR. KELLER:  I don't -- I guess I don't see,

21   Your Honor, how that reference, even accepting it is

22   true for current purposes, which, of course, we must,

23   why that's based on gender, as opposed to, maybe, a

24   really bad interrogation technique or it's fair to call

25   him a pedophile.  That's really mean.  Those things

1    might be true.  But there's no -- it's not based on

2    gender.  If the statement was something like, you're

3    just like all those men, like Sandusky, the way that you

4    treat women, something, which again, doesn't make sense,

5    because Sandusky was abusing males.

6              I mean, honestly, if we want to play it

7    through, and I know we're at the 12(b)6 stage, but I

8    don't see how that offhand statement in the course of an

9    investigation creates a gender bias that, in any way,

10   impacts the outcome.

11             THE COURT:  Okay.  With respect to Count 3,

12   the negligence.  As I understand the claim, it's a

13   failure to train and failure to supervise, that there

14   was no training, no supervision of the -- of the folks

15   that comprised the CSB and of the investigators.

16             MR. KELLER:  Yes, so, two arguments on that

17   point, Your Honor.  One, we say in our motion, we're not

18   -- the plaintiff does not articulate what the duty is,

19   why we owe a duty to plaintiff to train people in a

20   particular way, in a way that he finds more appropriate?

21   And the plaintiff actually doesn't respond to that at

22   all in his reply.

23             He solely talks about just the Action

24   Doctrine.  So, one, I'm not sure what the basis of the

25   duty is, but even if there is a duty, and again, the

1       plaintiff doesn't respond to that piece, I think the

2       gist of the Action Doctrine does apply here, because the

3       things that plaintiff says we did, we've been back and

4       forth on whether the plaintiff thinks there's a contract

5       or not, but now, if there is, the things he says we did

6       wrong, improper training, improper investigation and so

7       on, they're in his breach of contract count so it's one

8       or the other.

9                   THE COURT:  And, Mr. Dubrow?

10                  MR. DUBROW:  Well, given the fact that I had a

11      hand in drafting the opposition papers, I have to

12      respectfully disagree.  We did take this -- we tackled

13      this issue head-on.  What I find interesting is, on the

14      one hand, the defendant, St. Joe, takes the position

15      that we have not established a breach of contract claim,

16      but then says, you haven't established a negligence

17      claim because it's subsumed in the breach of contract

18      claim, which you haven't stated either.

19                  It's difficult to have your cake and eat it,

20      too, in this instance.  Well, let's talk about the

21      negligence issue.  The core argument that was advanced

22      by St. Joe's had to do with the gist of the action, and

23      that's really separated, simplistically.  One, we have

24      duties that we owe to one another, based upon the social

25      compact.  I shouldn't hit you with my car.  I shouldn't,

Rebuttal - Keller                                29

1     you know, have a crack in my sidewalk.  There are no

2     contractual obligations.  St. Joseph's University did

3     undertake a contractual obligation.  The contractual

4     obligation was to establish the Community Standards

5     Board.  The obligation was to establish a panel.  The

6     obligation was to employ specific people to serve on the

7     panel and train them to do these things.  Okay.

8            But their contract doesn't specifically say,

9     we're going to train them.  We're just going to use

10    them.  That's the contract claim.  The duty to train and

11    employ appropriate people to carry out your duties and

12    responsibilities is separate and apart from the

13    contract, and that forms the basis of the negligence

14    claim, and that's why they're doing it.

15            THE COURT:  All right.

16            MR. KELLER:  Well, one -- one point, then,

17    Your Honor.  And that's the issue we've raised is, we

18    would like to understand the source of the duty.  Pages

19    26 to 27 of the plaintiff's brief --

20            THE COURT:  I think the source of the duty, if

21    I understand Mr. Dubrow correctly, and if I don't, I'm

22    sure he'll correct me, is that once you have this

23    contract, you have a duty not to be negligent about the

24    way you go about doing your business.

25            Is that the essence of your claim, Mr. Dubrow?

1      MR. DUBROW:  Yes, in a sense, but what it is,

2  is to say that, if you're going to undertake this

3  contract, you have now imposed upon yourself a duty to

4  carry out appropriately, not so much your contractual

5  obligations, but your training.  And that's separate and

6  apart from contractual obligations.

7          THE COURT:  Training of the folks --

8          MR. DUBROW:  You train the right person to do

9  it.

10         THE COURT:  -- training the folks that will

11  implement the contract, so to speak?

12         MR. DUBROW:  Correct, and understand its terms

13  and also -- well, maybe even more, but it might come out

14  through discovery.

15         MR. KELLER:  So responding to that, Your

16  Honor, again, if it's -- if the claim is based in the

17  contract, then again, we're back to the Gist of Action

18  Doctrine, which I think I heard.  If it's, there's some

19  social duty, which the plaintiff does say in their

20  brief, pages 26 to 27.

21         We asked them for some authority about this

22  social duty concept, creating a duty to a particular

23  plaintiff to train their employees in a certain way.

24  There's no case cited.  It's a statement, you assume the

25  social duty.  We said, well, could you tell us the

1    source for that, so we can evaluate it.   There's no case

2    citation.

3              MR. DUBROW:   Well, actually, Your Honor, we

4    cited the Delhomme that addresses that issue.   We

5    addressed -- we cited Bayview Loan Servicing, LLC versus

6    Law Firm of Richard M. Squire and Associates, that

7    addresses that issue.   It talks about contractual

8    obligations and also, independent torts for negligent

9    training and hiring.

10             THE COURT:   With respect to Count 4, the

11   unfair trade practices and the Consumer Protection Law.

12             Mr. Keller?

13             MR. KELLER:   Your Honor, really, two pieces on

14   this.   One, it's our position that there is one case

15   that the plaintiff cites where a community college was

16   held to be subject to the Unfair Trade Practices Act.

17   In that case, the thing the plaintiff -- so if you

18   accept the UTPCPL can apply to a private educational

19   institution, which I'm not aware of a case that said

20   that applies to a private school as opposed to a public

21   school, but let's say it could.

22             So two things.   What's the thing you're

23   buying?   The thing people were buying in the Beaver

24   County Community College case was, we bought this

25   degree.   We're coming to school so we can get this

1    degree, and you fraudulently induced us to come, based

2    on that promise, because it turns out you can't grant us

3    that degree.  The thing you pay tuition for is to get

4    the degree.

5              The idea, again, going back to the

6    plausibility of Twombly and Iqbal, the idea that what

7    the plaintiff purchased here, the service he purchased,

8    was a particular set of disciplinary policies is not

9    plausible on its face.  It does not comport with common

10   sense.  The thing that Mr. Harris purchased, if he

11   purchased anything that's subject to the UTPCPL, is the

12   right to work towards a degree.

13             That's what he paid his money for.  The idea

14   that I paid -- I came to St. Joe's because I really

15   wanted a specific set of policies to apply, if I was

16   ever in -- in a student conduct proceeding.  It just

17   makes no -- it -- it defies the common sense test.  And

18   beyond that, there has to be reliance.  So the fact is,

19   the policies that Mr. Harris challenges now and says,

20   we're inappropriate, and I -- I relied on, to my

21   detriment.  He didn't know what those were until he

22   showed up.

23             He can't say, I paid my money.  I applied to

24   St. Joe's because I wanted a certain set of policies,

25   when he didn't even know what those policies were until

1    he got here, so I think it should be dismissed on both

2    of those basis.

3              MR. DUBROW:   Number one, what are the services

4    that he bought?  He bought the right to go to college.

5    Now, yes, the end result of that is a degree.  But does

6    St. Joe simply advertise itself as a college to get a

7    degree?  No.  It advertises itself to have students, to

8    have social interaction between the students, to have

9    sporting events, to have sporting -- intermural sports,

10   college sports, all types of things that a college

11   offers to somebody.

12             Also, St. Joe imposed upon its student body

13   its disciplinary procedures.  They were part and parcel

14   of the sale.  If you're going to buy our services to

15   obtain a degree, you're going to buy the conditions

16   preceding we're establishing for them.

17             So all -- it becomes all part and parcel of

18   the same sale.  That's what St. Joe imposed.  So

19   therefore, it does fall within the case cited, as -- as

20   being applicable to the act.  The second issue about the

21   reliance is an interesting one.  The handbook is given

22   to the student when he is accepted.

23             When you receive the letter in the mail saying

24   you're accepted at our college, you did not agree to

25   attend yet.  You did not enroll.  You may get one of 20

1    acceptance letters, and then make a decision.  He

2    receives the acceptance letter.  That's when the

3    handbook is provided.  Then he subsequently enrolls.  He

4    relies upon the handbook prior to his enrollment.  That

5    satisfies the reliance requirement, under the Act.

6              THE COURT:  Anything else?

7              MR. KELLER:  Your Honor, all I would say is

8    that -- and I know the Court, obviously, will look at

9    the actual pleading.  That's not how it's actually pled.

10   That's an argument today.  But I don't think the UTPCPL

11   should apply for the reasons we stated, but also the way

12   it's pled is, I relied upon these representations and

13   warranties about your procedures in coming to St. Joe's.

14   It just -- temporally, it doesn't make sense.

15             THE COURT:  And, Mr. Rucket, I'm sorry, but

16   I'm assuming you're joining in these arguments, unless I

17   hear otherwise, is that correct?

18             MR. RUCKET:  Yes, Your Honor.

19             THE COURT:  All right.  So let's talk about

20   Count 5, the defamation claim, and this is Harris versus

21   St. Joe's, Doe and Kalin.

22             MR. KELLER:  Your Honor, for St. Joe's and for

23   Kalin.  What the plaintiff complains about, as you

24   repeated, allegations, as pled, or allegations that --

25   that I -- Harris engaged in sexual assault, and you

1    repeated those to people.  One, that's true, there were

2    allegations that Harris was engaged in sexual

3    misconduct.  That's true.  There were.  So I --

4              THE COURT:  Well, when you say it was true,

5    that there were allegations, not --

6              MR. KELLER:  That there were allegations --

7              THE COURT:  -- not the voracity of the

8    allegations?

9              MR. KELLER:  Correct, that there were

10   allegations.

11             THE COURT:  Okay.

12             MR. KELLER:  And that people, in conducing an

13   investigation, which Mr. Harris says we have to conduct,

14   quite stridently, repeated those allegations.  I'm not

15   sure how any institution, higher education or otherwise,

16   is supposed to conduct an investigation if you can't

17   tell people what the allegations are.

18             So it's true, in the course of conducting an

19   investigation, what is it you're investigating?  Well,

20   it's alleged that Mr. Harris engaged in sexual

21   misconduct.  It's alleged he engaged in sexual assault.

22   That's true.  Those -- but those statements were true.

23   That did happen.  Those statements were true.

24             Secondly, we think there is a common interest

25   privilege which should apply here.  The communication of

1        these statements were all within St. Joe's in the course

2        of conducting an investigation.  There were statements

3        made to students, for the purposes of an investigation.

4        There were statements made among administrative for

5        purposes of an investigation.

6                And the Common Interest Privilege, we believe,

7        should make those, in this particular situation, should

8        make those communications privileged, because they were

9        serving an important interest.  They were not

10       communicated to the public at large, and they were

11       serving a common interest, namely, to try to figure out

12       what happened.

13               And last but not least, for a defamation

14       count, and there are other points in our brief, but you

15       do have to plead a particularized injury from the

16       alleged defamatory comment, and we don't think the

17       plaintiff has done so, in this case.

18               THE COURT:  Do you want to add anything, on

19       behalf of Ms. Doe?

20               MR. RUCKET:  Yes, Your Honor, on our motion to

21       dismiss on the defamation count, actually, our primary

22       argument in this case goes to all the counts against my

23       client, including defamation.

24               Your Honor, one in five college women will be

25       sexually assaulted through their years in college.  Date

1    rapes constitute about 42 percent of sexual assaults,

2    and they are the most under reported acts of sexual

3    assault on college campuses.  This is a situation where

4    my client was date raped by Mr. Harris.

5              They rely on these, what they called today, a

6    "booty call", which are flirtatious emails hours

7    beforehand, which plaintiff contends -- nowhere in there

8    does it say sex or sexual intercourse -- but plaintiff

9    contends gave him a right for hours thereafter to do

10   whatever he wanted, because he had some emails that had

11   some flirtatious comments in there.

12             That is just not the way the world works

13   today, and the context of this case, my client was date

14   raped.  She reported it, as the handbook requires.  She

15   went to the hearing, as the handbook requires.  She went

16   to a second hearing.  And the finding, twice, was that

17   she was sexually assaulted by the plaintiff.

18             He has now filed this lawsuit in Federal

19   Court.  And we've cited numerous cases, and the

20   plaintiff has cited nothing to contradict them, that

21   says, that you cannot relitigate the underlying finding

22   of the Administrative Board.  I know we went through

23   this earlier, but I'd just like to reiterate that.

24             You cannot have a second bite at the apple as

25   to the decision of whether it occurred.  The Courts are

1    not here to relitigate that.  It's not the province of

2    the jury to go and redecide the underlying case.

3    Otherwise, every single administrative hearing would be

4    rendered worthless.  All anybody would have to do is

5    say, we don't like the decision.  Let's go to Court, and

6    we'll get 12 -- eight or 12 jurors to go and redecide it

7    for us.

8             So in the context of this case, the way that

9    it has been pled against St. Joe's and my client, they

10   can challenge the hearing itself and whether it was done

11   properly.  And I agree.  And I join in St. Joe's

12   argument that it was properly conducted.  They cannot

13   relitigate the underlying finding that the sexual

14   assault occurred.

15            All of the counts against my client,

16   defamation, infliction of emotional distress, they're

17   all relying on that single finding that this event

18   occurred.  If it didn't occur or -- that it did not

19   occur.  If it -- the sexual assault occurred, as the

20   Hearing Board found, there can be no defamation.  There

21   can be no infliction of emotional distress.  There can

22   be no interference with contract.

23            So in this case, they are bound by that

24   conclusion, and they cannot relitigate that.  So we

25   submit, Your Honor, that all of those -- all claims

1     against my client have to fail.  You can't get up there

2     in front of a jury and argue it didn't happen, when it's

3     been found that it did, and that it's binding on him in

4     this lawsuit.

5                  THE COURT:  What about your immunity

6     arguments?

7                  MR. RUCKET:  Quasi-immunity -- immunity

8     because of quasi-judicial privilege, Your Honor, the

9     Schanne case held in Pennsylvania substantive law, that

10    a school administrative hearing can be a quasi-judicial

11    proceeding.  There was a Loudermill hearing.  That was a

12    special type of hearing, but it did not convert the

13    school into a government entity, as they argue from the

14    Schanne case that it should.

15                 It did not convert it into some type of

16    government function.  It's still a school, still holding

17    a school function, and we believe that the Schanne case

18    explicitly holds that a school can be considered quasi-

19    judicial -- have a -- is a quasi-judicial function.

20                 In this case, absolute immunity would apply.

21    I talked in my brief about the public policy in that,

22    and as I started out, you want women to come forward

23    when they've been sexually assaulted.  It is the most

24    under reported crime.  There's a series of lawsuits out

25    there right now, across the country where colleges are

1    being accused of not doing the investigation and not

2    protecting women from sexual assaults.

3            If women are afraid that if they come forward,

4    they're going to be sued in Federal Court.  When the

5    process finds that they have been sexually assaulted or

6    they're afraid to bring it up, that really hinders their

7    ability to come forward.

8            So the public policy, really, mandates a

9    privilege in coming forward to allow the claims to be

10   adjudicated in whatever form.  In this case, it was with

11   the administrative hearing, the CSB, pursuant to the

12   handbook at St. Joe's.

13           THE COURT:  So in short, as I understand your

14   argument, every statement she made to anybody of

15   authority, including her -- the person is identified by

16   initials, O-something.

17           MR. RUCKET:  O.T. -- O.T.

18           THE COURT:  O.T.  All of those statement would

19   be covered by the immunity?

20           MR. RUCKET:  Well in Schanne case, any

21   statement that leads --

22           THE COURT:  No, no.  In this case, that's what

23   your position is, right?

24           MR. RUCKET:  Yes, yes.  And it --

25           THE COURT:  So she has immunity from covering

1      all of those statements.

2                  MR. RUCKET:  Yeah, I mean, you're in the

3      bathroom.  Your friend comes forward, what's wrong, and

4      you tell her, you know, I was intimidated into having

5      sex, and that leads to her saying, we're reporting this,

6      that leads to the administrative hearing, and under

7      Schanne, that is covered by the immunity.

8                  THE COURT:  Okay.  Mr. Keller, do you want to

9      add anything to the immunity argument?

10                 MR. KELLER:  Not at this time, Your Honor.

11                 THE COURT:  Okay.  Mr. Dubrow, on both

12     arguments?

13                 MR. DUBROW:  Your Honor, I find it

14     fascinating, in a motion to dismiss, the defendants are

15     talking about studies.  Again, I don't know what these

16     studies are.  I don't know what these studies are based

17     upon.  I don't know what the facts of the studies are.

18     We're not talking about sexual assaults on campuses as a

19     whole.  We're talking about one accusation of sexual

20     assault by a woman.

21                 Now, what I also find --

22                 THE COURT:  How do you distinguish this case

23     from Schanne?

24                 MR. DUBROW:  Very simply, this, this was not a

25     quasi-judicial proceeding.  This was an internal

1    proceeding by a university that involved no government

2    participation.  Due process wasn't followed.

3    Fundamental Failures wasn't followed.  No stenographer.

4    No record.  Nothing.  Even their own policies say that

5    we destroy all these records.

6              How could you have any type of quasi or

7    judicial immunity attaching to any such proceedings?

8    But let's go one step further, Your Honor.  Talk about

9    what the -- the plaintiff claims happened here.  First

10   of all, as we point out, in our opposition to the Doe

11   motion to dismiss, the Doe motion to dismiss is not a

12   motion to dismiss.  It's an answer.  The first four

13   pages are chock full of her version of the incident.

14             And then, after you read four pages of her

15   version of the incident, adds an oh, by the way.  For

16   purposes of the motion to dismiss, however, you should

17   accept what the plaintiff has to say as true.  Now, you

18   can take spins any which way you want on these text

19   messages.  I refer to it as a "booty call".  He refers

20   to it as a flirtation.  I refer to it as evidence,

21   specific evidence that was excluded from this record.

22             Now, let's go back to the issue about

23   immunity.  There is no immunity.  There is absolutely no

24   immunity.  And the fall-back position, and the -- and

25   the best evidence of this is, look at St. Joe's surreply

1      -- or reply, to our brief.  They abandon the immunity

2      issue.  What they say is, no, Judge, what you need to

3      look at is, truth is the defense.

4              THE COURT:  Well, that's St. Joe's position.

5      I understand that.

6              MR. DUBROW:  Truth is the defense.  That was

7      the Doe position.  Oh, wait a minute, I accused him of

8      sexual assault.  It was true.  I mean, what is

9      defamation?  Defamation is a statement that's untrue

10     about somebody that injures his character.

11             THE COURT:  When do you apply that, in this --

12     in this context of --

13             MR. DUBROW:  There would be no immunity.

14             THE COURT:  -- ever, in a college setting?

15             MR. DUBROW:  If they -- wait a second.  If, in

16     fact, they turned a college setting into a more

17     fundamentally sound process.  If there was due process;

18     if there was an issue of record; if students were

19     permitted to be represented by counsel, even have their

20     parents present; if there was adherence as to

21     confronting one's accuser.

22             You can't have a Kangaroo Court, and then

23     throw the cloak of immunity over it.

24             THE COURT:  But then, so is the woman that is

25     telling people that I've been violated --

1            MR. DUBROW:  Yes.

2            THE COURT:  -- she would have to know all of

3    this in advance, before she could make the decision to

4    report?  In other words, she'd have to know, well,

5    there's immunity here, because there's a process down

6    the line?

7            MR. DUBROW:  What stops -- you know, a woman

8    goes to the police, which conveniently --

9            THE COURT:  Right.

10           MR. DUBROW:  -- she never did.  A woman goes

11   to the police and says, this guy, here, raped me.  He

12   assaulted me.  Well, they don't just have her in a room,

13   bring him in a room.  What does she say; what does he

14   say.  We're convicting you.  No, it doesn't work that

15   way.

16           We have an investigation.  We have probable

17   cause.  We have an arrest.  We have a preliminary

18   hearing.  We have a trial.  We have a process, which is

19   called the judicial process.  That's where immunity

20   applies.

21           But if you're going to have a flimsy

22   procedure, a procedure that affords absolutely no rights

23   to the accused.  And you know, we come back to the issue

24   of that bare bones argument that I made earlier, not

25   confronting one's accuser, no right to counsel, allowing

1        in hearsay testimony.  Where does St. Joe say that this

2        is -- well, what does St. Joe hide behind this, upon

3        this "dear colleague" letter, which FIRE addresses, and

4        which the law is going to demonstrate, does not give St.

5        Joe that right.

6                What Jane -- St. Joe's procedures were legally

7        insufficient.  So now, you're going to have this clearly

8        insufficient process, and say, we're going to cloak it

9        with immunity, because we're concerned that you women

10       out there are not coming forward and alleging when you

11       have been -- or complaining when you have been assaulted

12       or the victim of some sort of sexual crime from another

13       student.

14               So we're going to relax the standards to such,

15       almost to the point where this preponderance of the

16       evidence standards, more seem towards presumption of

17       guilt on the part of the accused, and then, cloak it

18       with immunity.  No, Your Honor, that's not what the case

19       law tells us.

20               THE COURT:  Well, distinguish this case.  What

21       due process was afforded in Schanne that wasn't afforded

22       -- how do you distinguish Schanne from the -- what

23       happened in this case?

24               MR. DUBROW:  There was no due process afforded

25       in this case, Your Honor.

1          THE COURT:  What was afforded in Schanne?

2          MR. DUBROW:  I don't --

3          THE COURT:  Distinguish it from this case.

4          MR. DUBROW:  I don't know.  I don't have it in

5     front of me.

6          THE COURT:  Schanne was the case with Lower

7     Merion student and the teacher.  And the teacher had a

8     sexual relationship with a student.  And then the

9     student graduated, eventually came back home, as I

10    understand it, expressed some concerns about this

11    previous sexual relationship, and it was reported to the

12    -- the student reported it to her neighbor.  Her

13    neighbor was also a teacher at Lower Merion.

14         MR. DUBROW:  Right.

15         THE COURT:  And as a result of that

16    conversation with the teacher, there was administrative

17    proceedings brought against the -- the chemistry

18    professor.

19         MR. DUBROW:  The teacher, yes.

20         THE COURT:  So where was -- where's the due

21    process that distinguishes the two sets of facts?

22         MR. DUBROW:  Because I don't know -- I

23    don't --

24         THE COURT:  That's a very -- well, summary of

25    Schanne.

1            MR. DUBROW:  But I don't know what due process

2       was afforded the teacher under the process.

3            THE COURT:  I'm asking you to distinguish the

4       two.  Am I bound by Schanne.

5            MR. DUBROW:  No, Your Honor, you're only bound

6       by whether or not you find that the process that was

7       afforded qualifies for judicial or quasi-judicial

8       immunity.  And we've cited a series of cases that

9       demonstrated that it does not.

10           THE COURT:  But there's a case from our

11      district that --

12           MR. DUBROW:  If the -- if you say -- if you

13      can compare the two basis of due process, you could say

14      that the due process afforded to this professor or to

15      this -- to the teacher was immeasurate with the due

16      process that was afforded to Mr. Harris, which I submit

17      was not, because it was afforded no process.  Now, why

18      should he be entitled -- why should St. Joe, with a

19      complaint, be entitled to judicial immunity?  Because

20      the process wasn't the same.

21           Plus, the issue about communication.  Do they

22      ignore the allegation in the complaint that -- that

23      says, at paragraph 73, "As the second semester of the

24      freshman year is about to begin, the Appeal Board still

25      has not ruled upon the panel's finding in Harris, who is

1    hesitant to return to St. Joseph's University, in light

2    of the, then, pending suspension."

3            What did St. Joe want to do at that point?  I

4    can submit to that, Your Honor.  I was involved in that.

5    They wanted to put him in select housing.  They didn't

6    want to put him in a dormitory.  They would have

7    stripped him of all privileges.

8            They wanted to just allow him to go to class

9    and come back to whatever cot they were going to confine

10   him to.  Are you going to tell me this wasn't

11   communicated to other people?  And so you go to the

12   fall-back argument employed by St. Joe and, even, Doe.

13   Oh, what about the truth defense?  What truth?  The

14   tainted truth?  This truth that's the product of this

15   ridiculous Kangaroo Court disciplinary proceeding?

16   That's the truth?

17           THE COURT:  Well, what do you make of

18   counsel's argument that a jury, as it were in this case,

19   can't revisit the result of the disciplinary hearing?

20           MR. DUBROW:  We're not revisiting the result

21   of the disciplinary hearing.  We're visiting, for the

22   first time, the disciplinary process, itself, because,

23   you know, if you say to me, well, look, I had this -- I

24   had this hearing, and the hearing produced a result.  So

25   we're now bound by the result.  Wait a second.  Your

1      hearing didn't allow A.  Your hearing, it didn't allow

2      B.  Your hearing didn't allow C.  Your hearing didn't

3      allow D.

4                 And someone says, wait a second, that hearing

5      process was flawed or that hearing process was not

6      implemented, as agreed.  The result is not the issue.

7      It's the process.  What St. Joe's and Doe take the

8      position as, that we are upset with the result.  I'm not

9      here complaining about the result.  I'm complaining

10     about the process.  The result follows the faulty

11     process.  Had this process been implemented correctly --

12     established correctly and implemented to its core, you

13     would not have gotten this result.  You would not have

14     gotten it.  It is incredibly simple.

15                THE COURT:  Wait, wait.  You said this process

16     plus, right?  This --

17                MR. DUBROW:  This process plus, what?

18                THE COURT:  You're saying, if this process had

19     been implemented correctly, but you're also suggesting

20     this process should have included the right to cross

21     witnesses, the right to confront --

22                MR. DUBROW:  Correct.

23                THE COURT:  -- your accuser, the right to

24     certain processes that are more akin to a criminal

25     trial.

1          MR. DUBROW:  No, not so much through a

2     criminal trial, but something more than what they

3     offered, and that's where they come back to this "dear

4     colleague" letter.  It says wait a minute.  There was an

5     edict from the Government.  We employed the bare bones,

6     as I said before.  FIRE comes forward and says, wait a

7     second, that "dear colleague" letter doesn't have that

8     type of legal import.  You, St. Joe, were required to

9     offer more to your accused.

10          So therefore, one of my positions is that, the

11     policy and the -- and the procedures, as established,

12     were flawed.  Then, to the extent that they were not

13     flawed or they were established, they weren't

14     implemented properly, and that there -- there was this

15     infiltration of gender bias.

16          There was this -- you know, it's interesting.

17     Listen to the Doe argument.  Well, there's this greater

18     concern that women don't come forward.  What are we

19     hearing?  We're hearing the underlying to this policy

20     and procedure.

21          We want to favor the woman. We want to favor

22     the accuser.  That sounds like gender bias to me.  We

23     want to have a policy and procedure that does afford the

24     accused any type of process, any type of fundamental

25     fairness.  And then we want to say, oh, by the way, if

1    you want to complain about it, you can't, and we're

2    immune.

3              MR. RUCKET:  Well, if I may --

4              MR. DUBROW:  Defeats the history of this juris

5    prudence.

6              THE COURT:  Sure.

7              MR. RUCKET:  If may, Your Honor?

8              THE COURT:  Sure.

9              MR. RUCKET:  Once again, Mr. Dubrow, as he did

10   in his brief, completely ignores our argument.  All of

11   the cases we cite, the plaintiff is attacking the

12   process, and the Courts still hold, you cannot change

13   the underlying result.  We're not going to relitigate

14   the underlying decision of the panel.  That's not what

15   courts do.

16             He can attack the process all he wants in this

17   trial.  He is bound to the decision that there was a

18   sexual assault, and therefore, all of his claims against

19   my client fail, because if there is a sexual assault,

20   she could not have defamed the plaintiff.  She could not

21   have intentionally inflicted emotional distress, et

22   cetera, et cetera.  So he talk about the process all he

23   wants; that's not our argument.  He doesn't address it

24   in his brief, and it hasn't been addressed here.

25             Your Honor asked a very interesting question

1   at the beginning of this hearing, which is, if this had

2   gone the other way, and my client had been told no, we

3   don't think a sexual assault occurred, could she come to

4   Court?  She could attack the process, but as I point out

5   in footnote eight of my brief, I guarantee you, the

6   plaintiff, Mr. Harris, will be making the exact same

7   argument we're making here today, which is, you had a

8   hearing.  They even made a decision.  You can't

9   relitigate that underlying argument.

10          I don't want to step on your toes, at all, Mr.

11  Keller, but this Kangaroo Court theory, this is a

12  private college.  It's not subject to 14th Amendment due

13  process.  This wasn't a Kangaroo Court.  It's not a

14  criminal hearing.  You're not entitled to criminal

15  procedure and criminal rules and criminal standards.

16  That's what they want to hold St. Joe's to in this

17  hearing.

18          The standard that you get is what is in that

19  handbook.  I know you're going to hear about the OCR

20  letter that was adopted by St. Joe's.  That's what the

21  hearing -- that's what they agreed to.  That's what you

22  get at the hearing.  That's what Mr. Harris got.  That's

23  what Jane Doe got, got a hearing pursuant to the

24  handbook.

25          You can't -- Mr. Harris wants this Court to

1   rule that he should have been entitled to a criminal

2   hearing.  He's not.  He got the hearing he was entitled

3   to twice.  There's nothing that precluded him from

4   introducing the text messages the first time, if he

5   wanted them.  They were introduced the second time.

6        There was no predetermination the second time

7   around, but he got the text messages in.  They were

8   discussed.  They were found not to say what he thinks

9   they, clearly, say, which we obviously dispute.  And the

10  panel found that there was a sexual assault.

11       If this -- when this litigation, you can't go

12  and -- and think of a jury charge, Your Honor.  You

13  can't get up in front of the jury and say, well, we're

14  going to decide whether the process was fair for St.

15  Joe's, but ladies and gentlemen, you're not allowed to

16  reconsider the underlying finding, but then, we're going

17  to reconsider the underlying finding, when we rule on

18  the claims against Jane Doe.

19       That's why Reardon, Baine, all the cases cited

20  in my brief, all say the same thing about, you could

21  relitigate the process, but not the underlying results.

22       Thank you.

23       THE COURT:  What about the false light

24  argument?  Or did you want to add anything to this

25  argument?

1             MR. KELLER:  I -- I did, Your Honor, and if

2      I --

3             THE COURT:  I'm sorry.

4             MR. KELLER:  -- may have -- thank you very

5      much.  So lots of responses to plaintiff's argument. I,

6      obviously, disagree with the Kangaroo Court argument,

7      but -- but if we're -- the idea that we're hiding behind

8      something, if we're hiding, we're hiding in plain sight.

9             The handbook says, it's not a criminal

10     process; it's not a civil process.  It's an internal

11     administrative procedure.  We're not hiding the ball;

12     it's right -- the very contract the plaintiff relies

13     upon, and that he says, he relied upon in coming to St.

14     Joe's, which is the basis for his UTPCPL claim, which

15     for other reasons, we think should be dismissed.  It's

16     right in there.  There's -- we're not behind anything.

17            We tell people when they come.  Here's what

18     this is.  This is an internal administrative process.

19     And the idea that because it's actually what -- what I

20     heard is exactly our point.  Because these things

21     happened to me, and I'm a male, it must all be biased

22     against men, and it must specifically be biased against

23     men in sexual misconduct proceedings.

24            These Community Standards apply to such things

25     as -- and this is in the handbook, pages 28 to 29 --

1    violating the alcohol policy, using fire to endanger

2    someone else, destroying property, failing to comply

3    with the directions of university personnel, using

4    slurs, videotaping someone without their consent.  There

5    are all sorts of things that Community Standards apply

6    to.

7            It's not just, as the plaintiff would lead you

8    to believe, sexual assault or sexual misconduct

9    allegations made by female students against male

10   students.  These are the procedures that apply to

11   everybody for everything.

12           If a male student accused a female student of

13   sexual assault, if a male student accused a female

14   student of making an audio recording.  If any student of

15   any gender is drinking in violation of the school's

16   policy, these same standards apply to everyone, across

17   the Board.  There's no different application one way or

18   the other.  There's no allegation that there is.

19           What you heard is, I wish this policy, again

20   -- yet agin -- I wish it had other things in it.  I wish

21   it required things that we're used to seeing in criminal

22   court.  It's not criminal court. You're not going to

23   have a criminal court proceeding over an internal

24   alcohol policy violation, somebody drinking a beer in

25   the dorm.

1          I mean, these policies apply to everything at

2     St. Joe's, not just accusations of sexual assault and

3     not just accusations of sexual assault by females

4     against males.  It would be the same process, if the

5     roles were reversed.  It would be the same process if it

6     were some other violation.

7          I also want to just briefly address a few

8     other things that the plaintiff -- plaintiff continues

9     to say the text messages weren't considered.  His own,

10     as Your Honor's pointed out, frankly, the amended

11     complaint pleads that they were.  He just didn't like

12     when they were, but they were considered.

13          The plaintiff continues to say that we

14     abandoned the quasi-judicial immunity argument.  We

15     didn't abandon it.  In our reply brief, as we're

16     supposed to do, and required to do by the rules, we

17     limited our reply to new issues that the plaintiff

18     raised.  That doesn't mean we abandoned the quasi-

19     judicial argument.

20          We didn't emphasize it anymore, because I

21     think Schanne is right on point.  I think that case is

22     right on point.  And what that case says is, when we're

23     evaluating statements made in the context of sexual

24     misconduct investigation, we need to determine whether

25     policy concerns, like encouraging open communication

1    without fear of lawsuits outweighs the right of the

2    defamation plaintiff to seek redress.

3              And the Court in that case says, "We think

4    that allegations of sexual misconduct are so important,

5    as a matter of policy, that people should have a

6    privilege in making statements to lead to an

7    investigation, and then the investigation.  We need to

8    determine whether policy concerns, like encouraging open

9    communication without fear of lawsuits, outweighs the

10   right of the defamation plaintiff to seek redress.

11             And the court in that case says, we think that

12   allegations of sexual misconduct are so important as a

13   matter of policy, that people should have a privilege in

14   making statements that will lead to an investigation,

15   and then the investigation goes where it goes.

16             But the idea that people have to fear, to Your

17   Honor's point, boy, if I say anything, I might be sued

18   for defamation.  That's going to be counter to a public

19   policy which encourages people to report sexual assault,

20   the sexual misconduct.

21             I think the case is on all four, so the reason

22   we describe it more in our reply brief is, because it's

23   -- I think there's much more to say.  The last point I

24   did want to -- I did want to mention briefly.  There is

25   a distinction in the defamation, and I'm not trying to

1    step on Mr. Rucket's toes, but on the defamation count,

2    what the folks from St. Joe's are alleged to have said

3    is, it's alleged that.   That's different.

4         I mean, that's what we did in the course of

5    the investigation, we told people, hey, listen it's

6    alleged that Mr. Harris did this.   That -- that's

7    different than he did this or did you know Mr. Harris

8    did that.   And to conduct the investigation, we had to

9    let people know what it was we were investigating.

10        If that's -- if that isn't covered by the

11   Common Interest Privilege and isn't an example of quasi-

12   judicial immunity, I don't know what -- I don't know

13   what any institution.   But certainly, private

14   institutions are supposed to do, so people make

15   allegations of sexual assault.

16        We say, look, we'd love to -- we'd love to

17   investigate this.   We realize you're unhappy and whether

18   it's -- I'll flip it -- it's a male student accusing a

19   female student of sexual assault, and we say, listen,

20   Mr. Harris, Mr. Jones, whoever, you know, we really --

21   we used to investigate these things, but now, we're

22   worried we're going to be sued for defamation if we tell

23   people this allegation's been made.

24        That -- that's not the law.   There are

25   protections built into the law, and I think they apply

1    here, and require dismissal of that claim.

2                  MR. DUBROW:  First of all, Your Honor, I

3    apologize for the Schanne argument.  I was looking at my

4    brief with regard to St. Joe.  Schanne was brought up by

5    Doe.

6                  THE COURT:  Right.

7                  MR. DUBROW:  And he did that on head-on.  And

8    I invite the Court to look to page 21 of a response

9    brief to the Doe argument, where we write that Doe's

10   reliance upon Schanne versus Addis is misplaced for two

11   critical reasons.  In Schanne, unlike Harris, the

12   plaintiff conceded the defamatory statement related to

13   the quasi-judicial proceedings, so she made the

14   agreement, okay, which we don't do here.

15                  Second, Schanne did not address the issue

16   presented in the instant action, "whether a purely

17   private internal disciplinary proceeding constituted

18   judicial -- quasi-judicial proceeding."

19                  And Schanne also involved what is called

20   Loudermill theory.

21                  THE COURT:  Right.

22                  MR. DUBROW:  And a Loudermill theory is

23   governmental.  So therefore, it has characteristics that

24   are quite different than the Harris situation.

25                  THE COURT:  Okay.

 1              MR. DUBROW:  Let's talk about it's common

 2      interest policy and the privilege and things of that

 3      sort.  Again, we go back to the flimsiness of this

 4      internal proceeding, the flimsiness of the evidence.

 5      You know, the issue about the text messages, if you look

 6      at this entire case, you look at all the statements that

 7      people made, and we don't even know what they are.  We

 8      haven't been able to -- you know, we're not even being

 9      able to open the door further than ajar.

10              THE COURT:  Right.

11              MR. DUBROW:  We know that what was present for

12      these text messages.  We hear the words common sense

13      employed.  I read those text messages with common sense.

14      I had other people read these text messages with common

15      sense.  The conclusion was universal.

16              Those text messages don't make it to the first

17      hearing.  Oh, Mr. Harris could have introduced it.  Mr.

18      Harris was a novice here.  Mr. Harris wasn't allowed to

19      have any assistance.  He wasn't allowed a parent, a

20      representative.  Nobody was allowed to participate with

21      him.  He's shown a report.

22              He's told that that's the complete report.  He

23      goes to the hearing.  There's supplemental information.

24      He doesn't have time to review it.  He assumes that what

25      he put in there was accurately reported.  The next thing

1    you know, he's being found guilty.  Now, they talk

2    about, well, St. Joe's says they're alleging it.

3    They're alleging it.  No, no.  He was found guilty by

4    this panel before the end of the semester.

5         The appeal was not hear and ruled upon until

6    the following semester.  Yet, when he's about to return

7    or thinking about the returning, he has all these types

8    of Draconian restrictions.  Why is that?  Because it's

9    alleged that he committed a sexual assault?  No, I don't

10   think so.

11        I think discovery will bear out that he was

12   already convicted of the sexual assault, and that's how

13   come the appeal was ridiculous.  It wasn't going to

14   change anything.  That die was cast.  The contract was

15   breached.  The damage was suffered.  So therefore, you

16   do have a defamatory --

17        THE COURT:  Well, wouldn't there have to be a

18   decision before there can be an appeal?

19        MR. DUBROW:  There was a decision.  The

20   decision was made in November.

21        THE COURT:  Right.  In the first semester --

22        MR. DUBROW:  He thought --

23        THE COURT:  -- against Mr. Harris.

24        MR. DUBROW:  Excuse me?

25        THE COURT:  The decision was made against Mr.

1    Harris in --

2                  MR. DUBROW:  Against Mr. Harris, correct.

3                  THE COURT:  -- the first semester.

4                  MR. DUBROW:  Against Mr. Harris, yes, correct.

5                  THE COURT:  So --

6                  MR. DUBROW:  No, no, no.  A decision was made

7    against him --

8                  THE COURT:  Right.

9                  MR. DUBROW:  -- during the first semester of

10   his freshman year.

11                 THE COURT:  Right.

12                 MR. DUBROW:  His fall semester.  Okay.  He

13   then files a timely appeal.

14                 THE COURT:  Right.

15                 MR. DUBROW:  The decision's still in play.

16                 THE COURT:  Right.

17                 MR. DUBROW:  The appeal is supposed to be

18   heard and resolved quickly.  It drifted into the

19   Christmas break.

20                 THE COURT:  Into January?

21                 MR. DUBROW:  Okay.  He, now, goes home,

22   because the school's over.  He wants to come back.  St.

23   Joe's starts to impose all these ridiculous restrictions

24   on him, because he's already been "convicted" --

25                 THE COURT:  Right.

1          THE COURT:  -- notwithstanding the pendency of

2    the appeal.  Are the communications still that it's

3    alleged that he committed a sexual assault or are the

4    communications, no, Mr. Harris did, in fact, commit a

5    sexual assault?  And if they were, did, in fact, commit

6    a sexual assault, are they immunized communications?  We

7    submit not.

8          And this is just a microcosm of the possible

9    scope of the defamation.  We don't know it yet.  That's

10   what discovery's all about.  We have established

11   sufficient evidence.  We have made sufficient

12   allegations in the law to satisfy the rules in Federal

13   court pleadings.  We have done it.

14          THE COURT:  Okay.

15          MR. DUBROW:  They can't simply say that, oh,

16   immunized.  No, I think that all of those issues need to

17   be fleshed out to determine whether there isn't

18   immunity.  I submit there's not.  But I don't think that

19   this Court or any Court, at this stage of the

20   proceedings, could determine, as a matter of law, that

21   immunity bars this claim.

22          And I don't think that this Court or any other

23   Court could determine that truth, as a matter of law,

24   bars this claim.  So I submit that the defamation claim

25   against St. Joe's, Kalin and Doe all apply.

1          THE COURT:  All right.  False light claim?

2          MR. DUBROW:  Your Honor, the false light, in

3    the defamation claims, although two separate causes of

4    action are basically the same arguments, and I believe

5    the defense would say the same, as well, is that

6    correct?

7          MR. KELLER:  Well -- well, the one -- the one

8    key difference is publicity is important for false

9    light.

10         THE COURT:  False light.

11         MR. KELLER:  Yeah, you see it in cases of the

12   newspaper article or the TV story or people -- I mean,

13   the -- the only reason this matter has received any

14   publicity is because the plaintiff filed a lawsuit.

15   That's the truth.  The -- the publication of the

16   allegations against Mr. Harris were made internally for

17   people at the university, so they could follow through

18   with the Community Standards process.  That's it.

19         MR. DUBROW:  No.  Number one, the publications

20   were not made solely because of this lawsuit.  For one,

21   they were published within St. Joseph's University, and

22   I don't know what the extent of the publication.  But,

23   also, he's been stigmatized with a record, saying that

24   he was found guilty of sexual assault.

25         He, now, has to go to apply to other colleges.

1    Every one of those college applications says, were you

2    thrown out of another lawsuit -- or school?  Were you

3    suspended from another school?  It forces him to publish

4    something as this.

5              MR. KELLER:  Your Honor, I guess if Mr. Harris

6    is the one that's -- really, the same argument I made to

7    begin with.  If he's out in the public, telling people

8    -- two different things.  If he's saying this is what

9    was alleged, so it gets back to our threshold argument,

10   and -- and I'm not quite sure where plaintiff went with

11   that last argument.

12             I feel like -- I just wanted to say briefly, I

13   feel like there is an intentional effort to conflate the

14   breach of contract and the process, and I don't like the

15   way this happened and Title 9, in an effort to get past

16   12(b)6.  I'm being honest.  I think the question was

17   about defamation.

18             The statements that the plaintiff alleges were

19   improper were -- and false light were, we told people

20   that he was alleged of sexual assault.  It's true.  He

21   was alleged of sexual assault.

22             The only publicity at that point was when we

23   conducted our internal investigation.  We didn't go out

24   on the street corner.  He didn't put it in the school

25   newspaper, and we didn't go on the news.  We would never

1    do that.

2            And if Mr. Harris is telling people, either

3    through a Federal law suit or voluntarily in the public,

4    hey listen, this is what happened, that's not -- that

5    certainly can't be attributed to St. Joseph's.

6            THE COURT:  Mr. Dubrow is saying that, but

7    for, St. Joseph's, he wouldn't have to do it, that's

8    your argument, is the right?

9            MR. DUBROW:  Part and parcel of it, yes.

10           THE COURT:  All right.  So what about the

11   intentional infliction of emotional distress?

12           MR. KELLER:  Your Honor, there are a number of

13   cases cited in our brief in internal disciplinary

14   proceedings, the <u>Reardon</u> case, the <u>Dempsey versus</u>

15   <u>Bucknell</u> case, and there are a number of others, where

16   courts say, even if you disagree with our process, and

17   even if you think it could have been conducted in a

18   different way, that doesn't give rise to a claim of

19   intentional infliction of emotional distress.  There

20   needs to be -- and some of the cases talk about ultra-

21   extreme conduct.

22           So for instance, falsifying a document that

23   says you killed people and sending that around to the

24   prospective employers, that can give rise to intentional

25   inflection of emotional distress.

1              But there's another case -- I'll try to find

2      it very quickly, if I can, Your Honor.  Let's see.  This

3      is the Hoffman versus Daugert (Ph), which we cite in our

4      brief.  In that case, the defendant, in addition to

5      engaging in other alleged tortious conduct, that he sent

6      harassing notes, threatening violence against the

7      plaintiff, explicit violence against the plaintiff.

8              And the Court said, well, that's really bad,

9      but that's not ultra-extreme conduct or outrageous

10     conduct, other than saying -- and again, this goes back

11     to Twombly and Iqbal -- other than saying, the things

12     that St. Joe's or the things that Kalin did are extreme

13     and outrageous.  There's no specific, factual

14     allegations to support that.

15             Even if you think it's wrong, which we

16     disagree with or think it's negligent, it's not so

17     extreme or outrageous as to give rise to an IED claim.

18             MR. DUBROW:  Now, far be it from me to say

19     that a reasonable prudent person, which is the standard,

20     wouldn't find what St. Joe and Kalin did, extremely

21     outrageous, is, in my view, extremely outrageous.  If

22     you take the plaintiff's theory and follow it to its

23     logical conclusion, he was victimized and scapegoated by

24     a failed policy that was improperly implemented.

25             Here is a person who goes through life with a

1    besmirched record that he committed a sexual assault,

2    based upon the accusations made by Jane Doe,

3    notwithstanding her own text messages, based upon

4    Kalin's comparison of Harris to Jerry Sandusky, based

5    upon a hearing that was done, stripped of all

6    fundamental fairness, omitting the text messages, curing

7    it later maybe, probably not.

8              And we're going to say, oh, wait a second,

9    what you did wasn't extremely outrageous.  Isn't that

10   something that needs to be fleshed out by the facts?  We

11   have stated a strong foundation to support every cause

12   of action asserted against the defendants.

13             And if you accept those allegations as true,

14   can this or any Court say, right now, that that wasn't

15   extremely outrageous behavior, and the Court cannot say,

16   as a matter of law that it was not, the IED claim that

17   stands.

18             MR. RUCKET:  What we just heard, Your Honor,

19   was, we want somebody else to evaluate these text

20   messages and make a decision on what they mean.  I'm not

21   going to go into what cuddle means here.  I've got a

22   completely different view of that, and I think that's

23   supported by my investigation. Let's have somebody else

24   evaluate it.  And that's already been done, and that's

25   already been decided, and that is what the are bound

1    with here.

2              So again, as we stated in Count 1, and in my

3    motion to dismiss's primary agreement, all of the

4    claims, including intentional infliction of emotional

5    distress fails.

6              THE COURT:  Let me ask about Court 4.  I just

7    looked at my notes, and it's something we did talk

8    about.  What about standing with respect to Count 4.

9    Count 4 is the Consumer Protection Claim.  Does he

10   purchase or lease goods or services?

11             MR. DUBROW:  Of course, he bought his -- he

12   pays tuition.

13             THE COURT:  He pays tuition?

14             MR. DUBROW:  Correct.

15             THE COURT:  Does it matter if it's him or his

16   parents with respect to standing on Count 4

17             MR. DUBROW:  Not for purposes of the motion to

18   dismiss?

19             THE COURT:  Why not?

20             MR. DUBROW:  He -- because he alleged he

21   purchased it.

22             THE COURT:  Okay.  All right.  Fair enough.

23             MR. DUBROW:  The arrangement between him and

24   his parents --

25             THE COURT:  I'm just asking --

1          MR. DUBROW:  -- may be sufficient to satisfy

2     that, but the allegation in the complaint is he

3     purchased the services.

4          THE COURT:  Okay.  I know somebody made an

5     issue of that, so --

6          MR. DUBROW:  The defense did.

7          THE COURT:  I want to raise it while you were

8     all here.

9          MR. DUBROW:  But again, the defendants keep

10    asking this Court to go outside the record.  The only

11    thing before the Court is the amended complaint.

12         THE COURT:  Well, I understand that.  And the

13    attachments to the amended complaint, which is the

14    handbook.  No.  The only attachment -- that's

15    interesting argument -- the only attachments in the

16    amended complaint were text messages, the complaint

17    referred to portions of the handbook.  The defendant,

18    St. Joe, attached the handbook.

19         Now, I'm not going to argue the handbook's not

20    before the Court.  We've certainly incorporated enough

21    of it to make it part of it part of the record.

22         THE COURT:  I want to make sure we're all on

23    the same page there.

24         MR. DUBROW:  Precisely.  But the "dear

25    colleague" letter's not part of the record.  And the

1    studies and all the other stuff that they want to bring

2    into it is not part of the record.

3              THE COURT:  The handbook is.

4              MR. DUBROW:  They made a party reference.

5              THE COURT:  And you're not disputing that?

6              MR. DUBROW:  I make -- the only thing that's

7    at issue on the complaint are those portions of the

8    handbook that we address.

9              THE COURT:  Dealing with the disciplinary

10   protocols.

11             MR. DUBROW:  Correct.

12             THE COURT:  Right, yes.

13             MR. DUBROW:  And also -- well, also the issue

14   about saying that's not a contract.  But that's --

15   that's an interesting that we could develop later on.

16             THE COURT:  Well, no, for the purposes of our

17   evaluation here --

18             MR. DUBROW:  The handbook.

19             THE COURT:  -- the handbook.

20             MR. DUBROW:  The disciplinary procedures.

21             THE COURT:  Disciplinary procedures, right.

22   Okay.

23             MR. DUBROW:  Yes.

24             MR. KELLER:  Your Honor, just very briefly, I

25   want to address two things.  So to one, on the Unfair

1    Trade Practices --

2              THE COURT:  The standing?

3              MR. KELLER:  Yes, that that I think it is

4    alleged in the complaint that he paid, and I would, as I

5    know we all know, if that's not true, we have a Rule 11

6    issue. So I'm not saying it's not, but the idea of well,

7    who -- who care, well it matters to his --

8              THE COURT:  Even if he paid a little bit, he's

9    in, right?

10             MR. KELLER:  Yeah.  Well, I'd have to -- I'd

11   have to -- I don't think there's been any case out there

12   that says that, but if -- if he bought -- there are lots

13   of reasons why I think that claim doesn't apply, which

14   I've already articulated.

15             THE COURT:  There are a lot of different ways

16   to finance college in this day and age, and even if

17   Harris paid a portion of it or took a loan to pay a

18   portion of it, that would give him standing, wouldn't

19   it?

20             MR. KELLER:  In -- in -- yeah, I think that's

21   right, Your Honor.  If -- if he paid it in the

22   expectation that he'd have certain disciplinary

23   proceedings, as we challenge

24             THE COURT:  Right.

25             MR. KELLER:  But the other thing I want to

1    say, just briefly is, again, and actually every time

2    that the plaintiff argues, they talk about guilty, and

3    they talk about the right to counsel, and they talk

4    about matters of criminal process.  That's not what this

5    matter is.  That's not what this case is about.  The

6    plaintiff again, says, I don't feel like things went

7    they way we thought they should have done.

8              I don't feel like this process is -- we feel

9    like there should be other things in your process that

10   aren't there.  That's not what the law requires.  That's

11   the thrust of the argument.

12             THE COURT:  Give me five minutes.  I'll be

13   right back.  We're in recess.

14             MR. KELLER:  Thank you, Your Honor.

15             (Recess, 11:18 a.m.)

16             THE COURT:  All right.  So let's turn to FIRE,

17   as it were.

18             MR. DUBROW:  Your Honor, could I just add one

19   little thing?

20             THE COURT:  Sure.

21             MR. DUBROW:  Okay.  Perhaps, a good analogy

22   would be to --

23             THE COURT:  I'm having trouble hearing you,

24   Mr. -- wait a minute.  Wait a minute.

25             MR. DUBROW:  Maybe -- maybe a better analogy

Colloquy                                            74

1    with regard to the process versus result analysis that

2    I've employed here would have been to a habeas corpus

3    proceeding, because there, you're also addressing a

4    process versus a result.

5            The defendants in this case keep coming to me

6    and saying, come to the Court, you're unhappy with the

7    result.  You're unhappy with the result.  Any person who

8    is unhappy with the result, is going to come in and

9    challenge it.  I haven't seen too many in the court

10   docket involving St. Joe's University.  What I suspect

11   is that they've had a number of internal disciplinary

12   proceedings.  I don't know what happened during those

13   internal disciplinary proceedings.  I don't know what

14   the results are.  The reason I don't is, that their own

15   policies and procedures tell us that they destroy all

16   those documents.

17           But what I do know is that -- put the result

18   aside in the Harris case -- what I do know is that the

19   policies and procedures employed were flawed, and the

20   implementation of those policies and procedures were

21   flawed.  That's what we bring to the attention to the

22   Court.

23           We could try this entire case, prevail on this

24   motion against us for a motion to dismiss, engage in

25   discovery, defeat a motion for summary judgment and take

Colloquy                                    75

1    this case to a jury.

2              THE COURT:  But what would that look like?

3    What would that trial, to the jury, look like?  I'm just

4    curious.  In your own view, what would it look like?

5              MR. DUBROW:  In terms of -- I mean, what would

6    it look like, in terms of exhibits mean?  I mean --

7              THE COURT:  No, no.  You're going to have your

8    client testify, give his version of what happened.

9              MR. DUBROW:  Yeah.

10             THE COURT:  He'll talk about --

11             MR. DUBROW:  It would be a lot more than that.

12   And I'm not going to -- I'm not going to show my hand.

13   I will explain at sidebar, but I'm going to --

14             THE COURT:  No, no.

15             MR. DUBROW:  I have evidence to show -- I have

16   evidence to show that this was clearly an unequivocally

17   consensual act, that this woman's tearful remorse --

18             THE COURT:  No, no.  I guess what I'm asking

19   is, so we -- se we would -- the underlining claims would

20   be tried, and then, whether St. Joe's provided due

21   process would be tried?

22             MR. DUBROW:  What would be at issue here would

23   be the issues raised on my complaint.  The issue would

24   be whether or not St. Joe adhered to its contractual

25   duties and obligations.  What are the contract terms?

Colloquy                                          76

1              THE COURT:  Okay.

2              MR. DUBROW:  Let's flesh that out through

3    discovery.  Now, we have the contract terms.  Are those

4    contract terms -- and we were about to hear from FIRE --

5    are those contract terms in accordance with applicable

6    law?

7              So now, what I have is, is St. Joe's setting

8    forth its handbook, its disciplinary procedures that may

9    or may not be in conformance with applicable law, and

10   let's assume they're not.  If they're not, they breached

11   a contract of initiative.  They imposed an unlawful

12   contract upon a student, who had no say in the matter.

13             MR. RUCKET:  While we're being given another

14   opportunity, Your Honor, I would also like to point out

15   that, I think Mr. Dubrow, in his argument earlier,

16   basically admitted or contradicted all of his basic

17   claims in this lawsuit.

18             He made a statement that the fact in this

19   case, as he has pled them are that the sexual -- that my

20   client and his client had sex.  She went to the

21   bathroom, then that she came back in a cuddle, that she

22   cuddled with him until 10:00 a.m. in the morning.  That

23   was the statement he put on the record, that their facts

24   are that she cuddled with him, after having sex, until

25   10:00 a.m. in the morning.

Colloquy                                          77

1           And isn't that the whole point here, that

2    they're trying to make is that cuddling and the text

3    messages were actually a "booty call", an invitation to

4    sex, and can mean nothing other than sex, but on the

5    record, he's admitted that's not accurate.  That's not

6    true.

7           This process worked the way it should have.

8    Text messages were not an invitation to sex.  And what

9    happened afterwards, adjudicated, it was decided, and

10   you can't get back in front of a jury later and have

11   them redecide that.

12          THE COURT:  Mr. Rucket, let me ask you a

13   question, going back to the immunity issue, in the

14   Schanne case, it's clearly a public entity.  It was the

15   Lower Merion School District at issue.  Here, we have a

16   private institution, St. Joseph's University is a

17   private institution.

18          Does the -- in Pennsylvania, in this quasi-

19   judicial immunity attach to statements made in the

20   context of a private institution?

21          MR. RUCKET:  Well, I have found no cases

22   dealing directly with a private school, but I would

23   argue, Your Honor, that Schanne does apply for public

24   policy purposes --

25          THE COURT:  Okay.

Colloquy                                              78

1           MR. RUCKET:  -- that you're still talking

2     about a government -- I'm sorry, you're talking about a

3     school administrative hearing.  A <u>Loudermill</u> hearing is

4     a type of hearing, but it still doesn't turn the school

5     into a governmental entity.

6           THE COURT:  Right.  Sir, how are you?

7           MR. COHN:   Good.  Thank you for having us

8     here today.

9           THE COURT:  Sure.  So give me your perspective

10    on this case?

11          MR. COHN:  Well, Your Honor, we were here for

12    only the limited purpose of insuring that the

13    defendant's argument regarding that they had to do it

14    this way, because that's what the "dear colleague"

15    letter required?

16          THE COURT:  Right.

17          MR. COHN:  We wanted to refute that argument.

18    That's FIRE's sole interest in the case.  We don't have,

19    you know, a position on whether or not Mr. Harris' due

20    process rates were ultimately, you know, violated.  So

21    that, the Court will have to look at what due process

22    procedures were provided him and whether or not that

23    ultimately met the obligations, and you'll have to

24    compare what was missing versus what you ultimately

25    think is what they should have done to make the process

Colloquy                                    79

1    meaningful and fair.

2              We weren't here to weigh in on that question,

3    but looking at the totality of each of those things and

4    checking them off.  Was it here?  Was it there?  It

5    matters.

6              THE COURT:  Okay.  Anything else, gentlemen?

7              MR. KELLER:  No, Your Honor.

8              MR. DUBROW:  What if it went the other way?

9    What would Jane Doe have done?

10             THE COURT:  That was my question.

11             MR. DUBROW:  Precisely.  There was also an

12   argument advanced by Jane Doe.  This isn't about what

13   Jane Doe would have/would not have done.  We have four

14   pages of a useless statement by Jane Doe about what she

15   believed happened.  That's not what's before this Court.

16   What is before this Court is what happened to Harris;

17   what these policies were and how they were implemented.

18             And we submit that our complaint is sufficient

19   to get past this stage of the proceedings, get into

20   discovery, and if we're back in front of this Court on

21   dispositive motions from either side of the caption, we

22   could address it there with greater facts.

23             THE COURT:  All right.  Anything else,

24   gentlemen?

25             MR. RUCKET:  Your Honor, this is about my

1    client being date raped and having two hearings at her

2    school about it.  It's not just about Mr. Harris.  It's

3    about my client, as well.

4              MR. KELLER:  Your Honor, we'll address the

5    "dear colleague" in our responsive brief.

6              THE COURT:  How much -- when do -- and I know

7    I caught you, maybe, off time today, but how much time

8    do you need to --

9              MR. KELLER:  Today was a little more

10   aggressive than I was anticipating, Your Honor, but we

11   can get it done today, if you like.

12             THE COURT:  No, no, no.  You don't have to

13   file it today.  Tell -- whatever you need.  All right.

14             MR. KELLER:  A week?  One week?

15             THE COURT:  A week.

16             MR. KELLER:  One week, but --

17             THE COURT:  And after that's filed, briefing

18   is closed in this, right?

19             MR. KELLER:  That's it, Your Honor.

20             THE COURT:  Okay.

21             MR. KELLER:  And -- and the point -- we will

22   get a brief in, but the point is, there are lots of

23   reasons why we think our policies and procedures are

24   okay, and we say, oh, and by the way, this "dear

25   colleague", but the idea that the "dear colleague"

Colloquy                                              81

1      letter is why we did what we did, I mean, that's -- it's

2      -- it's really -- it's almost irrelevant.  You know,

3      it's very relevant to FIRE.  I understand that.  That's

4      why they're here.  But for our -- our disciplinary

5      process, we've explained in detail, in our motion to

6      dismiss, all the reasons why we think our policies and

7      procedures are acceptable, appropriate, consistent with

8      the case law, not the sorts of things that Federal

9      courts are supposed to be relitigating, and that's

10     really the focus of the case.

11             THE COURT:  All right.  And you'll get back to

12     me on the 25th with respect to your filings, and then

13     the --

14             MR. KELLER:  Yes.

15             MR. DUBROW:  Well -- well, Your Honor --

16             THE COURT:  -- hold on --

17             MR. DUBROW:  I'm sorry.

18             THE COURT:  -- and then the briefing is

19     closed.  Yes?

20             MR. DUBROW:  My only suggestion is this,

21     perhaps to ease the burden upon St. Joseph's to submit

22     this brief.  If St. Joe's taken the position that, you

23     know, we really don't need to talk about that "dear

24     colleague" argument, if the Court, at this time, would

25     say, I am not going to consider the "dear colleague"

1    component to the St. Joe's argument, then it need not

2    consider the FIRE position, at this time, either.

3               THE COURT:  Well, let St. Joseph's decide how

4    they want to defend themselves.

5               MR. DUBROW:  Very well.  All right.  So we are

6    adjourned.  Thank you, everybody.

7               MR. KELLER:  Thank you, Your Honor.

8               MR. RUCKET:  Thank you, Your Honor.

9               (Proceedings concluded 11:42 a.m.)

10                              *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

    I, Ritajean Wioncek, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

1-22-14
Date

Ritajean Wioncek